ACCEPTED
01-15-00867-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/24/2015 10:18:56 AM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00867-CV

## FIRST COURT OF APPEALS

## HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/24/2015 10:18:56 AM
CHRISTOPHER A. PRINE
Clerk

**PENN VIRGINIA OIL & GAS GP, L.L.C. & PENN VIRGINIA OIL AND GAS L.P., Appellants.**

**V.**

**ALFREDO DE LA GARZA, INDIVIDUALLY AND AS NEXT OF FRIEND FOR XXXXXX XX XX XXXXX AND XXXXXXXX XX XX XXXXX, MINORS**

**&**

**JOHN PAUL ADAME, INDIVIDUALLY AND AS NEXT OF FRIEND OF XXXXXXXXX XXXXXX XXXXX, XXXX XXXX XXXXX, XXX, AND XXXX XXXXXXXX XXXXX, MINORS, Appellees.**

**On Appeal from the 215TH Judicial District Court, Harris County, Texas Cause No. 2014-42519**

APPELLANTS' RESPONSE TO APPELLEE'S MOTION TO DISMISS

To the Honorable Justices of the First Court of Appeals:

Appellants, Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas,

L.P. (collectively "Penn Virginia") file this Response to Appellee Alfredo De La

Garza's Motion to Dismiss. In support thereof, Penn Virginia would respectfully show this Honorable Court as follows:

1. In his Motion at paragraphs 5 and 6, Appellee argues that Penn Virginia's appeal should be dismissed because Penn Virginia filed its Notice of Appeal outside of the 20 day deadline to do so under Texas Rule of Appellate Procedure 28.1, and that Penn Virginia failed to "reasonably explain the need for an extension" in its Motion for Extension of Time to File Notice of Appeal. (*See* Penn Virginia's Motion for Extension of Time to File, attached as Exhibit A, and Penn Virginia's Reply to Appellees' Objection, attached as Exhibit B.)

2. Rather than reiterate all of the arguments made and facts asserted in Penn Virginia's underlying Motion for Extension of Time to File and Penn Virginia's Reply to Appellees' Objection to same, Penn Virginia would simply direct this Court to those Motions and the affidavits submitted in support of same, all of which are attached to this Response as Exhibits A and B, and which are on file with this Court. Penn Virginia would show further that this Court has not denied Penn Virginia's Motion for Extension, therefore, there has been no judicial determination that the Court lacks jurisdiction as a result of the date of filing. That is to say, if this Court grants Penn Virginia's Motion for Extension to File, then Penn Virginia's Notice of Appeal filed on October 13, 2015 will be considered timely filed and there will be no question as to jurisdiction.

**CONCLUSION & PRAYER**

In light of the foregoing, Appellants, Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas, L.P. pray that this Court deny Appellee's Motion to Dismiss. Penn Virginia further prays for such other and further relief, both special and general, at law and in equity, to which it may be justly entitled.

Respectfully submitted,

GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH

*/s/ Thomas J. Smith*
Thomas J. Smith
  State Bar No. 00788934
  tsmith@gallowayjohnson.com
Kelly C. Hartmann
  State Bar No. 24055631
  khartmann@gallowayjohnson.com
Alexis B. Hester
  State Bar No. 24072807
  ahester@gallowayjohnson.com
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777 – facsimile

**ATTORNEYS FOR APPELLANTS, PENN VIRGINIA OIL & GAS GP, LLC AND PENN VIRGINIA OIL & GAS, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with Rule 9.5 of the Texas Rules of Appellate Procedure, I have served the foregoing document upon the following attorneys by electronic service, personal mail, by commercial delivery service or by fax on November 24th, 2015:

| | |
|---|---|
| John David Hart | J. Javier Gutierrez |
| **LAW OFFICES OF JOHN DAVID HART** | Ana Laura Gutierrez |
| Wells Fargo Tower | **THE GUTIERREZ LAW FIRM, INC.** |
| 201 Main Street, Suite 1720 | 700 East Third Street |
| Fort Worth, Texas 76102 | Alice, Texas 78332 |
| Phone 817-870-2102 | Phone 361-664-7377 |
| Fax 817-332-5858 | Fax 361-664-7245 |
| *Counsel for Appellee, Alfredo De La Garza and his minor children* | *Counsel for Appellee, John Paul Adame and his minor children* |

*/s/ Kelly C. Hartmann*
Kelly C. Hartmann

ACCEPTED
01-15-00867-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/14/2015 4:27:54 PM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00867-CV

## FIRST COURT OF APPEALS

## HOUSTON, TEXAS

**PENN VIRGINIA OIL & GAS GP, L.L.C. & PENN VIRGINIA OIL AND GAS L.P., Appellants.**

**V.**

**ALFREDO DE LA GARZA, INDIVIDUALLY AND AS NEXT OF FRIEND FOR XXXXXX XX XX XXXXX AND XXXXXXXX XX XX XXXXX, MINORS
&
JOHN PAUL ADAME, INDIVIDUALLY AND AS NEXT OF FRIEND OF XXXXXXXXX XXXXXX XXXXX, XXXX XXXX XXXXX, XXX, AND XXXX XXXXXXXX XXXXX, MINORS,**

**Appellees.**

**On Appeal from the 215TH Judicial District Court,
Harris County, Texas
Cause No. 2014-42519**

MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL

To the Honorable Justices of the First Court of Appeals:

Appellants, Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas,

L.P. (collectively "Penn Virginia") file this Motion for Extension of Time to File

**EXHIBIT "A"**

Notice of Appeal pursuant to Rules 26.3 and 10.5(b)(2). In support thereof, Penn Virginia would respectfully show this Honorable Court as follows:

## I. FACTUAL SUMMARY

1.     This appeal arises out of a September 11, 2015 Order denying Appellant's Motion to Compel Arbitration and to Abate, which was filed in the 215th Judicial District Court of Harris County, Texas.[1] The underlying litigation, which is currently set for trial on May 31, 2016, involves an April 29, 2014 oilfield incident near Shiner, Texas, in which two employees of Nabors Completion & Productions Services Co. ("NCPS") were injured when an improperly constructed high pressure flow line parted and caused the sudden release of pressurized gas. The two employees (now, Appellees) were standing near the flow line when the line separated. NCPS was a well site contractor that had been hired by Penn Virginia, the operator, to perform workover operations. Both Appellees were members of the NCPS day crew.

2.     Nabors Industries, Inc. ("Nabors") and its subsidiaries, one of which is NCPS, have a valid arbitration program (known as the Nabors Dispute Resolution Program or "DRP") which requires that disputes involving injuries to employees that are incurred during the course and scope of employment be

---

[1] *See* Exhibit "A," Order Denying Motion to Compel Arbitration.

submitted to final and binding arbitration. Appellees acknowledged and accepted the terms of the DRP as a condition of their employment with NCPS.

3.      The DRP applies to all direct and indirect subsidiaries of Nabors, all current and former employees of the aforementioned subsidiaries, and any "Electing Entity" that has agreed to be bound by the terms of the agreement. Penn Virginia is an "Electing Entity" and agreed on more than one occasion to be bound by the terms of the DRP, first in a 2008 drilling contract and later in a 2010 drilling contract. In Penn Virginia's Motion to Compel Arbitration and Abate, Penn Virginia argued that Appellee's individual claims fall within the scope of the DRP, as both were employees of NCPS at the time of the incident and both allege that their injuries occurred while in the course and scope of their employment.[2] Because Penn Virginia is an Electing Entity to the Nabors DRP, Appellees' claims against Penn Virginia fall within the scope of the arbitration provisions set forth in the DRP.

4.      On June 18, 2015, Penn Virginia filed its Motion to Compel Arbitration and Abate. The matter was set for hearing on July 31, 2015 but was reset for September 11, 2015 after counsel for Appellee's made requests for various depositions and additional discovery relating to the arbitration agreement.

_____

[2] *See* "Exhibit B," Motion to Compel Arbitration.

Following the hearing and on September 11, 2015, the trial court issued an Order denying Penn Virginia's Motion to Compel Arbitration.

5. On October 1, 2015, Penn Virginia filed a Motion for Reconsideration of the Court's Order, and with it attached an Affidavit from Mr. Ernest Nelson, Vice President of Contracts for Nabors, to address a latent ambiguity raised by the Court during the hearing. The trial court heard the Motion for Reconsideration on October 12, 2015, and denied the Reconsideration on that same day.

## II. ARGUMENTS & AUTHORITIES

6. Penn Virginia now moves this Court of Appeals for an extension of time to file its Notice of Appeal in light of the Motion for Reconsideration that was presented to the Court and denied on October 12, 2015.[3]

7. Texas Rule of Appellate Procedure 26.3 states that "the appellate court may extend the time to file the notice of appeal if, within 15 days after the deadline for filing the notice of appeal, the party: "(a) files in the trial court the notice of appeal; and (b) files in the appellate court a motion complying with Rule 10.5(b)."[4] Rule 10.5(b)(2) provides the pleading requirements for a motion to extend time to file a Notice of Appeal. Under Rule 10.5(b)(2), appellant must

---

[3] *See* "Exhibit C," Motion for Reconsideration and "Exhibit D," Order Denying Motion for Reconsideration.

[4] *See* Exhibit "E," a File Stamped Copy of Penn Virginia's Notice of Appeal, which was filed with the trial court on October 13, 2015.

provide the deadline for filing "the item in question;" (in this case, the Notice of Appeal); "the facts relied on to reasonably explain the need for an extension;" identification of the trial court, "the date of the trial court's judgment or appealable order, and the case number and style of the case in trial court."

8.     In this instance, Penn Virginia's deadline to file the Notice of Appeal would have been twenty days from September 11, 2015, pursuant to Texas Rule of Appellate Procedure 28.1. Twenty days from September 11, 2015 was October 1, 2015. If this Motion is granted, the extended deadline will fall on October 16, 2015. There have been no other requests for extension of time to file this Notice of Appeal. The trial court's judgment or appealable order was entered on September 11, 2015, and the case number and style of the case in the trial court is as follows: Cause No. 2014-42519, *Alfredo De La Garza, Individually and as Next Friend for xxxxxx xx xx xxxxx and xxxxxxxx xx xx xxxxx, minors v. Penn Virginia Oil & Gas, L.P., Penn Virginia Oil & Gas GP, L.L.C., Mike Ferguson, Trifecta Oilfield Services, L.L.C., Cudd Pressure Control, Inc., Roywell Services, Inc., and Oaks Personnel Services, Inc. d/b/a The Oaks Group*.[5]

9.     The facts relied on to explain the need for an extension include the following:

---

[5] It is relevant to note that Appellees non-suited all defendants but for Penn Virginia and the Penn Virginia Company Man, Mike Ferguson.

- At the September 11, 2015 hearing, the Court noted that it would deny the Motion to Compel Arbitration and to Abate because the contracts entered into between Penn Virginia and Nabors in which Penn Virginia became an Electing Entity to the Nabors DRP contemplated application to "past and present" employees. The trial court reasoned that because neither of the Appellees were past or present employees of NCPS at the time the contracts were entered into, Penn Virginia's status as an Electing Entity did not apply to the dispute between Appellees and Penn Virginia, and therefore the DRP did not apply.

- On October 1, 2015, Penn Virginia filed a Motion for Reconsideration in which it presented the Affidavit of Ernest Nelson who, as set forth above, is the Vice President of Contracts for Nabors. Mr. Nelson entered into one of the contracts with Penn Virginia on behalf of Nabors and has personal knowledge as to the intent of Nabors when it prepared the agreements.

- In the Motion for Reconsideration, Penn Virginia argues that the language providing that "Penn Virginia is an Electing Entity as to all disputes with 'present and former employees and applicants of Nabors,'" must be read to mean that Penn Virginia is an Electing Entity "as to all

disputes involving present and former employees *at the time the dispute arises*," and not at the time the contract was entered into. In other words, "Penn Virginia's status as an Electing Entity is not limited to present and former employees as of 2008 or 2010" (the time the underlying contracts were entered into) but instead "applies as to all persons who are present Nabors employees or former Nabors employees at the time of the dispute."

- In this case, the dispute arose between Penn Virginia and Appellees on April 29, 2014, at which time both injured parties were NCPS employees. Because Penn Virginia became an Electing Entity to the Nabors Dispute Resolution Program in 2008 and again in 2010, the DRP applies as to the dispute between Penn Virginia and Appellees.

- Counsel for Penn Virginia mistakenly believed that the deadline to file its Notice of Appeal from the Order denying the Motion to Compel Arbitration was thirty days from September 11, 2015. Counsel determined after the actual deadline had passed that the appealable Order was an accelerated appeal and that Penn Virginia in fact had twenty days from the date of the September 11, 2015 Order. Penn Virginia now files

its Notice of Appeal and this Motion to Extend the Deadline to file its Notice of Appeal by fifteen days from October 1, 2015.

10. The failure to file a Notice of Appeal on October 1, 2015 was not deliberate or done in attempt to circumvent the Texas Rules. Counsel for Penn Virginia had a good faith belief that the deadline to file its Notice of Appeal of the Order denying the Motion to Compel Arbitration fell thirty days from the date of the September 11, 2015 Order, pursuant to Rule 26.1. Thus, counsel believed that the deadline to file was October 12, 2015 (as October 11, 2015 fell on a Sunday). In light of counsel's erroneous understanding of the deadline, it was Penn Virginia's belief that it could file the Motion for Reconsideration, proceed to oral argument on the morning of October 12, 2015, and immediately and timely file the Notice of Appeal from the original September 11, 2015 judgment if the Court then denied the Motion for Reconsideration.

11. In actuality, an appeal from an Order denying a Motion to Compel Arbitration is, pursuant to Rule 28.1(a), an accelerated appeal, which permits only twenty days to file the Notice of Appeal. Following counsel's research as to available remedies, Penn Virginia has made all available and good faith efforts to seek an extension under Rule 10.5(b)(2) to file its Notice of Appeal.

12. Before counsel became aware of the actual and correct deadline, counsel believed it was in Penn Virginia's best interest to allow the trial court to consider the Affidavit of Ernest Nelson and evaluate the Motion for Reconsideration before the Notice of Appeal was filed. Counsel further believed (in error) that the "thirty day deadline" would permit the trial court to review the Motion for Reconsideration and evaluate the Affidavit presented prior to divesting the trial court of its jurisdiction. Given the trial court's expression of concern at the September 11, 2015 hearing as to the "ambiguity" set forth above, Penn Virginia believed that the Motion for Reconsideration might resolve the issues the trial court took with the Motion to Compel Arbitration and that, if not, the Notice of Appeal could be timely filed immediately following the October 12 hearing.

13. Penn Virginia should be permitted to pursue its appeal and would request that this Court of Appeals exercise its discretionary authority to allow Penn Virginia to file its Notice of Appeal within fifteen days after the October 1, 2015 deadline. As this Court is no doubt aware, there is a strong presumption in Texas favoring arbitration. *See Circuit City Stores, Inc. v. Adams*, 121 S. Ct. 1302 (2001); *Cantella & Co. v. Goodwin,* 924 S.W.2d 943 (Tex. 1996)*; Jack B. Anglin v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992). If a valid arbitration agreement exists, and the claims are within the agreement's scope, a trial court has no discretion and must

compel arbitration. *Cantella,* 924 S.W.2d at 944; *Shearson Lehman Bros., Inc. v. Kilgore,* 871 S.W.2d 925, 928 (Tex. App.—Corpus Christi, 1994, orig. proceeding).

14.     Penn Virginia did not deliberately, strategically, or intentionally delay in filing its Notice of Appeal in an effort to subvert the Texas Rules of Appellate Procedure or engage in any gamesmanship with the trial court. Instead, counsel for Penn Virginia mistakenly believed the deadline to file its Notice of Appeal fell on October 12, 2015 rather than October 1, 2015. Penn Virginia believed that, with the thirty-day deadline, it would have the opportunity to address the trial court's specific concerns as to a particular and nuanced ambiguity in the contracts between Penn Virginia and Nabors. Penn Virginia should not be penalized for the errors made by its counsel and would request the opportunity to litigate the issues set forth in its Motion to Compel Arbitration, particularly the application of the arbitration provisions set forth in the Nabors DRP.

## **PRAYER**

Accordingly, Appellants, Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas, L.P. pray that this Court grant this Motion to Extend the Deadline to File a Notice of Appeal and permit Penn Virginia to present to this Court its arguments and authorities in support of arbitration. Penn Virginia further prays for

such other and further relief, both special and general, at law and in equity, to which it may be justly entitled.

Respectfully submitted,

/s/ Thomas J. Smith
Thomas J. Smith
  State Bar No. 00788934
  tsmith@gallowayjohnson.com
Kelly C. Hartmann
  State Bar No. 24055631
  khartmann@gallowayjohnson.com
Alexis B. Hester
  State Bar No. 24072807
  ahester@gallowayjohnson.com
GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777 – facsimile

**ATTORNEYS FOR APPELLANTS, PENN VIRGINIA OIL & GAS GP, LLC AND PENN VIRGINIA OIL & GAS, L.P.**

## <u>CERTIFICATE OF CONFERENCE</u>

As required by Tex. R. App. P. 10.1(a)(5), I certify that I have conferred with counsel for Appellees, both of whom indicated that they are opposed to this Motion.

/s/ Kelly C. Hartmann
Kelly C. Hartmann

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with Rule 9.5 of the Texas Rules of Appellate Procedure, I have served the foregoing document upon the following attorneys by electronic service, personal mail, by commercial delivery service or by fax on October 14, 2015:

John David Hart
**LAW OFFICES OF JOHN DAVID HART**
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
Phone        817-870-2102
Fax   817-332-5858
*Counsel for Appellee, Alfredo De La Garza and his minor children*

J. Javier Gutierrez
Ana Laura Gutierrez
**THE GUTIERREZ LAW FIRM, INC.**
700 East Third Street
Alice, Texas  78332
Phone 361-664-7377
Fax   361-664-7245
*Counsel for Appellee, John Paul Adame and his minor children, and Intervenor, Ernesto Gonzalez, Jr.*

*/s/ Kelly C. Hartmann*
Kelly C. Hartmann

NO. _____

_____ COURT OF APPEALS

HOUSTON, TEXAS

PENN VIRGINIA OIL & GAS GP, L.L.C. & PENN VIRGINIA OIL AND
GAS L.P., Appellants.

V.

ALFREDO DE LA GARZA, INDIVIDUALLY AND AS NEXT OF FRIEND
FOR [      ] [   ] [   ] AND [        ] [   ] [      ] MINORS
&
JOHN PAUL ADAME, INDIVIDUALLY AND AS NEXT OF FRIEND OF
[        ] [   ] [      ] [   ] [   ] [      ] AND [      ]
[      ] MINORS,
Appellees.

On Appeal from the 215TH Judicial District Court,
Harris County, Texas
Cause No. 2014-42519

VERIFICATION OF THOMAS J. SMITH

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

BEFORE ME, the undersigned authority on this day personally appeared Thomas J.

Smith, who after being duly sworn upon his oath stated as follows:

1.      "My name is Thomas J. Smith. I am over twenty-one (21) years of age. I am of

sound mind and in all ways competent to make this affidavit and verification.

2.    I am one of the attorneys of record for Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC.  I have personal knowledge of the facts stated in this affidavit and those facts are true and correct.

3.    I have reviewed the foregoing Motion for Extension of Time to File Notice of Appeal.  In my personal knowledge, the Motion truly and correctly recites the factual allegations set forth in the pleading."

_____
Thomas J. Smith

SUBSCRIBED AND SWORN TO before me a notary public, which witness my hand and seal of this office this 13th day of October, 2015.

_____
Notary Public in and for the State of Texas

ROBYN S. MORGAN
Notary Public, State of Texas
My Commission Expires
July 30, 2018

P-1
CPROV
PABAY

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR ☐ and ☐, minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC., and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § | 215th JUDICIAL DISTRICT |

**ORDER DENYING DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE**

On ___11TH___ day of ___September___, 2015, came to be considered Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's Motion to Compel Arbitration and to Abate. After considering the motion and hearing the arguments of counsel, this Court is of the opinion that the Motion should be DENIED, ~~and that Plaintiffs' claims against Defendant Mike Ferguson and Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group be severed from and proceed to trial on October 19, 2015~~.

**FILED**
Chris Daniel
District Clerk

SEP 11 2015

Time: _____

Harris County, Texas

By _____
Deputy

SIGNED this ___11TH___ day of ___September___, 2015

_____
Elaine H. Palmer
JUDGE, 215TH DISTRICT COURT

Order Denying Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's     Page 1 of 1
Motion to Compel Arbitration and to Abate

**EXHIBIT "A"**

Certified Document Number: 66994917 - Page 1 of 1
RECORDER'S MEMORANDUM
this instrument is of poor quality
at the time of imaging



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 13, 2015

Certified Document Number:        66994917 Total Pages: 1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR            A and | § | |
|                , minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, L.P., | § | |
| PENN VIRGINIA OIL & GAS GP, LLC, | § | |
| MIKE FERGUSON, TRIFECTA | § | |
| OILFIELD SERVICES, LLC, CUDD | § | |
| PRESSURE CONTROL, INC., | § | |
| ROYWELL SERVICES, INC. and OAKS | § | |
| PERSONNEL SERVICES, INC. d/b/a | § | |
| THE OAKS GROUP | § | 281ST JUDICIAL DISTRICT |

**DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP, LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE**

Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC (collectively referred to hereinafter as "Penn Virginia" unless individual reference is necessary) file this Motion to Compel Arbitration and to Abate pending such arbitration. In support thereof, Penn Virginia would show as follows:

**I. INTRODUCTION**

1. Plaintiff, Alfredo "Freddie" De La Garza ("Plaintiff" or "De La Garza"), Individually and as Next Friend of                    and                    , and Intervenor, John Paul "J.P." Adame ("Adame"), Individually and as Next Friend of                    , (collectively "the parties") filed personal injury claims against Penn Virginia on July 24, 2014 and November 6, 2014, respectively. Their claims arise out of an April 29, 2014 incident, which occurred at a well site

**EXHIBIT "B"**

located near Shiner, Texas while De La Garza and Adame were working in the course and scope of their employment with Nabors Completion & Production Co. ("NCPS").

2. Nabors Industries, Inc. ("Nabors") and its subsidiaries, one of which is NCPS, have a valid arbitration agreement which requires that disputes involving injuries to employees that are incurred during the course and scope of employment be submitted to final and binding arbitration. De La Garza and Adame both acknowledged and accepted the terms of the arbitration agreement.

3. The arbitration agreement applies to all direct and indirect subsidiaries of Nabors, all current and former employees of the aforementioned subsidiaries, and any "Electing Entity" that has agreed to be bound by the terms of the agreement.[1] Penn Virginia is an "Electing Entity" and has agreed on more than one occasion to be bound by the terms of the agreement.[2] De La Garza's and Adame's individual claims fall within the scope of the arbitration agreement as both were employees of NCPS at the time of the incident and allege that their injuries occurred while in the course and scope of their employment. De La Garza and Adame also filed claims as representatives of their minor children. The minors' claims are also subject to the arbitration agreement as they are derivative of De La Garza and Adame's claims. Consequently, De La Garza and Adame's individual claims against Penn Virginia and the claims filed on behalf of their minor children all fall within the scope of the arbitration agreement.

4. Therefore, Penn Virginia's Motion to Compel Arbitration should be granted, and this case should be abated or dismissed and compelled to final and binding arbitration.

---

[1] *See Nabors Dispute Resolution Program ("DRP")*, a true and correct copy of which is attached as Exhibit 1-A.

[2] *See 2008 Penn Virginia Oil & Gas, LP IADC Contract*, a true and correct copy of which is attached as Exhibit 1-B; *see also Contractors Special Provisions*, a true and correct copy of which is attached as Exhibit 1-C, at ¶ 16 "Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program." *See also 2010 Penn Virginia MC Energy, LLC IADC Contract*, a true and correct copy of which is attached as Exhibit 1-D; *see also Contractors Special Provisions*, a true and correct copy of which is attached as Exhibit 1-E, at ¶ 16.

## II. UNDISPUTED FACTS

5.     Nabors is the "Sponsor" of the Nabors Dispute Resolution Program ("DRP"), as that term is defined by the DRP.[3]

6.     The DRP is subject to the Federal Arbitration Act ("FAA").[4]

7.     By its terms, the Nabors DRP is designed to provide a means for the resolution of disputes between the "Company" and the Company's present and former employees that are related to or that arise out of a current or former employment relationship with the Company.[5]

8.     The DRP is intended to create an exclusive procedural mechanism for the final resolution of all disputes falling within its terms.[6] Consequently, the DRP requires that all disputes between De La Garza, Adame and the Company are subject to binding arbitration.[7]

9.     The DRP defines "Dispute" to include personal injuries that are incurred at the workplace or in the course and scope of employment.[8]

10.     The DRP defines "Company" as "Sponsor and every direct and indirect subsidiary...of Sponsor, **(and) any Electing Entity**."[9] As previously mentioned, Nabors is the

---

[3] *Affidavit of Keith Nicholson* (*"Nicholson Aff."*), a true and correct copy of which is attached as Exhibit 1, at ¶ 4; *see also* Exhibit 1-A, at ¶ 2(L).

[4] *See* Exhibit 1-A at ¶ ¶ 2(C) and 8. The Federal Arbitration Act, 9 U.S.C. § 2, applies in state courts and preempts state anti-arbitration laws to the contrary. *Circuit City Stores, Inc. v. Adams*, 121 S.Ct. 1302; *Southland Corp v. Keating*, 465 U.S. 1, 16 (1984); *see also Palm Harbor Homes v. McCoy*, 944 S.W.2d 716, 721 (Tex. App.—Fort Worth 1997) (holding that FAA preempted Texas Arbitration Act's requirement that party's attorney sign agreement). Although the FAA preempts state arbitration laws, courts still must resort to general state law contract principles to determine whether an arbitration agreement will be enforced.

[5] *See* Exhibit 1-A, at ¶ 1.

[6] *See* Exhibit 1-A, at ¶ 1.

[7] *See* Exhibit 1-A.

[8] "Dispute" means all legal and equitable claims, demand and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes under the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to...**6. *any personal injury allegedly incurred in or about a Company Workplace or in the course and scope of an Employee's employment.*** *See* Exhibit 1-A at ¶ 2(E) (emphasis added).

[9] *See* Exhibit 1-A at ¶ 2(D) (emphasis added).

"Sponsor" of the DRP. NCPS, De La Garza and Adame's employer at the time of the workplace incident, is a subsidiary of Nabors.[10] The DRP extends to and includes employees of NCPS.[11]

11. Further, Penn Virginia is an "Electing Entity" and agreed to be bound by the terms of the DRP in two IADC Contracts between it and Nabors.[12] As an "Electing Entity," Penn Virginia is required to resolve disputes with any past or present employee(s) or applicants of Nabors in accordance with the DRP.[13]

12. On January 2, 2013, Adame executed a document entitled "Application For Hourly And Daily Employment," as well as another document entitled "Notice to Applicants Regarding Dispute Resolution Program."[14] Likewise, on July 16, 2013, De La Garza executed the "Application For Hourly And Daily Employment" and the "Notice to Applicants Regarding Dispute Resolution Program."[15] De La Garza and Adame, by their signatures, acknowledged and agreed that they would be "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."[16]

13. On January 7, 2013, Adame also executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program."[17] The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program."[18] De La Garza executed the same document on July 22, 2013.[19] De La Garza and Adame, by their

---

[10] See Nicholson Aff. at ¶ 6.
[11] See Nicholson Aff. at ¶ 6; see also Affidavit of Katherine Ryan, a true and correct copy of which attached as Exhibit 2.
[12] See Nicholson Aff. at ¶ ¶ 7 through 9; see also Exhibits 1-B and 1-D; see also Exhibits 1-C and 1-E, at ¶ 16.
[13] See Nicholson Aff. at ¶ 10; see also Exhibits 1-B – 1-G.
[14] See Nicholson Aff. at ¶ 12; see also Exhibit 1-F.
[15] See Nicholson Aff. at ¶ 16; see also Exhibit 1-G.
[16] See Nicholson Aff. at ¶¶ 12 and 16; see also Exhibit 1-F and 1-G.
[17] Nicholson Aff. at ¶ 13; see also Exhibit 1-H.
[18] Nicholson Aff. at ¶ 13; see also Exhibit 1-H.
[19] Nicholson Aff. at ¶ 17; see also Exhibit 1-I.

signatures, again acknowledged and agreed that they would be "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."[20]

14. On April 29, 2003, Adame was hired by Nabors Well Services, Ltd. as a crew worker.[21] On January 7, 2013, as a result of a business reorganization, he became a crew worker for NCPS when Nabors Well Services, Ltd. liquidated into Nabors Well Services, Co., which liquidated and dissolved into NCPS.[22] As a crew worker, Adame's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Adame's job duties also involved activities associated with rigging-up and rigging-down workover rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations.[23] Adame's job duties and responsibilities did not include the movement of goods in interstate commerce.[24] While employed by NCPS, Adame was never employed as a commercial truck driver or transportation worker.[25]

15. On July 22, 2013, De La Garza was hired by NCPS as a crew worker.[26] As a crew worker, De La Garza's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. De La Garza's job duties also involved activities associated with rigging-up and rigging-down workover rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations.[27] De La Garza's job duties and responsibilities did not include

---

[20] *Nicholson Aff.* at ¶¶ 13 and 17; *see also* Exhibit 1-E.
[21] *Nicholson Aff.* at ¶ 14.
[22] *Nicholson Aff.* at ¶ 14.
[23] *Nicholson Aff.* at ¶ 14.
[24] *Id.*
[25] *Id.*
[26] *Nicholson Aff.* at ¶ 18.
[27] *Nicholson Aff.* at ¶ 18.

the movement of goods in interstate commerce.[28] While employed by NCPS, De La Garza was never employed as a commercial truck driver or transportation worker.[29]

16.     On July 24, 2014, De La Garza filed his Original Petition, and on September 8, 2014 and October 1, 2014, De La Garza filed his First and Second Amended Petitions.[30] Likewise, on November 6, 2014 and February 19, 2015, Adame filed his Original and First Amended Petitions in Intervention.[31] A copy of all  pleadings are maintained in the Court's records. De La Garza and Adame allege that on April 29, 2014 and while working for NCPS, they were injured when a piece of NCPS line pipe parted, causing both to be thrown back as a result of the released pressurized gas.[32]

### III. SUMMARY OF THE ARGUMENT

17.     The Company (defined to include Nabors, its subsidiaries, and any "Electing Entity") has a valid arbitration agreement, which both De La Garza and Adame acknowledged and accepted. Because Penn Virginia is an "Electing Entity," the parties' claims against Penn Virginia fall within the scope of the arbitration agreement. Consequently, the parties' claims must be submitted to final and binding arbitration in accordance with the DRP.  Therefore, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated.

### IV. ARGUMENT & AUTHORITIES

18.     Pursuant to the DRP, the parties' lawsuit must be submitted to binding arbitration. It is undisputed that Texas courts recognize that arbitration agreements in an "at-will" employment setting apply to personal injury claims. In fact, there is a strong presumption in Texas favoring arbitration. *See Circuit City Stores, Inc. v. Adams*, 121 S. Ct. 1302 (2001);

---

[28] *Id.*

[29] *Id.*

[30] Plaintiff's Original Petition, First Amended Petition, and Second Amended Petition.

[31] Adame's Original Petition in Intervention and First Amended Petition in Intervention.

[32] *See* Plaintiff's Original Petition and First Amended Petition, as well as Adame's Original Petition in Intervention and First Amended Petition in Intervention.

*Cantella & Co. v. Goodwin,* 924 S.W.2d 943 (Tex. 1996); *Jack B. Anglin v. Tipps,* 842 S.W.2d 266, 268 (Tex. 1992). If a valid arbitration agreement exists, and the claims are within the agreement's scope, a trial court has no discretion and must compel arbitration. *Cantella,* 924 S.W.2d at 944; *Shearson Lehman Bros., Inc. v. Kilgore,* 871 S.W.2d 925, 928 (Tex. App.—Corpus Christi, 1994, orig. proceeding).

19.     The clear language of the DRP states that the Federal Arbitration Act, 9 U.S.C. § 1, et. seq. ("FAA") controls.[33] The Texas Supreme Court has held that in cases where the FAA is stated in the agreement as the controlling law, the FAA prevails. *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 91 (Tex. 1996). In adjudicating a motion to compel arbitration under the FAA, courts generally try to determine whether the parties agreed to arbitrate the dispute in question. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985); *Folse v. Richard Wolf Medical Instruments Corp.,* 56 F.3d 603, 605 (5th Cir. 1995); *R.M. Perez & Assocs., Inc. v. Welch,* 960 F.2d 534, 538 (5th Cir. 1992).

20.     Under the FAA, the court applies ordinary state contract law principles in order to decide whether a valid arbitration agreement exists. *See In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 781 (Tex. 2006) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995)); 9 U.S.C.A. § 1 et seq.; CIV. PRAC. & REM. CODE § 171.001 et seq. Once a valid arbitration agreement is established, a presumption attaches favoring arbitration. *Dallas Cardiology Assoc., P.A. v. Mallick,* 978 S.W.2d 209, 212 (Tex. App.—Dallas, 1998, pet. denied). Then Court must then determine whether the arbitration agreement covers the non-movant's claims. *In re Jim Walter Homes, Inc.,* 207 S.W.3d 888 (Tex. App.—Houston [14th Dist.] 2006). In doing so, a court must focus on the complaint's factual allegations rather than the legal causes of action asserted. *Id.*

---

[33] *See* Exhibit 1-A at ¶ ¶ 2(C) and 8.

21. Thus, two questions guide the determination of whether Penn Virginia's Motion to Compel should be granted: 1) is there a valid agreement to arbitrate; and 2) does the dispute in question fall within the scope of the agreement? *Associated Glass, Ltd. v. Eye Ten Oaks Invs., Ltd.*, 147 S.W.3d 507, 511 (Tex. App.—San Antonio 2004, no pet.).

**A.** <u>**Valid Agreement to Arbitrate**</u>

22. An "at-will" employee who receives notice of an employer's arbitration policy and continues or commences employment accepts the terms of the agreement as a matter of law. *See In re Halliburton*, 80 S.W.3d 566 (Tex. 2002); *In re Dallas Peterbilt, Ltd., L.L.P.*, 196 S.W.3d 161, 162 (Tex. 2006). In *Halliburton*, the employer created a dispute resolution program which obligated both employees and the employer to arbitrate all disputes between them. *See Halliburton*, 80 S.W.3d at 566. The Texas Supreme Court held that the employer was justified in giving notice to all employees of the program and informing them that by continuing to work after the adoption of the program, employees would be considered to have accepted the program. *See id* at 569-71.

23. Four years later, the San Antonio Court of Appeals extended *Halliburton* even further. Relying on *Halliburton,* the Fourth Court of Appeals compelled arbitration where the employee expressly refused to sign an arbitration agreement but continued to work after receiving notice of the arbitration requirement. *In re RRGT, Inc.*, 2006 WL 622736 (Tex. App.—San Antonio 2006, orig. proceeding).

24. It should also be noted that the San Antonio Court of Appeals has specifically considered the Nabors DRP and held that it is valid and enforceable on multiple occasions. *See NDUSA USA, LP v. Pena*, 385 S.W.3d 103 (Tex. App.—San Antonio 2012, pet. denied); *NDUSA USA, LP v. Carpenter*, 198 S.W.3d 240, 249 (Tex. App.—San Antonio 2006, orig.

proceeding). Furthermore, in October 2013 and then again in December 2013, the Texas Supreme Court denied the family of a deceased Nabors' employee's petition for review when the family sought to reverse the Fourth Court of Appeals' determination that the DRP was **valid** and **enforceable**. *See Pena*, 385 S.W.3d 103.

25.     De La Garza and Adame executed documents on several occasions that clearly express both parties' agreement to the terms of the DRP.[34] The documents specifically state that De La Garza and Adame acknowledged receiving, reviewing, understanding, and accepting the DRP's requirement to submit disputes to arbitration.[35] De La Garza and Adame's signatures on the aforementioned documents is strong evidence of their actual acknowledgment and agreement that they are required to adhere to the DRP. *See In re Bunzl USA*, 155 S.W.3d 202 (Tex. App.— El Paso 2004, orig. proceeding).

26.     De La Garza and Adame accepted the terms of the DRP as a matter of law. Therefore, a valid and enforceable agreement to arbitrate was formed. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006).

**B.     The Dispute Falls Within the Scope of the Agreement**

27.     The parties' claims fall within the scope of the DRP. The DRP requires that disputes between the Company (defined as Nabors, its subsidiaries, and any "Electing Entity") and its current or former employees be submitted to arbitration. According to the parties' Petitions, De La Garza and Adame were both employees of a Nabors' subsidiary (NCPS) and both were allegedly injured while in the course and scope of their employment. Consequently, this dispute, which is between NCPS employees and Penn Virginia (an "Electing Entity"), falls within the scope of the agreement.

---

[34] *See Nicholson Aff.* at ¶¶ 12, 13, 16, and 17; *see also* Exhibits 1-F – 1-I.
[35] *Nicholson Aff.* at ¶¶ 12, 13, 16, and 17; *see also* Exhibits 1-F – 1-I.

28. Whether a claim falls within the scope of an arbitration agreement depends on the factual allegations of the complaint rather than the legal causes of action asserted. *Prudential Secs., Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995); *Ikon Office Solutions, Inc. v. Eifert*, 2 S.W.3d 688, 697 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding); *Prudential-Bache Secs., Inc. v. Garza*, 848 S.W.2d 803, 807 (Tex. App.—Corpus Christi 1993). Based on the factual allegations contained in the parties' pleadings, the parties' claims fall squarely within the scope of the DRP.

29. It is undisputed that De La Garza and Adame were employed by NCPS, which is a Nabors subsidiary.[36] It is undisputed that La Garza and Adame both alleged that they were injured at the workplace and/or in the course and scope of their employment.[37]

30. De La Garza and Adame signed an acknowledgement that specifically states, "I have received a copy of the Nabors Dispute Resolution Program…and understand that I am required to adhere to the Dispute Resolution Program and its **requirement** for submission of disputes to…**arbitration**."[38] All of these terms are clearly defined in the DRP.

31. The DRP clearly and unequivocally states that it "applies to and binds the Company, each Employee and Applicant."[39] The DRP defines "Dispute" to include any personal injury that is incurred at the workplace or in the course and scope of employment.[40] According to the DRP, "Company" means "Sponsor and every direct and indirect subsidiary…of Sponsor, (and) any Electing Entity."[41]

---

[36] *Nicholson Aff.* at ¶ ¶ 6, 11 through 15; *see also* Plaintiff's Original Petition and First Amended Petition, and Adame's Original Petition in Intervention and First Amended Petition in Intervention.
[37] *See* Plaintiff's Original Petition and First Amended Petition and Adame's Original Petition in Intervention and First Amended Petition in Intervention.
[38] *Nicholson Aff.* at ¶¶ 13 and 16; *see also* Exhibits 1-H and 1-I (emphasis added).
[39] *See* Exhibit 1-A, at ¶ 1.
[40] *See* Exhibit 1-A at ¶ 2(E).
[41] *See* Exhibit 1-A at ¶ 2(D).

32. Nabors is the "Sponsor" of the DRP.[42] NCPS is a subsidiary of Nabors.[43] Penn Virginia is an "Electing Entity" and agreed that it is bound by the terms of the DRP.[44] Therefore, Penn Virginia falls within the scope of the "Company."

33. The parties' claims clearly fall within the scope of the arbitration agreement. Consequently, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated or dismissed and compelled to final and binding arbitration.

## V. CONCLUSION

34. Nabors has instituted a comprehensive dispute resolution program, which requires arbitration of disputes between the Company (which is defined as Nabors Industries, Inc., its subsidiaries, and any "Electing Entity") and current or former employees. De La Garza and Adame unequivocally agreed to adhere to the DRP and its requirement to submit all claims to arbitration. The DRP applies to personal injuries that occur at the workplace or while the employee is in the course and scope of his employment. Therefore, the parties' claims, as asserted in this lawsuit, are subject to the terms of the DRP. Consequently, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated or dismissed and compelled to final and binding arbitration.

## PRAYER

For the foregoing reasons, PENN VIRGINIA OIL & GAS, L.P. and PENN VIRGINIA OIL & GAS GP, LLC request that the Court grant this Motion, abate or dismiss this action, and order that the claims asserted by Alfredo De La Garza, Individually and as Next Friend of

a, and Intervenor, John Paul Adame, Individually and as

Next Friend of                                                                                              be

---

[42] *Nicholson Aff.* at ¶ 4; *see also* Exhibit 1-A, at ¶ 2(L).
[43] *Nicholson Aff.* at ¶ 6.
[44] *See Nicholson Aff.* at ¶ ¶ 7 through 10; *see also* Exhibits 1-C and 1-E, at *Contractors Special Provisions*, ¶16.

compelled to final and binding arbitration. PENN VIRGINIA OIL & GAS, L.P. and PENN VIRGINIA OIL & GAS GP, LLC further request all other relief to which they are entitled.

Respectfully submitted,

/s/ Thomas J. Smith

Thomas J. Smith
  State Bar No. 00788934
  tsmith@gallowayjohnson.com
Kelly C. Hartmann
  State Bar No. 24055631
  khartmann@gallowayjohnson.com
Alexis B. Hester
  State Bar No. 24072807
  ahester@gallowayjohnson.com
GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777 – facsimile

**Attorneys for Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served electronically, by and through the Court approved electronic filing manager, to participating parties on this 18th day of June 2015, as follows:

John David Hart
**LAW OFFICES OF JOHN DAVID HART**
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
Phone 817-870-2102
Fax 817-332-5858
*Counsel for Plaintiff, Individually and as Next Friend of 1*
*, Minor Children*

Benjamin A. Escobar, Jr.
Brit T. Brown
**BEIRNE, MAYNARD & PARSON, L.L.P.**
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Phone 713-623-0887
Fax 713-960-1527
*Counsel for Defendant, Cudd Pressure Control, Inc.*

J. Javier Gutierrez
Ana Laura Gutierrez
**THE GUTIERREZ LAW FIRM, INC.**
700 East Third Street
Alice, Texas 78332
Phone 361-664-7377
Fax 361-664-7245
*Counsel for Intervenor,*
*John Paul Adame, Individually and as Next Friend of*

*/s/ Thomas J. Smith*
Thomas J. Smith

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR ☐☐☐☐ ☐☐☐☐ minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, LP, PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § § | 281ST JUDICIAL DISTRICT |

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority on this day personally appeared Thomas J. Smith, who after being duly sworn upon his oath stated as follows:

1.    "My name is Thomas J. Smith. I am over twenty-one (21) years of age. I am of sound mind and in all ways competent to make this verification.

2.    I am one of the attorneys of record for Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC. I have personal knowledge of the facts stated in this affidavit and those facts are true and correct.

3.    I have reviewed the foregoing Motion to Compel Arbitration and to Abate this case pending such arbitration. In my personal knowledge, the Motion truly and correctly recites the factual allegations set forth in the pleadings and the evidence in the trial court record."

Thomas J. Smith

SUBSCRIBED AND SWORN TO before me a notary public, which witness my hand and seal of this office this 15th day of June, 2015.

Notary Public in and for the State of Texas

RHONDA SCHNITZ
Notary Public, State of Texas
My Commission Expires
December 13, 2018

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR [          ] and | § | |
| [          ] minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, LP, | § | |
| PENN VIRGINIA OIL & GAS GP, LLC, | § | |
| MIKE FERGUSON, TRIFECTA | § | |
| OILFIELD SERVICES, LLC, CUDD | § | |
| PRESSURE CONTROL, INC., | § | |
| ROYWELL SERVICES, INC. and OAKS | § | |
| PERSONNEL SERVICES, INC. d/b/a | § | |
| THE OAKS GROUP | § | 281ST JUDICIAL DISTRICT |

## AFFIDAVIT OF KEITH NICHOLSON

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared Keith Nicholson, the affiant, a person whose identity is known to me. After I administered an oath to affiant, the affiant testified:

1. "My name is Keith Nicholson. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am Assistant General Counsel for Nabors Corporate Services, Inc.

3. In my capacity as Assistant General Counsel, I am required to be familiar with Nabors Industries, Inc.'s corporate structure and the relationship of its various subsidiaries and affiliated companies. I am also required to be familiar with the Nabors Dispute Resolution Program ("DRP").

4. Nabors Industries, Inc. is the "Sponsor" of the Nabors DRP as that term is defined by the DRP. A true and correct copy of the DRP is attached to my affidavit as Exhibit 1-A.

5. The DRP provides that it applies to all direct and indirect subsidiaries of Nabors Industries, Inc., as well as all "Electing Entities" that have agreed to be bound by same.

6. Nabors Completion & Production Services Co. ("NCPS") was a subsidiary of Nabors

**EXHIBIT "1"**

Industries, Inc. at the time of the April 29, 2014 incident which makes the basis of the lawsuit.

7. On September 23, 2008, Penn Virginia Oil & Gas, LP agreed to be bound by the DRP as an "Electing Entity" in the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-B. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-C.

8. The Contractors Special Provisions page states at paragraph 16 that "Operator, its parent, subsidiary, and affiliated corporations…(collectively "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity…"

9. In addition, on September 8, 2010, Penn Virginia MC Energy, LLC agreed to be bound by the DRP as an "Electing Entity" in the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-D. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-E. It is my understanding that Penn Virginia MC Energy, LLC is a subsidiary or affiliated corporation of Penn Virginia Oil & Gas, LP and/or Penn Virginia Oil & Gas GP, LLC.

10. As an "Electing Entity," Defendants, Penn Virginia Oil & Gas, LP and Penn Virginia Oil & Gas GP, LLC are required to resolve disputes with any past or present employee(s) or applicant(s) of Nabors Industries, Inc. or its subsidiaries in accordance with the DRP.

11. Based upon my review of the personnel file of Mr. Adame, I can confirm that Mr. Adame was employed by NCPS, and that he executed various documents that acknowledged that he received, reviewed, and accepted the terms and conditions of the DRP.

12. Specifically, my review of the relevant documents confirms that on January 2, 2013, Mr. Adame executed a document entitled "Application For Hourly And Daily Employment," a true and correct copy of which is attached as Exhibit 1-F. Mr. Adame acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

13. Further, on January 7, 2013, Mr. Adame executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program," a true and correct copy of which is attached as Exhibit 1-H. The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program." Mr. Adame acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

14. Mr. Adame was employed by NCPS as a crew worker. As a crew worker, Mr. Adame's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Mr. Adame's job duties also involved activities associated with rigging-up and rigging-down work over rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations. While employed by NCPS, Mr. Adame was never a commercial truck driver or transportation worker.

15. Based upon my review of the personnel file of Mr. Alfredo De La Garza, I can confirm that Mr. De La Garza was employed by NCPS, and that he executed various documents that acknowledged that he received, reviewed, and accepted the terms and conditions of the DRP.

16. Specifically, my review of the relevant documents confirms that on July 16, 2013, Mr. De La Garza executed a document entitled "Application For Hourly And Daily Employment," a true and correct copy of which is attached as Exhibit 1-G. By his signature, Mr. De La Garza acknowledged and agreed that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

17. Further, on July 22, 2013, Mr. De La Garza executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program," a true and correct copy of which is attached as Exhibit 1-I. The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program." Mr. De La Garza acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

18. Mr. De La Garza was employed by NCPS as a crew worker. As a crew worker, Mr. De La Garza's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Mr. De La Garza's job duties also involved activities associated with rigging-up and rigging-down work over rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations. Mr. De La Garza's job duties and responsibilities did not include the movement of goods in interstate commerce. While employed by NCPS, Mr. De La Garza was never a commercial truck driver or transportation worker.

19. At all times relevant to this matter, NCPS was engaged in interstate commerce as it was in the business of providing services for the development of oil and gas resources that are placed into commerce in both Texas and other states of the United States.

20. On information and belief, Penn Virginia is also engaged in interstate commerce as it is in the business of producing oil and gas resources that are placed into commerce in both Texas and other states of the United States.

21. Attached as Exhibit 1-A to my affidavit is a true and correct copy of Nabors Industries, Inc.'s DRP booklet, in English and Spanish, respectively. These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

22. Attached as Exhibit 1-B to my affidavit is a true and correct copy of the 2008 IADC Drilling Contract between Nabors and Penn Virginia Oil & Gas, LP, and attached as Exhibit 1-C is a true and correct copy of the portion of the IADC contract titled "Contractors Special Provisions." These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

23. Attached as Exhibit 1-D to my affidavit is a true and correct copy of the 2010 IADC Drilling Contract between Nabors and Penn Virginia MC Energy, LLC, and attached as Exhibit 1-E is a true and correct copy of the portion of the IADC contract titled "Contractors Special Provisions." These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

24. The records attached as Exhibits 1-F, 1-G, 1-H, and 1-I are true and correct copies of records that are kept by NCPS in the regular course and scope of business, and it was the regular course of business of NCPS for an employee or representative of NCPS, with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time the act or event that was recorded."

FURTHER AFFIANT SAYETH NOT.

_____
Keith Nicholson

Sworn to and subscribed before me by Keith Nicholson on the 16th day of June, 2015.

_____
Notary Public in and for the State of Texas
My Commission expires: May 5, 2018

MARY D. HOISINGTON
Notary Public, State of Texas
My Commission Expires
May 05, 2018

# NABORS DISPUTE RESOLUTION
# PROGRAM and RULES



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos*

**EXHIBIT 1-A**

## THE LABORS DISPUTE RESOLUTION PROGRAM

1. **Purpose and Construction**

   The Program is designed to provide a means for the quick, fair, accessible, and inexpensive resolution of Disputes between the Company and the Company's present and former Employees and Applicants for employment, related to or arising out of a current, former or potential employment relationship with the Company. The Program is intended to create an exclusive procedural mechanism for the final resolution of all Disputes falling within its terms. It is not intended either to abridge or enlarge substantive rights available under applicable law. The Program contractually modifies the "at-will" employment relationship between the Company and its Employees, but only to the extent expressly stated in the Program. The Program should be interpreted in accordance with these purposes.

2. **Definitions**

   A. "AAA" means the American Arbitration Association.

   B. "JAMS" means Judicial Arbitration and Mediation Services.

   C. The "Act" means the Federal Arbitration Act, 9 U.S.C.§1, et seq., as amended from time to time.

   D. "Company" means Sponsor and every direct or indirect subsidiary (whether a corporation, limited liability company, company partnership or other legal entity) of Sponsor, any Electing Entity, any entity or person alleged to have joint and several liability concerning any Dispute, and all of their directors, officers, employees, and agents, every plan of benefits, whether or not tax-exempt, established or maintained by any such entity, the fiduciaries, agents and employees of all such plans, and the successors and assigns of all such entities, plans and persons; provided, however, that in the case of an Electing Entity, "Company" shall include the Electing Entity only to the extent provided in the Electing Entity's agreement to be bound by the Program.

   E. "Dispute" means all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes

der the Program, or between a person and by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to:

1. this Program;

2. the employment or potential reemployment of an Employee, including the terms, conditions, or termination of such employment with the Company;

3. employee benefits or incidents of employment with the Company;

4. any other matter related to or concerning the relationship between the Employee and the Company including, by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; workers' compensation retaliation; defamation; infliction of emotional distress, antitrust claim concerning wages or otherwise, or status, claim or membership with regard to any employee benefit plan;

5. an Applicant's application for employment and the Company's actions and decisions regarding such application; and

6. any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment.

"Dispute" includes all such matters regardless of when the events on which they are based occurred, including matters based on events occurring before the Employee became subject to this Program (so long as such disputes were not previously asserted in a judicial forum) or after termination of the employment relationship.

F. "Electing Entity" means any legal entity that has agreed to be bound by the Program as provided herein.

G. "Employee" means any person who is or has been in the employment of the Company on or after the effective date of this Program, whether or not employed at the time a claim is brought with respect to a Dispute, residing in the United States, or otherwise subject to

laws of the United States or any state, ·   iicipality, or other political subdivision of the United States.

H. "Applicant" means any person who is seeking or has sought employment with the Company after the effective date of this Program.

I. "Party" means, with respect to a particular Dispute, affected persons and/or entities bound by this Program.

J. "Program" means this Nabors Dispute Resolution Program, as amended from time to time.

K. "Rules" means the Nabors Dispute Resolution Rules, as amended from time to time, which are applicable to mediation and arbitration.

L. "Sponsor" means Nabors Industries, Inc., a Delaware corporation.

3. **Name, Application and Coverage**

A. The Program shall be referred to as the "Nabors Dispute Resolution Program." Alternatively, it may be referred to as the "Dispute Resolution Program."

B. Until revoked by Sponsor pursuant to this Program, this Program applies to and binds the Company, each Employee and Applicant and the heirs, beneficiaries and assigns of any such person or entity; provided, however, that this Program shall not apply to any Employee in a unit of Employees represented by a labor organization, or to the Company with respect to such employees, except to the extent permitted in an applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

C. Except as provided for herein, this Program applies to any Dispute.

D. Notwithstanding anything to the contrary in this Program, the Program does not apply to claims for workers' compensation benefits or unemployment compensation benefits.

E. Mediation and arbitration are only available for Disputes involving legally protected rights.

F.   twithstanding any other provision : ·eof, any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under the Program. Furthermore, an action under The Limitation of Ship Owners Liability Act, 46 U.S.C. §§181-189, shall not be subject to this Program.

## 4. Resolution of Disputes

All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules.

## 5. No Retaliation

No employee shall be subject to any form of discipline or retaliation for initiating or participating in good faith in any process or proceeding under this Program.

## 6. Amendment

A. This Program may be amended by Sponsor at any time by giving at least 10 days' notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules, unless otherwise agreed.

B. Sponsor may amend the Rules at any time by serving notice of the amendments on AAA and JAMS. However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules unless otherwise agreed.

## 7. Termination

This Program may be terminated by Sponsor at any time by giving at least 10 days' notice of termination to current Employees. However, termination shall not be effective as to Disputes for which a proceeding has been initiated pursuant to the Rules prior to the date of termination unless otherwise agreed.

## 8. Applicable Law

A. The Act shall apply to this Program, the Rules, and any proceedings under the Program or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Program or the Rules.

B. arbitrations held pursuant to this Program shall be convened as near as possible to the worksite where the events in dispute occurred if Nabors continues to perform work at that location. Otherwise the arbitration will occur at the place most convenient for the majority of the witnesses.

C. Other than as expressly provided herein, or in the Rules, the substantive legal rights, remedies, and defenses of all Parties are preserved. In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all relief, legal or equitable, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceeding.

D. Other than as expressly provided herein, or in the Rules, the Program shall not be construed to grant additional substantive, legal, or contractual rights, remedies or defenses which would not be applied by a court of competent jurisdiction in the absence of the Program.

E. Notwithstanding the provisions of the preceding subsection, in any proceeding before an arbitrator, the arbitrator, in his or her discretion, may allow a prevailing Employee or Applicant a reasonable attorney's fee as part of the award. The discretion to allow an award of fees under this subsection is in addition to any discretion, right or power which the arbitrator may have under applicable law. If the arbitrator awards attorney fees without authorization for such an award by statute or contract, such award will be limited to $2,500.00.

9. **Administrative Proceedings**

A. This Program shall apply to a Dispute pending before any local, state or federal administrative body or court unless prohibited by law.

B. Participation in any administrative or judicial proceeding by the Company shall not affect the applicability of the Program to any such Dispute upon termination of the administrative or judicial proceedings. A finding, recommendation or decision by an administrative body on the merits of a Dispute shall have the same legal weight or effect under the Program as it would in a court of competent jurisdiction.

## 10. Ex( ive Remedy

Proceedings under the Program shall be the exclusive, final and binding method by which Disputes are resolved.

## 11. Electing Entities

A. Corporations or other legal entities, not otherwise Parties, may elect to be bound by this Program by written agreement with Sponsor.

B. Election may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity.

## 12. Effective Date

The Effective Date of this Program shall be April 15, 2001.

## 13. Severability

The terms of this Program and the Rules are severable. The invalidity or unenforceability of any provision therein shall not affect the application of any other provision. Where possible, consistent with the purposes of the Program, any otherwise invalid provision of the Program or the Rules may be reformed and, as reformed, enforced.

## 14. Assent

Employment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program, both during the employment and after termination of employment. Submission of an application, regardless of form, for employment constitutes consent by both the Applicant and the Company to be bound by this Program.

# NABORS DISPUTE RESOLUTION RULES

## 1. Definitions

All definitions included in the Nabors Dispute Resolution Program apply to these Rules.

## 2. Application

A. If different rules are applicable to a specific class of Disputes, and have been adopted by Sponsor and served on AAA or JAMS, these Rules shall not apply to such class of Disputes.

B. ~~se~~ Rules apply in the form existing ~~the time~~ proceedings are initiated under them.

C. To the extent consistent with these Rules, the Employment Dispute Resolution Rules of AAA or JAMS also apply to all proceedings governed by these Rules.

## 3. Initiation of the Process

A. A Party may initiate proceedings under these Rules at any time, subject to any defenses including those applicable to the timeliness of the claim, including limitations and laches.

B. A Party may initiate proceedings by serving a written request to initiate proceedings on AAA or JAMS, and tendering the appropriate administrative fee.

C. Copies of the request shall be served on all other Parties to the Dispute by AAA or JAMS. The request shall describe the nature of the Dispute, the amount involved, if any, the remedy sought, and the proceeding locale requested.

D. Proceedings may also be initiated by an Employee or Applicant by serving a written request to initiate proceedings on the Company's Dispute Resolution Program Administrator. In such a case, the Company shall promptly forward any properly served request it has received to AAA or JAMS.

E. Parties against whom a claim is asserted shall file an answering statement within 21 days of receiving notice of intent to arbitrate or a specification of claims, which shall include any counterclaims and any request that the arbitrator (if any) prepare a statement of reasons for the award.

## 4. Administrative Conference

AAA or JAMS shall convene an administrative conference as soon as possible after receipt of the answering statement or after expiration of the time for filing an answering statement if one has not been filed. The conference may be held in person or by telephone. At the conference, AAA or JAMS will determine whether the Parties are in agreement on a method to resolve the Dispute. If the Parties are in agreement, AAA or JAMS will implement the procedure in accordance with their rules upon payment of any applicable fee. If the Parties cannot agree, or if the

Par[ ]have previously attempted and failed [ ]esolve the Dispute by mediation or another nonbinding mechanism, the Dispute shall be arbitrated under these Rules.

## 5. Appointment of Arbitrator

Immediately after payment of the arbitration fee, AAA or JAMS shall simultaneously send each Party an identical list of names of persons chosen from a panel of qualified arbitrators which AAA or JAMS shall select and maintain. Each Party to the Dispute shall have fourteen (14) days from the transmittal date to strike any names objected to, number the remaining names in order of preference, and return the list to AAA or JAMS. If a Party does not return the list within the time specified, all persons therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the order of mutual preference, AAA or JAMS shall invite the acceptance of the arbitrator or arbitrators to serve. In those cases where more than $2,000,000 is in controversy, either Party shall have the right to require that the arbitration proceed before a three member panel rather than a single arbitrator. The Party who elects for a panel in these circumstances shall notify the other Parties during the administrative conference described in Section 4 of the Program. Any Party shall have the right to strike one list of arbitrators in its entirety. When a Party exercises this right, AAA or JAMS shall issue a new list of arbitrators consistent with the above procedures.

## 6. Qualifications of the Arbitrator

No person shall serve as an arbitrator in any matter in which that person has any financial or personal interest. Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias. Upon receipt of such information from the arbitrator or any other source, AAA or JAMS will either replace that person or communicate the information to the Parties for comment. Thereafter, AAA or JAMS may disqualify that person, and its decision shall be conclusive.

## 7. Vacancies

If a vacancy occurs for any reason or if an appointed arbitrator is unable to serve promptly, the appointment procedure in Section 5 shall apply to the selection of a substitute arbitrator.

## 8. Da Time and Place of Hearings

A. The arbitrator shall set the date, time and place of any proceeding pursuant to the requirements of Section 8B of the Program.

B. Notice of any hearing shall be given at least ten (10) days in advance, unless the arbitrator determines or the Parties agree that a shorter time is necessary.

C. The arbitrator shall make every effort, without unduly incurring expense, to accommodate the Employee or Applicant in the selection of a proceeding location.

## 9. Conferences

At the request of AAA or JAMS, or of a Party or on the initiative of the arbitrator, the arbitrator or AAA or JAMS may notice and hold conferences for the discussion and determination of any matter which will expedite the proceeding, including:

A. venue,

B. clarification of issues,

C. determination of preliminary issues, including summary determination of dispositive legal issues,

D. discovery,

E. the time and location of proceedings or conferences,

F. interim legal or equitable relief authorized by applicable law,

G. pre- or post-hearing memoranda,

H. stipulations; and/or

I. any other matter of substance or procedure.

## 10. Mode of Hearings and Conferences

In the discretion of the arbitrator or by agreement of the Parties, conferences and hearings may be conducted by telephone or by written submission, as well as in person.

## 11. Preparing Discovery

A. On any schedule determined by the arbitrator, each Party shall submit in advance the names and addresses of the witnesses it intends to produce and any documents it intends to present.

B. The arbitrator shall have discretion to determine the form, amount and frequency of discovery by the Parties.

C. Discovery may take any form permitted by the Federal Rules of Civil Procedure, as amended from time to time, subject to any restrictions imposed by the arbitrator.

## 12. Representation

Any Party may be represented by counsel or by any other authorized representative.

## 13. Attendance at Hearings

The arbitrator shall maintain the privacy of the proceedings to the extent permitted by law. Any person having a direct interest in the matter is entitled to attend the proceedings.

The arbitrator shall otherwise have the power to exclude any witness, other than a Party or other essential person, during the testimony of any other witness. The arbitrator shall determine whether any other person may attend the proceeding. Upon the request of any Party, the arbitrator shall exclude any witness during the testimony of any other witness.

## 14. Postponement

A. The arbitrator, for good cause shown by a Party, or on agreement of the Parties, may postpone any proceeding or conference.

B. The pendency of court proceedings related to the same matter is not good cause for postponement.

## 15. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by any Party, shall do so.

## 16. Rec___ ] of Proceedings

There shall be no stenographic, audio, or video record of the proceedings unless either requested by one of the Parties or specified by the arbitrator. The Party requesting the record shall bear the entire cost of producing the same. Copies of the record shall be furnished to all other Parties upon request and upon payment of the cost of reproduction.

## 17. Procedure

The proceedings shall be conducted by the arbitrator in whatever order and manner will most expeditiously permit full presentation of the evidence and arguments of the Parties.

## 18. Arbitration in the Absence of a Party

The arbitrator may proceed in the absence of Parties or representatives who, after due notice, fail to be present or fail to obtain a postponement. An award shall not be made solely on the default of a Party. The arbitrator shall require any Party who is present to submit such evidence as the arbitrator may require for the making of an award.

## 19. Evidence

A. The arbitrator shall be the sole judge of the relevancy, materiality, and admissibility of evidence offered. Conformity to legal rules of evidence shall not be necessary.

B. The arbitrator may subpoena witnesses or documents at the request of a Party or on the arbitrator's own initiative.

C. The arbitrator may consider the evidence of witnesses by affidavit or declaration, but shall give it only such weight as the arbitrator deems appropriate after consideration of any objection made to its admission.

## 20. Post-Hearing Submissions

All documentary evidence to be considered by the arbitrator shall be filed at the hearing unless the arbitrator finds good cause to permit a post-hearing submission. All Parties shall be afforded an opportunity to examine and comment on any post-hearing evidence. The arbitrator shall permit the filing of post-hearing briefs at the request of a Party and shall determine the procedure and timing of such filings.

## 21. Closing and Reopening of Proceedings

A. When the arbitrator is satisfied that the record is complete, including the submission of any post-hearing briefs or documents permitted by the arbitrator, the arbitrator shall declare the proceeding closed.

B. The proceeding may be reopened on the arbitrator's initiative or upon application of a Party at any time before the award is made.

## 22. Waiver of Procedures

Any Party who fails to object in writing, after knowledge that any provision or requirements of these procedures and Rules have not been complied with, shall be deemed to have waived the right to object.

## 23. Service of Notices and Papers

Any papers, notices, or process necessary or proper for the initiation or continuation of any proceeding under these Rules (including the award of the arbitrator, any court action in connection therewith, or the entry of judgment on an award made under these procedures) may be served on a Party by mail addressed to the Party or his or her representative at the last known address or by personal service. AAA, JAMS, the Parties, and the arbitrator may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give any notices required by these Rules.

## 24. Communications with the AAA, JAMS, and the Company

A. Any Party may notice, serve or communicate with AAA by contacting:

> Regional Administrator
> American Arbitration Association
> 1001 Fannin St., Suite 1005
> Houston, Texas 77002
> (713) 739-1302
> Fax: (713) 739-1702

B. Any Party may notice, serve or communicate with JAMS by contacting:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

C.    y notice, service or communicatic    with the Company will be to:

> Legal Department
> Nabors Industries, Inc.
> 515 West Greens Road, Suite 1200
> Houston, Texas 77067-4525
> (281) 874-0035
> Fax: (281) 775-8431

## 25. Communication with the Arbitrator

There shall be no communication between the Parties and the arbitrator other than at any oral hearings or conferences. Any other oral or written communications from the parties to the arbitrator shall be directed to the AAA or JAMS (and copied to the Parties) for transmission to the arbitrator, unless the Parties and the arbitrator agree otherwise.

## 26. Time of Award

The award shall be promptly made by the arbitrator, unless otherwise agreed by the Parties or specified by applicable law, no later than thirty (30) days from the date of the closing of the proceeding or, if applicable, the closing of a reopened proceeding.

## 27. Form of Award

The award shall be in writing and shall be signed by the arbitrator. The arbitrator shall write a statement of reasons for the award if requested to do so in the request to initiate proceedings or in the answering statement. The award shall be executed in any manner required by applicable law.

## 28. Modification of Award

On order of a court of competent jurisdiction, or on agreement of the Parties, the arbitrator shall modify any award. The arbitrator may modify an award on the motion of a Party if the arbitrator finds that the award, as rendered, is ambiguous or defective in form, or if the award requires an illegal or impossible act. These are the only circumstances under which an arbitrator shall have jurisdiction to withdraw or modify an award.

## 29. Set  nent

If the Parties settle their Dispute during the course of the arbitration, the arbitrator may set out the terms of the settlement in a consent award.

## 30. Scope of Arbitrator's Authority

The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

## 31. Judicial Proceedings and Exclusion of Liability

A. Neither AAA, JAMS, nor any arbitrator is a necessary Party in any judicial proceedings relating to proceedings under these Rules.

B. Neither AAA, JAMS, nor any arbitrator shall be liable to any Party for any act or omission in connection with any proceedings within the scope of these Rules.

C. Any court with jurisdiction over the Parties may compel a Party to proceed under these Rules at any place and may enforce any award made.

D. Parties to these Rules shall be deemed to have consented that judgment upon the award of the arbitrator may be entered and enforced in any federal or state court having jurisdiction of the Parties.

E. Initiation of, participation in, or removal of a legal proceeding shall not constitute waiver of the right to proceed under these Rules.

F. Any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met, pending the institution of proceedings under these Rules.

## 32. Fee  id Expenses

A. The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.

B. All attorneys' fees shall be borne by the Party incurring them except as otherwise provided by law, by the Program, or in the award of the arbitrator.

C. Discovery costs (e.g., court reporter fees for original transcripts) shall be borne by the Party initiating the discovery. The cost of copies of deposition transcripts or other discovery shall be borne by the Party ordering the copy.

D. The fees and expenses of experts, consultants and others retained or consulted by a Party shall be borne by the Party utilizing those services.

E. The Employee or Applicant shall pay a $150 fee if he or she initiates arbitration or mediation. Otherwise, Employee/Applicant Parties shall not be responsible for payment of fees and expenses of proceedings under these Rules, including required travel of an arbitrator or a mediator, expenses of an arbitrator, mediator, AAA or JAMS, and the cost of any proof produced at the discretion of an arbitrator.

F. If the demand for mediation or arbitration is initiated by the Company, such fees will be paid by the Company.

G. Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

## 33. Interpretation and Application of These Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. All other rules shall be in interpreted and applied by the AAA or JAMS.

## 34. Applicable Law

A. Proceedings under these Rules and any judicial review of awards shall be governed by the Act.

B.    cept where otherwise expressly prov⌐ 1 in these Rules, the substantive law applied shall be state or federal substantive law which would be applied by a United States District Court sitting at the place of the proceeding.

### 35. Mediation

At any time before the proceeding is closed, the Parties may agree to mediate their dispute by notifying AAA or JAMS. AAA or JAMS shall determine what procedures apply to any such mediation.

### 36. Spanish

A copy of this Program is available in Spanish.

Nabors Industries, Inc.
April 2001



**January 17, 2007**

**TO:** All Employees of Nabors Industries, Inc. and Subsidiaries

**RE:** Nabors Dispute Resolution Program

Dear Employee:

Effective ten (10) days after the date of this notice, pursuant to Section 6 of the Nabors Dispute Resolution Program, Nabors Industries, Inc. ("Nabors") and its subsidiaries are amending the Nabors Dispute Resolution Program and Rules for the determination of all disputes between employees and Nabors or one of its subsidiaries.

The amendments to the Program and Rules are enclosed on the back of this page. Nabors is amending one (1) section of the Nabors Dispute Resolution Program and one (1) section of the Nabors Dispute Resolution Rules. You should already have a copy of the current Program and Rules, or they may be found on the Nabors Intranet under policy number 200.80.1 at http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

As before, the Nabors Dispute Resolution Program, as amended, gives you the most effective and efficient means of resolving any disputes you may have through a process which encourages resolution at the earliest opportunity. Employees do not waive any substantive legal rights under the Program. Rather, the Program, as amended, provides that any substantive legal issues you may have will be resolved on an individual basis in mediation or before a neutral arbitrator, whose decision will be final and binding on you and the Company. Under the Program, as amended, however, you waive any procedural rights you may have to bring a court action, on an individual or on a class, collective or representative basis; and you waive your right to a jury trial concerning any dispute you may have with the Company or any Electing Entity (as defined in the Program), including any personal injury claims or claims of discrimination based on race, national origin, gender, religion, age or disability under any federal or state civil rights statute.

Every individual who works for Nabors Industries, Inc. or a subsidiary is subject to the Program, as amended, except that the amended provisions will affect only disputes initiated after the effective date of the amendments, and not any matters pending before the effective date. Your continued employment after the date you receive this notice will constitute your acceptance of the amendments to the Program, both during and after your employment with the Company.

We look forward to continuing to work together. If you have any questions about the amendments to the Program and Rules or any other term of your employment, please do not hesitate to contact the Human Resources Department of your employer.

Sincerely,

NABORS INDUSTRIES, INC.

*\*A copy of this notice is available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*\* Una copia de esta noticia está disponible en español con solo requerirla al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.*



## Amendment to THE NABORS DISPUTE RESOLUTION PROGRAM:

### 4. Resolution of Disputes

A. All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules. The Parties forego any right either may have to a jury trial on claims relating in any way to any Dispute.

B. Each Dispute shall be arbitrated on an individual basis. The Parties forego and waive any right to join or consolidate claims in arbitration with others or to make claims in arbitration as a representative or as a member of a class or in a private attorney general or similar capacity, unless such procedures are agreed to by all Parties. Neither the Company nor any Employee or Applicant may pursue any Dispute on a class action, collective action or consolidated basis or in a representative capacity on behalf of other persons or entities who are claimed to be similarly situated, or participate as a class member in such a proceeding. The arbitrator in any proceeding under this Program shall have no authority to conduct the matter as a consolidated, class, collective or representative action.

C. If the procedural limitation in Paragraph B of this Section is held unenforceable by a court in a proceeding in which a party seeks to pursue a consolidated, class or collective action or otherwise act in a representative capacity, then this Program shall apply to such proceeding only to the following extent. The court will decide whether the Dispute should proceed on a consolidated, class, collective or other representative basis and, if so, will define the scope of the class. None of the foregoing determinations shall be submitted to the arbitrator, and in no event shall the arbitrator have the power to determine class, collective or representative action certification. The court's decisions will be subject to appeal pursuant to the applicable rules of procedure. If the court certifies a class, collective or other representative action, then all other determinations in or related to the Dispute shall be made by the arbitrator. The arbitrator shall determine questions of liability to or of the class as a whole and remedies available to or from the class as a whole. The arbitrator shall also decide the relief, if any, to which a party or class member may be entitled individually. If the court, however, ultimately denies a party's request to proceed on a consolidated, class, collective or representative basis, then that party's individual claim(s) shall still be subject to this Program and referable to arbitration pursuant to its terms.

## Amendment to NABORS DISPUTE RESOLUTION RULES:

### 30. Scope of Arbitrator's Authority

A. The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

B. The arbitrator shall not have the power to hear any claims in arbitration as a class or collective action, or in a private attorney general or similar capacity, or on any other representative capacity basis, or, absent the consent of all parties, on a consolidated basis. The arbitrator shall be authorized to decide only the disputed claims between the individual parties.

# PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE NABORS



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors*

**PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE NABORS**

1. **1. Propósito y Diseño**

El Programa está diseñado con el fin de proporcionar un medio para la resolución rápida, justa, accesible y económica de conflictos entre la Compañía y los Empleados actuales y anteriores de la Compañía y los Aspirantes para puestos de empleo, con respecto a o como consecuencia de una relación de empleo actual, anterior o potencial con la Compañía. El Programa está diseñado para facilitar un proceso para la resolución definitiva de todas los Conflictos descriptos en los términos del mismo. No está diseñada para limitar o aumentar los derechos fundamentales disponibles bajo las leyes aplicables. El Programa modifica en forma contractual la relación de empleo efectuado entre la Compañía y sus Empleados, pero sólo en la medida en que esté expresamente establecido en el Programa. El Programa deberá ser interpretado de acuerdo con esta intención.

2. **Definiciones**

A. "AAA" significará la Asociación Americana de Arbitraje (the American Arbritration Association).

B. "JAMS" significará los Servicios de Mediación y Arbitraje Judiciales (Judicial Arbitration and Mediation Services)

C. La "Ley" significará la Ley Federal de Arbitraje (the Federal Arbitration Act)

D. La "Compañía" significará el patrocinador del Programa y las filiales directas o indirectas (ya sean una corporación, una compañía de responsabilidad limitada, una sociedad u otra entidad legal) del patrocinador, la Entidad que Selecciona el Programa, la entidad o persona que se alega tiene responsabilidad asociada o separada con respecto a cualquier Conflicto, y todos sus directores, funcionarios, empleados y agentes, plan de beneficios, ya sea exento o no-exento de impuestos, establecido o mantenido por dicha entidad, los fiduciarios, agentes y empleados de dichos planes, y los sucesores y beneficiarios de dichas entidades, planes y personas; siempre y cuando, en el caso de la Entidad que selecciona el Programa, "La Compañía" deberá incluir la Entidad que Selecciona el Programa solamente en la medida establecida en el contrato de dicha Entidad en la que estará obligada por el Programa.

E. "Conflicto" significará todas las demandas legales y justas, los reclamos y controversias, de cualquier índole o tipo, ya fueren contractuales, o de responsabilidad extracontractual, de acuerdo con el derecho escrito o las regulaciones o alguna otra ley, entre las partes obligadas por el Programa o por un contrato para resolver los Conflictos de acuerdo al Programa, o entre una persona obligada por el Programa y una persona o entidad con derecho a recibir sus beneficios, incluyendo pero sin limitarse a lo siguiente:

1. este Programa;

2. la contratación o la posible recontratación de un Empleado, incluyendo los términos, condiciones o el cese de dicho empleo con la Compañía;

3. los beneficios o incidentes de empleo con la Compañía;

4. todo asunto relacionado con la relación entre el Empleado y la Compañía incluyendo, por ejemplo pero sin limitarse a: la discriminación basada en la raza, el sexo, la religión, el origen nacional, la edad, la condición de veterano de guerra o cualquier incapacidad; el acuso sexual u cualquier otro tipo de acoso; las represalias por concepto de compensación laboral; la difamación, la imposición de un agravio emocional, la reclamación de antimonopolio relacionado con sueldos o el estado de, una reclamación por o una membresía relacionado con los planes de beneficios para empleados;

5. la solicitud de un Aspirante para un puesto de empleo y las acciones y decisiones de la Compañía con respecto a dicha solicitud; y

6. cualquier lesión personal supuestamente incurrida en o alrededor del sitio de trabajo de una Compañía o durante el término y alcance de las actividades laborales de un Empleado,

El "Conflicto" incluye todo lo anteriormente mencionado, independientemente del momento en que hayan ocurrido los eventos en los cuales estén basados, incluyendo los asuntos basados en eventos que hayan sucedido antes de que el Empleado estuviera sujeto a este Programa (siempre y cuando dichos conflictos no fueren establecidos con anterioridad en un tribunal jurídico) o después de la terminación de la relación de empleo

F. La "Entidad que Selecciona el Programa" significará toda entidad legal que hubiera acordado una obligación por medio el Programa de acuerdo a las disposiciones de este documento.

G. El "Empleado" significará toda persona que estuviera o hubiera sido empleada por la Compañía a la fecha o después de la fecha de vigencia de este Programa, incluso si estuviera o no estuviera empleado por la Compañía en el momento en que una demanda fuera presentada en relación con un Conflicto, y que residiera en los Estados Unidos de América, o que estuviera sujeto a las leyes de los Estados Unidos o de cualquier estado, municipalidad u otra subdivisión política de los Estados Unidos.

H. El "Aspirante" significará toda persona que estuviera buscando o que haya buscado empleo con la Compañía después de la fecha de vigencia de este Programa.

I. Las "Partes" significarán, las personas perjudicadas en relación con un Conflicto particular, y/o las entidades que obligadas y vinculadas por este Programa.

J. El "Programa" significará este Programa de Resolución de Conflictos de Nabors, y como fuere modificado de tiempo en tiempo.

K. Las "Reglas" significarán las Reglas para la Resolución de Conflictos de Nabors, según fueran modificadas de tiempo en tiempo, que sean aplicables a la mediación y el arbitraje.

L. El "Patrocinador" significará Nabors Industries, Inc., una corporación del estado de Delaware.

## 3. Nombre, Aplicación y Cobertura

A. El Programa será denominado el "Programa de Resolución de Conflictos de Nabors". De forma alternativa, podrá ser referido como el "Programa de Resolución de Conflictos".

B. Hasta que sea revocado por la entidad Patrocinadora de acuerdo con lo dispuesto en este Programa, dicho Programa se aplica y obliga la Compañía, cada Empleado y cada Aspirante y sus herederos, los beneficiarios y los cesionarios de dicha persona o entidad; siempre que este Programa no se aplique a un Empleado que sea parte de un grupo de Empleados representados por una organización laboral o a la Compañía relacionada con dichos empleados, excepto

en la medida permitida en un convenio de negociación colectiva (entre patronos y sindicatos obreros) o legalmente impuesto por la Compañía cuando ningún convenio de negociación colectiva estuviera vigente.

C.  Este Programa se aplica a todo Conflicto, salvo se estipule lo contrario en este documento.

D.  Sin perjuicio de lo estipulado en este Programa, el mismo no se aplica a las reclamaciones por concepto de indemnización o compensación de beneficios para obreros o de beneficios por concepto de desempleo.

E.  La mediación y el arbitraje están solamente disponibles para los Conflictos que involucren derechos que estuvieren protegidos legalmente.

F.  Sin perjuicio de otras disposiciones establecidas en este documento, todo tribunal con jurisdicción sobre las Partes puede emitir órdenes judiciales (incluyendo requerimientos judiciales preliminares) si los requerimientos legales y equitativos de acuerdo a las leyes aplicables se cumplieran durante la institución de las demandas bajo el Programa. Adicionalmente, una demanda bajo la Ley denominada The Limitation of Ship Owners Liability Act, 46 U.S.S §§181-189, no estará sujeta a este Programa.

4.  **Resolución de Conflictos**

Los conflictos que no fueren resueltos por las Partes serán definitivamente resueltos de acuerdo con este Programa y sus Reglas.

5.  **Artículo referente a Represalias**

No se podrá imponer ninguna forma de disciplina, ni se deberá tomar represalias con los empleados por haber iniciado o participado de buena fe en un proceso o una demanda de acuerdo con este Programa.

6.  **Enmienda**

A.  Este Programa puede ser modificado por el Patrocinador en cualquier momento mediante una notificación previa a los empleados actuales de por lo menos 10 días. Sin embargo, no se deberá aplicar ninguna enmienda a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas salvo se convenga lo contrario

B.  El Patrocinador puede modificar las Reglas en cualquier momento por medio de la notificación de las enmiendas en AAAy JAMS. Sin embargo, ninguna enmienda de

las Reglas deberá aplicar a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas, salvo se acuerde lo contrario.

## 7. Terminación del Programa

Este Programa podrá ser terminado por el Patrocinador en cualquier momento mediante la notificación a los Empleados actuales en un plazo no mayor de 10 días previo a la terminación antedicha. Sin embargo, la terminación no entrará en vigencia para los Conflictos para los cuales una demanda haya sido iniciada de acuerdo con las Reglas antes de la fecha de terminación, salvo se acuerde lo contrario.

## 8. Ley Aplicable

A. La Ley se aplicará a este Programa, las Reglas y cualquier demanda realizada de acuerdo al Programa o las Reglas, incluyendo las demandas para obligar, hacer cumplir, anular o confirmar demandas, adjudicaciones, órdenes de un árbitro, o resoluciones de acuerdo al Programa o las Reglas.

B. Todos los arbitrajes efectuados de acuerdo con este Programa deberán ser convocados tan cerca como fuera posible del sitio de trabajo donde sucedieron los eventos en disputa, en caso que Nabors continúe realizando labores en esa ubicación. De lo contrario, el arbitraje tomará lugar en el sitio más conveniente para la mayor parte de los testigos.

C. Salvo se establezca de manera expresa en las Reglas contenidas en este documento, se conservan los derechos legales fundamentales, los recursos y los mecanismos de defensa de todas la Partes. En caso de arbitraje, el árbitro tendrá la autoridad para determinar las leyes aplicables y de ordenar las compensaciones legales o equitativas, que una Parte pudiera obtener de un tribunal de jurisdicción competente en base a las reclamaciones presentadas en la demanda.

D. Salvo se estipule de forma expresa en este documento, o en las Reglas del mismo, no se deberá interpretar el Programa con el propósito de otorgar derechos, recursos o mecanismos de defensa fundamentales, legales o contractuales adicionales, los cuales no podrían ser aplicados por un tribunal de una jurisdic-

ción competente en ausencia del Programa.

E. Sin perjuicio de las disposiciones establecidas en la subcláusula anterior, en toda demanda presentada ante un árbitro, el árbitro, a su total discreción, podrá permitir que un Empleado o Aspirante prevaleciente reciba los honorarios para el pago de abogados como parte del fallo dictado. La discreción para permitir la concesión de una asignación de honorarios de acuerdo a esta subcláusula será adicional a toda discreción, derecho o autoridad que el árbitro pudiera tener de acuerdo a las leyes aplicables. Si el árbitro concede los honorarios de abogado sin la autorización para dicha asignación por derecho escrito o contrato, dicha asignación estará limitada a $2,500.00.

## 9. Procesos Administrativos

A. Este Programa se deberá aplicar a un Conflicto que estuviera pendiente ante toda entidad administrativa o tribunal local, estatal o federal, a menos que estuviera prohibido por la ley.

B. La participación en todo proceso administrativo o judicial por la Compañía no deberá afectar la aplicabilidad del Programa a dicho Conflicto una vez que fuere terminado el proceso administrativo o judicial. Un fallo, una recomendación o una decisión efectuada por una entidad administrativa en base a los méritos de un Conflicto deberá tener el mismo peso o efecto legal de acuerdo al Programa como si hubieran sido dictados por un tribunal de una jurisdicción competente.

## 10. Recurso Exclusivo

Los procesos efectuados de acuerdo al Programa deberán ser el método exclusivo, inapelable y vinculante por medio de los cuales se resolverán los Conflictos.

## 11. Las Entidades que Seleccionen el Programa

A. Las Corporaciones u otras entidades legales, que no fuesen Partes del mismo, tienen la opción de decidir si quisieren estar vinculadas y obligadas por este Programa mediante un contrato escrito con el Patrocinador.

B. Dicha opción para participar en este Programa puede ser efectuada en relación con algunos tipos de Conflictos, o en relación con algunas personas, a discreción de la Entidad que Seleccione el Programa.

## 12. La Fecha de Vigencia

La Fecha de Vigencia de este Programa será el 15 de abril de 2001.

## 13. Atribución de Separación

Los términos de este Programa y las Reglas son separables. La falta de validez o de la obligación para que se cumplieran algunas de las disposiciones en este documento no afectará la aplicación de las otras disposiciones. Donde fuere posible, y en forma consistente con los propósitos del Programa, toda disposición que fuera invalidada en el Programa o en las Reglas se podrá modificar y después de modificada, se podrá obligar su cumplimiento.

## 14. Asentimiento

El empleo o la continuación del empleo después de la Fecha en Vigencia de este Programa constituyen el consentimiento por parte del Empleado y la Compañía para estar obligados por las disposiciones de este Programa, durante la duración del empleo y después del cese del mismo. La presentación de una solicitud de empleo, independientemente del formulario utilizado, constituye el consentimiento por parte del Aspirante y la Compañía para estar obligados por las disposiciones de este Programa.

# REGLAS PARALA RESOLUCIÓN DE CONFLICTOS DE NABORS

## 1. Definiciones

Todas las definiciones incluidas en el Programa de Resolución de Conflictos de Nabors se aplicarán a estas Reglas.

## 2. Aplicación

A. Si hubieran reglas diferentes que fueran aplicables a una determinada clase específica de Conflicto, y éstas hubieran sido adoptadas por el Patrocinador y notificadas a AAA y JAMS, estas Reglas no se aplicarán a dicha clase de Conflictos.

B. Estas Reglas se aplican de la forma en que existieran en el momento en que se iniciaran los procesos establecidos de acuerdo con las mismas.

A.     En la medida que fuera consistente con estas

las Reglas de Resolución de Conflictos Laborales de AAAo JAMS también se aplicarán a todos los procesos reglamentados por estas Reglas.

## 3. El Inicio del Proceso

A. Una Parte puede iniciar la demanda de acuerdo con lo establecido por estas Reglas en cualquier momento, sujeto a los mecanismos de defensa e incluyendo aquellos que apliquen en el tiempo oportuno de la reclamación, incluyendo las limitaciones y demoras indebidas.

B. Una Parte puede iniciar la demanda mediante la entrega de una solicitud escrita para iniciar la demanda en AAAo JAMS y después del pago de cargo administrativo correspondiente.

C. Las copias de la solicitud deberán ser entregadas a todas las otras Partes del Conflicto por AAAo JAMS. La solicitud deberá describir la índole del Conflicto, el monto involucrado, si lo hubiese, el recurso que se solicita y el sitio solicitado para el proceso.

D. Las demandas también pueden ser iniciadas por un Empleado o Aspirante mediante la entrega de una solicitud escrita para iniciar los procesos al Administrador del Programa de Resolución de Conflictos de la Compañía. En dicho caso, la Compañía deberá entregar en la brevedad posible a AAA o JAMS toda solicitud que hubiera recibido y que hubiera sido entregada en forma apropiada.

E. Las Partes contra quienes se haya presentado una demanda deberán presentar una declaración en respuesta a dicha demanda dentro del plazo de 21 días de la fecha a partir de la que se recibió la notificación de la intención de arbitrar o la descripción de las reclamaciones, la cual deberá incluir las contrademandas y las solicitudes para que el árbitro (si lo hubiera) prepare una declaración fundamentando las razones por las cuales se concede la indemnización.

## 4. Junta Administrativa

AAA o JAMS deberán convocar una junta administrativa tan pronto como sea posible después de haber recibido la declaración de respuesta o después del vencimiento del plazo para la presentación de la declaración de respuesta, si

dicha declaración no hubiera sido presentada. La junta
puede ser sostenida en persona o por teléfono. En la junta,

A.       En la medida que fuera consistente con estas

AAAo JAMS determinarán si las Partes han acordado un método para resolver el Conflicto. Si las Partes estuvieran de acuerdo, AAA o JAMS implementarán el proceso de acuerdo con sus reglas una vez que se haya efectuado el pago del cargo correspondiente. Si las Partes no pueden llegar a un acuerdo, o si las Partes hubieran intentado llegar a un acuerdo y no pudieron resolver el Conflicto por medio de la mediación u otro mecanismo que no fuera vinculante u obligatorio, el Conflicto deberá ser arbitrado de acuerdo con estas Reglas.

## 5. El Nombramiento de un Árbitro

Inmediatamente después del pago del cargo por concepto de arbitraje, AAA o JAMS deberán enviar simultáneamente a cada Parte involucrada una lista idéntica de los nombres de las personas que fueron escogidas de un panel de árbitros calificados que AAA o JAMS deberá seleccionar y mantener. Cada una de las Partes del Conflicto tendrá catorce (14) días a partir de la fecha del comunicado para tachar los nombres que no prefiere, numerar en orden de preferencia los nombres restantes y devolver la lista a AAA o JAMS. Si una de las Partes no regresara la lista dentro del plazo especificado, todas las personas en la misma serán consideradas como aceptables. Entre las personas que hayan sido aprobadas en ambas listas, y de acuerdo con el orden de preferencia mutua, AAAo JAMS deberán invitar a que uno de ellos o más de uno ejerza/n de árbitro/s. En los casos en los cuales más de $2,000,000 esté en controversia, cualquiera de las partes tendrá el derecho de solicitar que el arbitraje proceda delante de un panel de tres miembros en vez de un solo árbitro. La Parte que escoja un panel en estas circunstancias deberá notificar a las otras Partes durante la junta administrativa descrita en la Cláusula 4 del Programa. Cualquiera de las Partes tendrá el derecho de tachar una lista de árbitros en su totalidad. Cuando una de las Partes ejercita este derecho, AAAo JAMS deberá emitir una nueva lista de árbitros de manera consistente con los procesos anteriormente mencionados.

## 6. Requisitos para la designación de un Árbitro

Ninguna persona deberá ejercer como árbitro en ningún caso en el cual dicha persona tuviera un interés financiero o personal. Antes de aceptar el nombramiento, el posible candidato deberá revelar cualquier circunstancia que posiblemente pudiera impedir una audiencia oportuna o crear la presunción de parcialidad. Una vez recibida dicha información por parte del árbitro o de cualquier otra fuente, AAA o JAMS tendrá que sustituir esa persona o comunicar la información a las Partes involucradas para que

puedan formular sus comentarios. A partir de entonces, AAA o JAMS podrán descalificar dicha persona y su decisión será concluyente.

## 7. Vacantes

Si hubiera una vacante por cualquier razón o si un árbitro designado no pudiera ejercer en forma oportuna, se deberá aplicar el proceso para determinar nombramientos descripto en la Cláusula 5 para la selección de un árbitro substituto.

## 8. Fecha, Hora y Sitio para las Audiencias

A. El árbitro deberá fijar la fecha, hora y sitio de cualquier proceso efectuado de acuerdo con las disposiciones de la Cláusula 8B del Programa.

B. Se proporcionará la notificación de la audiencia con un plazo no mayor de diez (10) días de anticipación, salvo que el árbitro determinara o que las Partes convengan que un periodo más corto fuera necesario.

C. El árbitro deberá realizar su labor, sin incurrir en gastos indebidos, para acomodar el Empleado o el Aspirante en la selección de un sitio para el proceso.

## 9. Juntas

A pedido de AAA o JAMS, o de una de las Partes o por iniciativa del árbitro, el árbitro de AAA o JAMS podrá convocar a juntas previa notificación para la discusión y la determinación de cualquier asunto que agilice el proceso, incluyendo:

A. la jurisdicción,

B. la aclaración de asuntos de especial interés

C. la determinación de asuntos preliminares, incluyendo el sumario de las consideraciones y disposiciones legales

D. la junta previa a la audiencia

E. el tiempo y sitio para los procesos o juntas de arbitraje

F. los recursos equitativos o legales interinos autorizados por las leyes aplicables

G. los memorandums anteriores o posteriores a la audiencia

H. las disposiciones, y/o

I. cualquier otro asunto o proceso fundamental

## 10. La modalidad para realizarAudiencias y Juntas

A discreción del árbitro o por común acuerdo entre las Partes, se podrán realizar juntas y audiencias por teléfono o por escrito, así como en persona.

## 11. La Junta previa a la Audiencia

A. En un horario que será determinado por el árbitro, cada una de las partes deberá entregar por adelantado los nombres y direcciones de los testigos que se pro-pone presentar y también los documentos que tiene planeado presentar.

B. El árbitro tendrá la discreción para determinar el for-mato, la cantidad y la frecuencia de las juntas con las Partes involucradas.

C. Las juntas antedichas podrán tomar el formato permi-tido por las Reglas Federales para Procesos Civiles, ser modificadas de tiempo en tiempo, y estar sujetas a las restricciones impuestas por el árbitro.

## 12. Representación

Cualquiera de las Partes podrá ser representada por un abogado o por cualquier otro representante autorizado.

## 13. La Asistencia a las Audiencias

El árbitro deberá guardar la privacidad de los procesos hasta donde fuera permitido por la ley. Todas aquellas personas que tienen un interés personal en el caso a ser tratado ten-drán el derecho de asistir a los procesos de arbitraje.

El árbitro deberá tener la autoridad de excluir a cualquier testigo que no fuera una de las Partes u otra persona esen-cial, durante del testimonio de otros testigos. El árbitro deberá determinar si alguna otra persona podrá asistir al proceso. A pedido de cualquiera de las Partes, el árbitro deberá excluir cualquier testigo durante el testimonio de otros testigos.

## 14. Aplazamiento de los procesos o juntas de arbitraje

A. El árbitro, debido a una causa justificada demostrada por una de las Partes, o de común acuerdo con las Partes, podrá postergar cualquier proceso o junta de

arbitraje.

B. La realización de procesos judiciales pendientes y relacionados con el mismo asunto no constituye una causa justificada para su aplazamiento.

## 15. Declaración Jurada

Antes de proseguir con la primera audiencia, cada árbitro podrá tomar el juramento para el ejercicio de su cargo y así lo hará si fuera requerido por la ley. El árbitro puede requerir que los testigos testifiquen bajo juramento conducido por una persona debidamente calificada y así lo hará si fuera requerido por la ley o requerido por alguna de las Partes.

## 16. Registro de los Procesos de Arbitraje

No habrá ningún registro estenográfico, de audio o video de los procesos de arbitraje salvo que fueran solicitados por alguna de las Partes o determinado por el árbitro. La Parte que solicite el registro deberá pagar el costo total de su producción. Se suministrarán copias del registro a pedido de las otras Partes y una vez que se haya pagado el costo de la reproducción.

## 17. Proceso

El Proceso deberá ser dirigido por el árbitro en el orden y de la manera que permita la más rápida presentación de la evidencia y de los argumentos de las Partes.

## 18. El Arbitraje en Ausencia de una de las Partes

El árbitro podrá proseguir en ausencia de una de las Partes o representantes que, después de la debida notificación, no se presentaran o no obtuvieran un aplazamiento. No se alcanzará un fallo solamente en base a la falta de asistencia de una de las Partes. El árbitro deberá requerir que cualquiera de las Partes presentes presente toda la evidencia que el árbitro requiriera con el fin de alcanzar un fallo o conceder una asignación.

## 19. Evidencia

A. El árbitro será el único que juzgará la relevancia, la importancia, y la admisibilidad de la evidencia que fuera presentada. La conformidad con las reglas legales referentes a evidencia no será necesaria.

B. El árbitro puede citar con una orden de comparecencia a testigos o documentos a pedido de una de las Partes o

por la iniciativa propia del árbitro.

C. El árbitro puede considerar la evidencia de los testigos mediante una declaración jurada o una declaración, pero le deberá dar el peso que el árbitro considere apropiado después de haber considerado cualquier objeción hecha para su admisión al proceso de arbitraje.

## 20. Presentación de la Evidencia después de la Audiencia

La evidencia documentada a ser considerada por el árbitro deberá ser presentada en la audiencia salvo que el árbitro encuentre una justificación para que se permita una presentación posterior a dicha audiencia. Se les deberá proporcionar a todas las Partes la oportunidad para examinar y comentar sobre cualquier evidencia que fuera presentada posteriormente a la audiencia. El árbitro deberá permitir la presentación de expedientes a pedido de una de las Partes y deberá determinar el proceso y el momento oportuno de dicha presentación.

## 21. El Cierre y la Reapertura de los Procesos de Arbitraje

A. Cuando el árbitro esté satisfecho que el registro está completo, incluyendo los expedientes que hayan sido presentados con su permiso después de la audiencia, el árbitro deberá declarar el cierre del proceso.

B. Se podrá reabrir el proceso por iniciativa del árbitro o mediante la solicitud de una de las Partes en cualquier momento anterior al fallo del árbitro.

## 22. Renuncia al Derecho de Objetar en el Proceso de Arbitraje

Después de haber tenido conocimiento de que no se hubiera cumplido con las disposiciones o requerimientos relacionados con estos procesos y reglas de arbitraje, cualquiera de las Partes que no se oponga por escrito será considerada como que hubiera renunciado al derecho de objetar.

## 23. Notificaciones

Cualquier comunicado, notificaciones o procesos necesarios o apropiados para la iniciación o la continuación de cualquier proceso de arbitraje efectuado de acuerdo con estas Reglas (incluyendo el fallo del árbitro, cualquier demanda judicial en relación con el mismo, o la adjudicación de una indemnización efectuada de acuerdo con estos procesos) puede ser enviado por correo dirigido a la Parte o su representante a la dirección más reciente de la cual se

tuviera conocimiento o entregado mediante un servicio de mensajería. AAAo JAMS, las Partes, y el árbitro también podrán usar la transmisión por facsímile, telex, telegrama, u cualquier otra forma escrita de comunicación electrónica con el fin de entregar cualquier notificación requerida por esta Reglas.

24. **La Comunicación con AAA, JAMS y la Compañía**

A. Cualquiera de las Partes podrá notificar o comunicarse con AAA, comunicándose con:

> Regional Administrador
> (Administrador Regional)
> American Arbitration Association
> (Asociación Americana de Arbitraje)
> 1001 Fannin St. Suite 1005
> Houston, Texas 77002
> (713) 739-13022
> Fax: (713) 739-1702

B. Cualquiera de las Partes podrá notificar o comunicarse con JAMS, comunicándose con:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

C. Cualquier notificación o comunicado con la Compañía deberá ser dirigido a:

> Legal Department (Departamento Legal)
> Nabors Industries, Inc.
> 515 West Greens Road, Suite 1200
> Houston, Texas 77067-4525
> (281) 874-0035
> Fax: (281) 775-8431

25. **Comunicación con el Árbitro**

No habrá ninguna comunicación con las Partes y el árbitro aparte de la comunicación en las audiencias o juntas de arbitraje. Cualquier otra forma de comunicación ya sea oral o escrita de las partes al árbitro deberán ser dirigidas a AAA o JAMS (y su copia enviada a las Partes) para ser transmitidas al árbitro, salvo que las Partes y el árbitro acuerden lo contrario.

26. **Plazo para efectuar el Fallo de Arbitraje**

El fallo se efectuará rápidamente por el árbitro, salvo que se hubiera acordado lo contrario por las Partes o que estu-

viera estipulado por las leyes aplicables, en un plazo no mayor de treinta (30) días a partir de la fecha del cierre de los procesos o, si fuera aplicable, del cierre de un proceso de arbitraje que haya sido reabierto.

## 27. El Formato del Fallo de Arbitraje

El fallo del arbitraje deberá ser por escrito y deberá ser firmado por el árbitro. El árbitro deberá redactar una declaración de las razones para el fallo, si fuera requerido en la solicitud para iniciar los procesos o en la declaración de respuesta que se hubieran presentado. El fallo del árbi - tro deberá ser ejecutado de la manera requerida por las leyes aplicables.

## 28. Modificaciones del Fallo del Árbitro

Como consecuencia de un mandato de un tribunal de jurisdicción competente, o por común acuerdo entre las Partes, el árbitro deberá modificar cualquier fallo que se hubiera dictado. El árbitro podrá modificar un fallo mediante la moción de alguna de las Partes si el árbitro considera que el fallo fuera ambiguo o presentara algún defecto, o si el fallo requiriera un acto ilegal o imposible de realizar. Estas son las únicas circunstancias por medio de las cuales un árbitro tendrá jurisdicción para retirar o modificar un dictamen o fallo.

## 29. Resolución

Si las Partes resuelven su Disputa durante el transcurso del arbitraje, el árbitro podrá describir los términos de la resolución en un fallo de consentimiento.

## 30. Alcance de la Autoridad del Árbitro

La autoridad del árbitro deberá estar limitada a la resolución de Conflictos legales entre las Partes. Como tal, el

árbitro deberá estar obligado por y deberá aplicar las leyes aplicables, incluyendo las que estén relacionadas con la determinación del peso de la prueba, así como las leyes fundamentales. El árbitro tendrá la autoridad para limitar o extender los derechos fundamentales protegidos por las leyes aplicables. El árbitro podrá también conceder un recurso de emergencia o provisional que esté o que podría estar autorizado por las leyes aplicables. El árbitro deberá estar obligado a cumplir con las disposiciones del Programa y las Reglas.

## 31. Los Procesos Judiciales y la Exclusión de Responsabilidad

A. Ni AAA, JAMS o ningún árbitro deberán constituir

ninguna de las Partes de ningún proceso judicial en relación con los procesos de arbitraje efectuados de acuerdo con estas Reglas.

B. Ni AAA, JAMS o ningún árbitro será responsable ante ninguna de las Partes por ningún acto de omisión en relación con cualquier proceso que se encuentre dentro del alcance de estas Reglas.

C. Cualquier tribunal con jurisdicción sobre las Partes podrá obligar a alguna de las Partes a proceder de acuerdo con estas Reglas en cualquier lugar y podrá hacer cumplir cualquier fallo que se haya dictado.

D. Se considerará que las Partes bajo estas Reglas consienten en que el fallo del árbitro podrá ser admitido y que dicho fallo se podrá hacer cumplir en cualquier tribunal federal o estatal que tuviera jurisdicción sobre las Partes.

E. La iniciación de, la participación en, o la eliminación de un proceso legal no constituirá una renuncia al derecho a proceder de acuerdo con estas Reglas.

F. Cualquier tribunal con jurisdicción sobre las Partes podrá presentar órdenes judiciales (incluyendo órdenes preliminares) si se cumplieran los requisitos legales necesarios y equitativos de acuerdo con las leyes aplicables, en espera de la institución de los procesos de arbitraje efectuados de acuerdo con estas Reglas.

## 32. Honorarios y Gastos

A. Los gastos de los testigos deberán ser pagados por la Parte que presenta dichos testigos, salvo se indique lo contrario en las leyes aplicables o en el fallo del árbitro.

B. Todos los honorarios de los abogados deberán ser pagados por la Parte que los contrató, salvo se indique lo contrario en las leyes aplicables, en el Programa o en el fallo del árbitro.

C. Los costos de las juntas a realizarse (por ejemplo: los honorarios del relator para la transcripción original) deberán ser pagados por la Parte que inicia la junta. El costo de las copias de la transcripción de la declaración jurada y cualquier otro costo deberá ser pagado por la Parte que solicite la copia.

D. Los honorarios y los gastos de los peritos, asesores y demás que fueren presentados o consultados por una de las Partes, deberán ser pagados por la Parte que utilice dichos servicios.

E. El Empleado o Aspirante deberá pagar un cargo de $150 si él o ella inicia el arbitraje o mediación. Aparte de dicho cargo, el Empleado / Aspirante no será responsable de pagar los honorarios y gastos del proceso efectuado de acuerdo a estas Reglas, incluyendo los viáticos requeridos de un árbitro o mediador, AAA o JAMS, y el costo de cualquier evidencia que fuere presentada a la discreción del árbitro.

F. Si la demanda para mediación o arbitraje es iniciada por la Compañía, dichos honorarios serán pagados por la Compañía.

G. Salvo se indique lo contrario en las leyes vigentes o en el fallo del árbitro, todos los otros gastos, honorarios y costos del proceso efectuado de acuerdo a estas Reglas serán pagados de manera equitativa por las Partes que no son Empleados/Aspirantes.

## 33. Interpretación y Aplicación de Estas Reglas

El árbitro deberá interpretar y aplicar estas Reglas en lo que respecta a los poderes y deberes del árbitro. Todas las otras reglas deberán ser interpretadas y aplicadas por AAA o JAMS.

## 34. Ley Aplicable

A. Los Procesos efectuados de acuerdo a estas Reglas y la revisión judicial de los fallos deberán ser regidos por la Ley.

B. Salvo se indique lo contrario de forma expresa en estas Reglas, las leyes fundamentales aplicadas

deberán ser leyes estatales o leyes federales fundamentales que serían aplicadas por un Tribunal de Distrito de los Estados Unidos que tomara el lugar del proceso de arbitraje.

## 35. Mediación

En cualquier momento después de que el proceso de arbitraje haya concluido, las Partes podrán acordar la mediación de su disputa por medio de la notificación de AAA o JAMS. AAA o JAMS deberán determinar que procesos se aplican a dicha mediación.

## 36. Español

Este Programa de Resolución de Conflictos se encuentra disponible en inglés y en español

**Nabors Industries, Inc.**
April 2001



**17 de enero de 2007**

**A:**     Todos los Empleados de Nabors Industries, Inc. y Subsidiarias

**REF:**  Programa de Resolución de Disputa de Nabors

Estimado Empleado:

A partir de diez (10) días después de la fecha de este aviso, de conformidad con la Sección 6 del Programa de Resolución de Disputa de Nabors de Nabors Industries, Inc. ("Nabors") y sus subsidiarias están enmendando el Programa y Reglamentos de Resolución de Disputa de Nabors para la determinación de todas las disputas entre los empleados y Nabors o una de sus subsidiarias.

Las enmiendas al Programa y Reglamentos están anexas en la parte posterior de esta página. Nabors estás enmendando una (1) sección del Programa de Resolución de Disputa de Nabors y una (1) sección de los Reglamentos de Resolución de Disputa de Nabors. Usted debe ya tener una copia del programa y los reglamentos actuales o pueden encontrarse en la Intranet de Nabors, de acuerdo a la política número 200.80.1, en http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

Como antes, el Programa de Resolución de Disputa de Nabors, incluyendo sus enmiendas, le da los medios más efectivos y eficientes para resolver cualquier disputa que pueda tener, a través del proceso que estimula la resolución a la oportunidad más inmediata. Los empleados no renuncian a algún derecho legal sustantivo de acuerdo al Programa. En su lugar, el programa, incluyendo sus enmiendas, estipula que cualquier asunto legal sustantivo que pueda tener, sea resuelto sobre una base individual por mediación o ante un árbitro neutral, cuya decisión será final y que lo obliga a usted y a la Compañía. De acuerdo al programa. incluyendo sus enmiendas, sin embargo, usted renuncia a todo derecho de procedimiento que pueda tener para iniciar una acción judicial en base individual, colectiva, de clase o representativa; y usted renuncia al derecho de un juicio ante jurado en relación con alguna disputa que pueda tener con la Compañía o alguna Entidad Electora (como es definida en el Programa), que incluye alguna reclamación de lesión o reclamación de discriminación en base a raza, origen nacional, género, religión, edad o discapacidad ,de acuerdo con cualquier estatuto de derechos civiles federales o estatales.

Cada individuo que trabaja para Nabors Industries, Inc. o una subsidiaria está sujeto al Programa, incluyendo sus enmiendas, excepto que las disposiciones enmendadas afecten solamente a las disputas iniciadas después de la fecha efectiva de la enmiendas y sin asuntos pendientes antes de la fecha efectiva. Su empleo continuado después de la fecha en que reciba este aviso constituirá su aceptación de las enmiendas al Programa, tanto durante y después de su empleo con la Compañía.

Esperamos continuar trabajando juntos. Si tiene alguna pregunta acerca de estas enmiendas al Programa y a los Reglamentos o a cualquier otro término de su empleo, por favor, no dude en comunicarse con el Departamento de Recursos Humanos de su empleador.

Atentamente,

NABORS INDUSTRIES, INC.

*\*Una copia de este aviso está disponible en español,*
*si la solicita al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.*



## Enmienda al PROGRAMA DE RESOLUCIÓN DE DISPUTA DE NABORS:

**4. Resolución de disputas**

A. Todas las disputas que no sean de otro modo establecidas por las Partes serán finales y resueltas de manera concluyente, de acuerdo a este Programa y a los Reglamentos. Las partes renuncian a todo derecho que puedan tener a un juicio ante jurado sobre reclamaciones relacionadas de alguna manera a cualquier disputa.

B. Cada disputa será arbitrada sobre una base individual. Las Partes preceden y renuncian a cualquier derecho para unirse o consolidar reclamaciones en arbitraje cono otros o para hacer reclamaciones al arbitraje como un representante o como un miembro de una clase o en capacidad de abogado particular o similar, a menos que tales procedimientos sean convenidos por todas las partes. Ni la Compañía ni algún Empleado o Solicitante puede continuar alguna Disputa sobre una base de acción de clase, de acción colectiva o consolidada o en capacidad de representación de otras personas o entidades que hayan reclamado estar situados similarmente o participado como un miembro de clase en tal demanda. El árbitro en alguna demanda de acuerdo a este Programa no tendrá autoridad para conducir el asunto como una acción consolidada, de clase colectiva o de representación.

C. Si la limitación del procedimiento en el Párrafo B de esta Sección no puede hacerse cumplir por un tribunal en una demanda en la cual una parte busca ejercer una acción consolidada, de clase o colectiva, o actuar de otra manera en una capacidad de representación, entonces este programa aplicará a tal demanda sólo al siguiente alcance. El tribunal decidirá si la Disputa debe proceder sobre una base consolidada, de clase, colectiva u otra de representación y, si es así, definirá el alcance de la clase. Ninguna de las determinaciones anteriores será remitida al árbitro y en ningún caso el árbitro tendrá el poder para determinar la certificación de acción de clase, colectiva o de representación. Las decisiones del tribunal estarán sujetas a apelación en conformidad a las reglas de procedimiento aplicables. Si el tribunal certifica una acción de clase, colectiva u otra representación, entonces todas las otras determinaciones, dentro o relacionadas con la Disputa, serán hechas por el árbitro. El árbitro determinará las preguntas de responsabilidad para, o de la clase, como un todo y los remedios disponibles para o de la clase, como un todo. En árbitro también decidirá el desagravio, si lo hay, al cual una parte o miembro de clase puede tener derecho individualmente. Si el tribunal, no obstante, niega en última instancia una solicitud de una parte para proceder sobre una base consolidada, de clase, colectiva o de representación, entonces esa reclamación individual de la parte estará todavía sujeta a este Programa y referible al arbitraje en conformidad a sus términos.

## Enmienda a los REGLAMENTOS DE RESOLUCIÓN DE DISPUTA DE NABORS:

**30. Alcance de la Autoridad del Árbitro**

A. La autoridad del árbitro será limitada a la resolución de Disputas legales entre las Partes. Como tal, el árbitro estará obligado y aplicará la ley pertinente, que incluye aquello relacionado con la ubicación de la carga de la prueba, así como la ley sustantiva. El árbitro no tendrá la autoridad, ya sea de abreviar o aumentar, los derechos sustantivos disponibles de acuerdo con la ley aplicable. El árbitro también puede otorgar desagravio de emergencia o temporal que sea o sería autorizado por la ley aplicable. El árbitro estará obligado y cumplirá con las disposiciones del Programa y los Reglamentos.

B. El árbitro no tendrá el poder de escuchar reclamaciones en el arbitraje como una acción de clase o colectiva, o en capacidad de abogado particular o similar o sobre otra base de capacidad de representación, o ausente el consentimiento de todas las partes, sobre una base consolidada. El árbitro estará autorizado a decidir solamente las reclamaciones disputadas entre las partes individuales.



**Applicant Must Read And Verify With Signature**

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities, from all liability for any damages that may result from furnishing information regarding me. ___Adlg___ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. ___Adlg___ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration. ___Adlg___ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. ___Adlg___ - INITIALS

This application will be considered active for thirty (30) days.

_Alfredo De la Haya_                     _7-16-13_
Applicant's Signature                         Date

HR-105 (01/07/11)

## NOTICE TO APPLICANTS REGARDING

### DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1    I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2.    By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

Alfredo De La Garza
_____
Name of Applicant

Alfredo De La Garza
_____
Signature of Applicant

7-16-13
_____
Date

Alfredo De La Garza


## AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todos los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible.

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporciona este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3.    Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4    Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

_____
Nombre del Aspirante

_____
Firma del Aspirante

_____
Fecha

HR-106

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

Alfredo De La Garza
Name of Employee (Print)

Alfredo De La Gar
Signature of Employee

7-22-13
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un período de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

Nombre del Empleado (Letra de Imprenta/Molde)

Firma del Empleado

Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.



Revised April, 2003

INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS
## DRILLING BID PROPOSAL
### AND
## DAYWORK DRILLING CONTRACT - U.S.

TO: NABORS DRILLING USA, LP

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____

this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M on _____ , 20 ____ .
to the following address: _____

## THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY, AND ALLOCATION OF RISK – SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

**OPERATOR:** Penn Virginia Oil & Gas, LP
**Address:** 840 Gessner Road, Suite 800
Houston, Texas 77024
**CONTRACTOR:** NABORS DRILLING USA, LP
**Address:** 515 W. Greens Road, Suite 1000
Houston, Texas 77067

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.

1. **LOCATION OF WELL:**
Well Name and Number: **To be advised by Operator**
Parish/County: **Jefferson**   State: **Texas**   Field Name: _____
Well location and land description: **To be advised by Operator**
1.1 Additional Well Locations or Areas: **None.**
Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**
Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the _____ day of _____ , 20 ____ ; or **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Contractor shall have the right to terminate this Contract unless Operator pays Contractor the Standby Time Rate from such release date until the location is ready. If Contractor so terminates, the termination shall be deemed to be a termination at Operator's election, and the provisions of Sub-paragraph 6.4(a) shall apply.**

3. **DEPTH:**
3.1 Well Depth: The well(s) shall be drilled to a depth of approximately __10,500'__ Feet, or to the _____ formation, whichever is deeper, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____ ** feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4. **DAYWORK RATES:**
Contractor shall be paid at the following rates for the work performed hereunder.

4.1 Mobilization: Operator shall pay Contractor a mobilization fee of $ _____ or a mobilization day rate of $ __19,000*__ per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: **Move-in and rig up on the new well site.**
*Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string up services.**

4.2 Demobilization: Operator shall pay Contractor a demobilization fee of $ _____ or a demobilization day rate during tear down of $ __19,000*__ per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.**
*Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string down services.**

4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ , Operator shall pay Contractor a sum of $ _____ per twenty-four (24) hour day.

4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with **Five (5)** man crew the operating day rate shall be:

| Depth Intervals | | | | | | |
|---|---|---|---|---|---|---|
| From | To | | Without Drill Pipe | | With Drill Pipe | |
| 0 | Rig Release | $ | 21,000 | per day | $ 21,000 | per day |
| | | $ | | per day | $ | per day |
| | | $ | | per day | $ | per day |

Using Operator's drill pipe $ __21,000__ per day.

The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.



## EXHIBIT "1-B"

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | | Size | Grade | Directional or Uncontrollable Deviated Hole | | Size | Grade |
|---|---|---|---|---|---|---|---|
| $ N/A | per ft. | | | $ N/A | per ft | | |
| $ N/A | per ft. | | | $ N/A | per ft. | | |
| $ N/A | per ft. | | | $ N/A | per ft. | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 Repair Time: In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of ___eight (8)___ hours for any one rig repair job, but not to exceed twenty-four (24) hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____zero (0)_____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6 Standby Time Rate: $___100% of the Operating Day Rate___ per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 Drilling Fluid Rates: When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a) $___20___ per man per day for Contractor's rig-site personnel.
(b) $___110___ per day additional operating rate; and
(c) Cost of all labor, material and services plus ___twenty-four (24)___ hours operating rate to clean rig and related equipment.

4.8 Force Majeure Rate: $___100% of the Operating Day Rate___ per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 Reimbursable Costs: Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____ten (10)_____ percent for such cost of handling. When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Contractor shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.

4.10 Revision in Rates: The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than ___zero (0)___ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a) Labor costs, including all benefits, of Contractor's personnel;
(b) Contractor's cost of insurance premiums;
(c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $___N/A___; Operator shall provide all fuel.
(d) Contractor's cost of catering, when applicable;
(e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
(f) ~~Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU110103) to determine to what extent a price variance has occurred in said spare parts and supplies;~~
(g)(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

## 5. TIME OF PAYMENT

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 Disputed Invoices and Late Payment: Operator shall pay all invoices within _____thirty (30)_____ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of _____1 1/2_____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3

## 6. TERM:

6.1 Duration of Contract: This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of_____ commencing on the date specified in Paragraph 2 above.~~

6.2 ~~Extension of Term: Operator may extend the term of this Contract for _____ well(s) or for a period of _____ by giving notice to Contractor at least _____ days prior to completion of the well then being drilled or by___ Not Used.~~

6.3 Early Termination:

(a) By Either Party: Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

(b) By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c) By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4 Early Termination Compensation:

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty ~~a sum equal to the standby time rate (Subparagraph 4.6) for a period of _____ days or~~ a lump sum of $ ___105,000___.

(b) Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or__ plus, as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate__

(c) Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for _____five (5)_____ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, a lump sum of $_____ ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or__ as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate__

7. CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

8. DRILLING METHODS AND PRACTICES:

8.1 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2 Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3 Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4 Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5 If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

9. INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

10. SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NDUSA

advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.

11. EQUIPMENT CAPACITY

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder or where canal or water depths are in excess of _____ feet. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment

12. TERMINATION OF LOCATION LIABILITY:

When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.

13. INSURANCE

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extend of the indemnification obligations assumed herein.

14. RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:

14.1 Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.

14.2 Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or ____100____ percent of current new replacement cost of such equipment delivered to the well site.

14.3 Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.

14.4 Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.

14.5 The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.

14.6 Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.

14.7 Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from , and shall protect, defend and indemnify Contractor from and against, any such liability.

14.8 Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.9 Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or

damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.6 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



of THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.
NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT.

**19. INFORMATION CONFIDENTIAL:**

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

**20. SUBCONTRACTS:**

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

**21. ATTORNEY'S FEES**

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

**22. CLAIMS AND LIENS:**

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

**23. ASSIGNMENT:**

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

**24. NOTICES AND PLACE OF PAYMENT:**

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

**25. CONTINUING OBLIGATIONS:**

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

**26. ENTIRE AGREEMENT:**

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

**27. SPECIAL PROVISIONS:**

27.1 Exhibit "C" – <u>Contractors Special Provisions</u> is attached hereto and made a part hereof.

27.2 In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas. Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3 For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $19,000 per day.

27.4 Epoch Well Services, Inc. ("Epoch"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Epoch $280 per day (spud to release) for rental of the Epoch Rig Watch system.

The Epoch Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included with option for 6 additional probes), trip tank volume probes (1 probe included with option for 1 additional probe), and return flow paddle.

**28. ACCEPTANCE OF CONTRACT:**

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this 23 day of Sep , 20 08.

OPERATOR: Penn Virginia Oil & Gas

By: _____

Title: Ops Mgr

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this 22nd day of September , 20 08 , which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within Seven (7) days of the above date Contractor shall be in no manner bound by its signature thereto.

CONTRACTOR: Nabors Drilling USA, LP By; NDUSA Holdings Corp., its General Partner

By: _____

Title: Vice President Marketing and Sales

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



## EXHIBIT "A"

To Daywork Contract dated ___ **September 22** ___ 20 __ **08**

Operator __ **Penn Virginia Oil & Gas, LP** _____ Contractor ___ **Nabors Drilling USA, LP** _____

Well Name and Number ___ **To be advised by Operator** _____

### SPECIFICATIONS AND SPECIAL PROVISIONS

**1. CASING PROGRAM (See Paragraph 7)**

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | in. | in | lbs/ft. | | ft. | hrs |
| Surface | in. | in. | lbs/ft. | | ft. | hrs |
| Protection | in. | in. | lbs/ft | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |
| Production | in. | in. | lbs/ft | | ft. | hrs |
| Liner | in. | in. | lbs/ft | | ft. | hrs |
| | in. | in. | lbs/ft | | ft. | hrs |

**2. MUD CONTROL PROGRAM (See Subparagraph 8.2)**

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Other mud specifications: _____

_____

_____

_____

**3. INSURANCE (See Paragraph 13)**

3.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___ **one (1) million** ___ covering all of Contractor's employees working under this Contract.

3.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___ **one (1) million** ___ combined single limit per occurrence for Bodily Injury and Property Damage.

3.3 Automobile Public Liability Insurance with limits of $__ **one (1) million** ___ for the death or injury of each person and $___ **one (1) million** ___ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $___ **one (1) million** ___ for each accident.

3.4 ~~In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoreman's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.~~

3.5 Other insurance: **Excess liability insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.** ___

**4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:**

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract

4.1 Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. ___ **712*** ___ the major items of equipment being:

Drawworks: Make and Model ___ **Per rig Inventory attached hereto and made a part hereof.** ___

Engines: Make, Model, and H.P. _____

No. on Rig _____

Pumps: No. 1 Make, Size, and Power _____

No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W.P. _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive: Type _____

Drill Pipe: Size ___ **4 1/2"** ___ in **weights and grades as necessary to maintain 100,000 lbs overpull** ft. Size _____ in _____ ft

Drill Collars: Number and Size ___ **25-6 ½" (nominal); 6-8" (nominal)** ___

Form provided by Forms On-A-Disk
(214) 340-9429 - FormsOnADisk.com

Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|------|--------------------|--------------|--------|
| | | | |
| | | | |
| | | | |

B.O.P. Closing Unit: _____
B O.P, Accumulator: _____

4.2   Derrick timbers.

4.3   Normal strings of drill pipe and drill collars specified above.

4.4   Conventional drift indicator.

4.5   Circulating mud pits.

4.6   Necessary pipe racks and rigging up material.

4.7   Normal storage for mud and chemicals.

4.8   Shale Shaker.

4.9   _____

4.10  _____

4.11  _____

4.12  _____

4.13  _____

4.14  _____

4.15  _____

4.16  _____

4.17  _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract.

5.1   Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.

5.2   Stake location, clear and grade location, and provide turnaround, including surfacing when necessary

5.3   Test tanks with pipe and fittings.

5.4   Mud storage tanks with pipe and fittings.

5.5   Separator with pipe and fittings.

5.6   Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.

5.7   Labor to disconnect and clean test tanks and mud gas separator.

5.8   Drilling mud, chemicals, lost circulation materials and other additives.

5.9   Pipe and connections for oil circulating lines.

5.10  Labor to lay, bury and recover oil circulating lines.

5.11  Drilling bits, reamers, reamer cutters, stabilizers and special tools

5.12  Contract fishing tool services and tool rental

5.13  Wire line core bits or heads, core barrels and wire line core catchers if required.

5.14  Conventional core bits, core catchers and core barrels.

5.15  Diamond core barrel with head.

5.16  Cement and cementing service.

5.17  Electrical wireline logging services.

5.18  Directional, caliper, or other special services

5.19  Gun or jet perforating services.

5.20  Explosives and shooting devices.

5.21  Formation testing, hydraulic fracturing, acidizing and other related services

5.22  Equipment for drill stem testing.

5.23  Mud logging services

5.24  Sidewall coring service

5.25  Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.

5.26  Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment.

5.27  Casing scratchers and centralizers.

5.28  Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.

5.29  Special or added storage for mud and chemicals.

5.30  Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.

5.31  Blowout preventer testing packoff and testing services

5.32  Replacement of BOP rubbers, elements and seals, if required, after initial test

5.33  Casing Thread Protectors and Casing Lubricants

5.34  $H_2S$ training and equipment as necessary or as required by law.

5.35  Site septic systems.

5.36  Ditching around rig and location. _____

5.37  Third party BOP testing service. _____

5.38  _____

5.39  _____

5.40  _____

5.41  _____

5.42  _____

5.43  _____

5.44  _____

5.45  _____

5.46  _____

5.47  _____

5.48  _____

5.49  _____

5.50  _____

**6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:**

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column

| | Item | To Be Provided By and At The Expense Of | |
|---|---|---|---|
| | | Operator | Contractor |
| 6.1 | Cellar and Runways | X | |
| 6.2 | Ditches and sumps | X | |
| 6.3 | Fuel (located at _____ ) | X | |
| 6.4 | Fuel Lines (length ___ of rig only ___ ) | | X |
| 6.5 | Water at source, including required permits | X | |
| 6.6 | Water well, including required permits | X | |
| 6.7 | Water lines, including required permits | X | |
| 6.8 | Water storage tanks _____ capacity (Per rig inventory) | | X |
| 6.9 | Potable water and bottled water | X | |
| 6.10 | Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 | Maintenance of water well, if required | X | |
| 6.12 | Water Pump | X | |
| 6.13 | Fuel for water pump | X | |
| 6.14 | Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 | Transportation of Contractor's property: | | |
| | Move in | See Paragraph 4.1 | |
| | Move out | See Paragraph 4.2 | |
| 6.16 | Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 | Special strings of drill pipe and drill collars as follows: | | |
| | Any required | X | |
| 6.18 | Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 | Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 | Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 | Rate of penetration recording device (Epoch electronic) | | X |
| 6.22 | Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 | Casing tools | X | |
| 6.24 | Power casing tongs | X | |
| 6.25 | Laydown and pickup machine | X | |
| 6.26 | Tubing tools | X | |
| 6.27 | Power tubing tong | X | |
| 6.28 | Crew Boats, Number _____ | N/A | N/A |
| 6.29 | Service Barge | N/A | N/A |
| 6.30 | Service Tug Boat | N/A | N/A |
| 6.31 | Rat Hole | X | |
| 6.32 | Mouse Hole | X | |
| 6.33 | Reserve Pits | X | |
| 6.34 | Upper Kelly Cock | | X |
| 6.35 | Lower Kelly Valve | | X |
| 6.36 | Drill Pipe Safety Valve | | X |
| 6.37 | Inside Blowout Preventer | | X |
| 6.38 | Drilling hole for or driving for conductor pipe | X | |
| 6.39 | Charges, cost of bonds for public roads | X | |
| 6.40 | Portable Toilet | X | |
| 6.41 | Trash Receptacle | X | |
| 6.42 | Linear Motion Shale Shaker (Per rig inventory) | | X |
| 6.43 | Shale Shaker Screens | X | |
| 6.44 | Mud Cleaner | X | |
| 6.45 | Mud/Gas Separator | X | |
| 6.46 | Desander | | X |
| 6.47 | Desilter | | X |
| 6.48 | Degasser | X | |
| 6.49 | Centrifuge | X | |
| 6.50 | Rotating Head | X | |
| 6.51 | Rotating Head Rubbers | X | |
| 6.52 | Hydraulic Adjustable Choke | X | |
| 6.53 | Pit Volume Totalizer | X | |
| 6.54 | Communication, type ___ (Cellular phone for rig use only) | | X |
| 6.55 | Forklift, capacity _____ | X | |
| 6.56 | Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | | |
| 6.58 | | | |
| 6.59 | | | |
| 6.60 | | | |


NDUSA

7. OTHER PROVISIONS:

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



Revised April, 2003

**EXHIBIT "B"**

(See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)     The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)     The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.



## EXHIBIT "C"

### CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Texas_May04




# NABORS DRILLING USA, LP

## Rig No. 712

### Diesel Electric Land Rig

**DRAWWORKS:** Mid - Continent U712 EA, with an input rating of 1,000 horsepower, Baylor 6032 Dynamatic brake, crown-o-matic and Foster catheads. Drum is lebus grooved for a 1 1/4" drilling line.

**PRIMARY POWER:** Three Caterpillar D-399 engines rated at 1,215 horsepower each, driving three KATO 1030 KW generators with a Ross Hill SCR system.

**MAST:** Dreco 136' cantilever, 136' clear height x 21' base at floor. API static hook load of 571,000 lbs. w/ 10 lines strung.

**SUBSTRUCTURE:** Dreco "Slingshot", with a 22' floor height and 18' clear height under the rotary beams. Substructure is designed for a 600,000 lbs. casing load simultaneous with a setback load of 350,000 lbs.

**MUD PUMPS:** Two Gardner Denver PZ-10 triplex mud pumps rated at 1,300 horsepower each, driven by one 1000 horsepower GE 752 motors each.

**MUD TANKS:** Two tank, 970 barrel system with a 75 barrel slugging compartment in the suction tank. Mud system is equipped with stirring guns and clean out gates. Mud mixing and 10 HP mud agitators.

**SOLIDS CONTROL:** 12 cone desilter.
2 cone desander.
Two linear motion shale shakers.

**WATER STORAGE:** One 500 barrel tank.

**FUEL STORAGE:** One 12,000 gallon tank.

**HOOK/BLOCK:** BJ 5350 Hook and National 545G Block, both rated at 350 tons.

**SWIVEL:** CE LB 400. 400 ton.

**ROTARY:** GD 27 1/2".

**ACCUMULATOR:** Koomey, 180 gallon, eight station, with an electric powered triplex pump, two air operated pumps, regulating valves and eight station remote control.

**BLOWOUT PREVENTERS:** One 11" x 5,000 psi, Annular, H2S Trim.
One 11" x 5,000 psi, Single ram, H2S Trim.
One 11" x 5,000 psi, Double ram, H2S Trim.
One 3 1/8 x 5,000 psi, choke manifold, H2S Trim.

**DRILL PIPE:** As per contract

**DRILL COLLARS:** As per contract

**MISC. EQUIPMENT:**

| | |
|---|---|
| Automatic driller | One air hoist |
| Wireline unit | 0-7 degree drill indicator |
| 4 Pen drilling recorder | Lower Kelly valve |
| Upper Kelly valve | Inside BOP |
| Full opening safety valve | 5 1/4" x 40' Hex Kelly |
| Vapor proof lighting system | Kelly spinner |
| Spinning wrench | |



## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial Inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The Inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Texas_May04

# EXHIBIT "1-C"

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.

Revised April, 2003

**INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS**
**DRILLING BID PROPOSAL**
**AND**
**DAYWORK DRILLING CONTRACT - U.S.**

TO: NABORS DRILLING USA, LP

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M. on _____ , 20 ____ .
to the following address: _____

**THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY,**
**RELEASE OF LIABILITY, AND ALLOCATION OF RISK –**
**SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14**

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| | |
|---|---|
| **OPERATOR:** | Penn Virginia MC Energy, LLC |
| Address: | 110 West 7th, Suite 1000 |
| | Tulsa, Oklahoma 74119 |
| **CONTRACTOR:** | NABORS DRILLING USA, LP |
| Address: | 515 W. Greens Road, Suite 1000 |
| | Houston, Texas 77067 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). *When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.*

1. **LOCATION OF WELL:**
   Well Name and Number: To be advised by Operator *HUERTA #1-30H AW CS*
   Parish/County: ~~Weehita~~ *LOGAN AW* State: Oklahoma Field Name: _____ *AW CS*
   Well location and land description: To be advised by Operator *Sec 30-16N-3W AW CS*
   1.1 Additional Well Locations or Areas: None.
   Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**
   Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the _____ day of _____ , 20 ____ ; or **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Operator shall pay Contractor the Standby Time Rate from such release date until the location is ready.** *OPERATOR ACCEPTS RIG UPON EXECUTION OF CONTRACT AW CS*

3. **DEPTH:**
   3.1 Well Depth: The well(s) shall be drilled to a depth of approximately **TBA** Feet, or to the _____ formation, ~~whichever is deeper~~, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____** feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4. **DAYWORK RATES:**
   Contractor shall be paid at the following rates for the work performed hereunder.

   4.1 Mobilization: Operator shall pay Contractor ~~a mobilization fee of $~~ _____ or a mobilization day rate of $ **17,000*** per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: **Move-in and rig up on the new well site.**
   ***Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string up services.**

   4.2 Demobilization: Operator shall pay Contractor ~~a demobilization fee of $~~ _____ or a demobilization day rate ~~during tear down of~~ $ **17,000*** per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: **Rig down and remove rig from the final well location and, if applicable, move the** rig to the nearest suitable stack out location. *IF THE RIG HAS NO LOCATIONS TO MOVE ON. AW CS*
   ***Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string down services.**

   ~~4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ Operator shall pay Contractor a sum of $ _____ per twenty-four (24) hour day.~~

   4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with **Five (5)** man crew the operating day rate shall be:

   | Depth Intervals From | To | Without Drill Pipe | | With Drill Pipe | |
   |---|---|---|---|---|---|
   | 0 | Rig Release | $ 20,000** per day | | $ 20,000** per day | |
   | ____ | ____ | $ ____ per day | | $ ____ per day | |
   | ____ | ____ | $ ____ per day | | $ ____ per day | |

   Using Operator's drill pipe $ **20,000**** per day. **The Operating Day Rate includes a Canrig top drive.

   The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.

Form provided by Forms On-A-Disk
(214) 340-9428 • FormsOnADisk.com



**EXHIBIT "1-D"**

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | Size | Grade | Directional or Uncontrollable Deviated Hole | Size | Grade |
|---|---|---|---|---|---|
| $ N/A per ft. | | | $ N/A per ft. | | |
| $ N/A per ft. | | | $ N/A per ft. | | |
| $ N/A per ft. | | | $ N/A per ft. | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 Repair Time: In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of ~~eight (8)~~ _four (4)_ hours for any one rig repair job, but not to exceed ~~thirty-six (36)~~ _twenty-four (24)_ hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____zero (0)_____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig and top drive maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6 Standby Time Rate: $____100% of the Operating Day Rate____ per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 Drilling Fluid Rates: When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a) $ 20 per man per day for Contractor's rig-site personnel.
(b) $ 110 per day additional operating rate; and
(c) Cost of all labor, material and services plus ____twenty-four (24)____ hours operating rate to clean rig and related equipment

4.8 Force Majeure Rate: $____100% of the Operating Day Rate____ per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 Reimbursable Costs: Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus ____fifteen (15)____ percent for such cost of handling. *When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.*

4.10 Revision in Rates: The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than ____zero (0)____ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a) Labor costs, including all benefits, of Contractor's personnel;
(b) Contractor's cost of insurance premiums;
(c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $__N/A____; Operator shall provide all fuel.
(d) Contractor's cost of catering, when applicable;
(e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
~~(f) Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU110102) to determine to what extent a price variance has occurred in said spare parts and supplies;~~
~~(g)~~(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

5. TIME OF PAYMENT

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 Disputed Invoices and Late Payment: Operator shall pay all invoices within ____thirty (30)____ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of ____1 1/2____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3.

6. TERM:

6.1 Duration of Contract: This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of~~ _____ commencing on the date specified in Paragraph 2 above.

6.2 ~~Extension of Term: Operator may extend the term of this Contract for~~ _____ ~~well(s) or for a period of~~ _____ ~~by giving notice to Contractor at least~~ _____ ~~days prior to completion of the well then being drilled or by.~~ _Not used._ _OPERATOR NOTIFICATION WITHIN 15 DAYS AFTER S/OD HAS THE RIGHT TO EXTEND_

6.3 Early Termination: _for additional well or for APEAING of time subject to mutually Agreed RATES, TERMS AND CONDITIONS._

(a) By Either Party: Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

(b)  By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c)  By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4  Early Termination Compensation:

(a)  Prior to Commencement; In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty ~~a sum equal to the standby time rate (Subparagraph 4.6) for a period of~~ _____ days or a lump sum of $   140,000   .

(b)  Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or~~ plus, as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate.

(c)  Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for _____seven (7)_____ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, ~~a lump sum of $_____ provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or~~ as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate.

7.  CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

8.  DRILLING METHODS AND PRACTICES:

8.1  Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2  Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3  Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4  Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5  If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

9.  INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

10.  SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must

advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.

11. EQUIPMENT CAPACITY

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder or where canal or water depths are in excess of _____feet. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

12. TERMINATION OF LOCATION LIABILITY:

When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.

13. INSURANCE

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extend of the indemnification obligations assumed herein.

14. RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:

14.1 Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.

14.2 Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or ____100____ percent of current new replacement cost of such equipment delivered to the well site.

14.3 Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.

14.4 Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.

14.5 The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.

14.6 Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.

14.7 Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from , and shall protect, defend and indemnify Contractor from and against, any such liability.

14.8 Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.9 Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



Revised April, 2003

damage to property. Operator's Indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the Indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 *Liability for Wild Well:* Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 *Pollution or Contamination:* Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 *Consequential Damages:* Subject to and without effecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 *Indemnity Obligation:* Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



of THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT _____.

19. INFORMATION CONFIDENTIAL:

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

20. SUBCONTRACTS:

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

21. ATTORNEY'S FEES

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

22. CLAIMS AND LIENS:

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

23. ASSIGNMENT:

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

24. NOTICES AND PLACE OF PAYMENT:

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

25. CONTINUING OBLIGATIONS:

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

26. ENTIRE AGREEMENT:

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

27. SPECIAL PROVISIONS:

27.1 Exhibit "C" – Contractors Special Provisions is attached hereto and made a part hereof.

27.2 In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas. Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3 For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $17,000 per day.

27.4 Canrig Drilling Technology Ltd. ("Canrig"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Canrig $260 per day (spud to release) for rental of the Canrig Rig Watch system.

The Canrig Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included), trip tank volume probes (1 probe included), and return flow paddle.

28. ACCEPTANCE OF CONTRACT:

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this _8th_ day of _Sept_, 20_10_.

OPERATOR: _Penn Virginia MC Energy, LLC_
By: _____
Title: _Regional Mgr_

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this _3rd_ day of _September_, 20_10_, which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within _Seven (7)_ days of the above date Contractor shall be in no manner bound by its signature thereto.

CONTRACTOR: _Nabors Drilling USA, LP By: NDUSA Holdings Corp., its General Partner_
By: _E. Nelson_
Title: _Vice President Contracts_

# EXHIBIT "A"

To Daywork Contract dated ___Spetember 3___, 20 _10_

Operator __Penn Virginia MC Energy, LLC__          Contractor ___Nabors Drilling USA, LP___

Well Name and Number ___To be advised by Operator___

## SPECIFICATIONS AND SPECIAL PROVISIONS

### 1. CASING PROGRAM (See Paragraph 7)

|  | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Walt on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | in. | in. | lbs/ft | | ft | hrs |
| Surface | in. | in. | lbs/ft | | ft. | hrs |
| Protection | in. | in. | lbs/ft. | | ft. | hrs |
| | in | ln | lbs/ft | | ft. | hrs |
| Production | in | in. | lbs/ft. | | ft | hrs |
| Liner | in | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |

### 2. MUD CONTROL PROGRAM (See Subparagraph 8.2)

| Depth Interval (ft) | | | | | |
|---|---|---|---|---|---|
| From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Other mud specifications: _____

### 3. INSURANCE (See Paragraph 13)

3.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___one (1) million___ covering all of Contractor's employees working under this Contract.

3.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___one (1) million___ combined single limit per occurrence for Bodily Injury and Property Damage

3.3 Automobile Public Liability Insurance with limits of $___one (1) million___ for the death or injury of each person and $___one (1) million___ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $___one (1) million___ for each accident.

3.4 In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoremen's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.

3.5 Other insurance: ___Excess liability insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE Insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.___

### 4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract.

4.1 Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. ___F28*___, the major items of equipment being:

Drawworks: Make and Model ___Per rig inventory attached hereto and made a part hereof.___

Engines: Make, Model, and H.P _____

No. on Rig _____

Pumps: No. 1 Make, Size, and Power _____

No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W.P. _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive: Type _____

Drill Pipe: Size ___5"___ in __weights and grades as necessary to maintain 100,000 lbs overpull__ ft ; Size: ___ in. ___ ft

Drill Collars: Number and Size ___43-6 3/8" (nominal); 10-8" (nominal)___

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|------|--------------------|--------------|--------|
| | | | |
| | | | |
| | | | |

B.O.P. Closing Unit: _____
B.O.P. Accumulator: _____

4.2   Derrick timbers.
4.3   Normal strings of drill pipe and drill collars specified above.
4.4   Conventional drill indicator
4.5   Circulating mud pits.
4.6   Necessary pipe racks and rigging up material.
4.7   Normal storage for mud and chemicals.
4.8   Shale Shaker.
4.9   _____
4.10  _____
4.11  _____
4.12  _____
4.13  _____
4.14  _____
4.15  _____
4.16  _____
4.17  _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract

5.1   Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.
5.2   Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.
5.3   Test tanks with pipe and fittings.
5.4   Mud storage tanks with pipe and fittings
5.5   Separator with pipe and fittings
5.6   Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.
5.7   Labor to disconnect and clean test tanks and mud gas separator
5.8   Drilling mud, chemicals, lost circulation materials and other additives.
5.9   Pipe and connections for oil circulating lines.
5.10  Labor to lay, bury and recover oil circulating lines.
5.11  Drilling bits, reamers, reamer cutters, stabilizers and special tools.
5.12  Contract fishing tool services and tool rental.
5.13  Wire line core bits or heads, core barrels and wire line core catchers if required.
5.14  Conventional core bits, core catchers and core barrels.
5.15  Diamond core barrel with head
5.16  Cement and cementing service.
5.17  Electrical wireline logging services.
5.18  Directional, caliper, or other special services
5.19  Gun or jet perforating services.
5.20  Explosives and shooting devices.
5.21  Formation testing, hydraulic fracturing, acidizing and other related services.
5.22  Equipment for drill stem testing.
5.23  Mud logging services
5.24  Sidewall coring service.
5.25  Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.
5.26  Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment
5.27  Casing scratchers and centralizers
5.28  Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.
5.29  Special or added storage for mud and chemicals.
5.30  Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.
5.31  Blowout preventer testing packoff and testing services.
5.32  Replacement of BOP rubbers, elements and seals, if required, after initial test
5.33  Casing Thread Protectors and Casing Lubricants.
5.34  H$_2$S training and equipment as necessary or as required by law.
5.35  Site septic systems.
5.36  ___Ditching around rig and location._____
5.37  ___Third party BOP testing service._____
5.38  _____
5.39  _____
5.40  _____
5.41  _____
5.42  _____
5.43  _____
5.44  _____
5.45  _____
5.46  _____
5.47  _____
5.48  _____
5.49  _____
5.50  _____

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column.

| | Item | To Be Provided By and At The Expense Of | |
|---|---|---|---|
| | | Operator | Contractor |
| 6.1 | Cellar and Runways | X | |
| 6.2 | Ditches and sumps | X | |
| 6.3 | Fuel (located at _____) | X | |
| 6.4 | Fuel Lines (length __of rig only__ ) | | X |
| 6.5 | Water at source, including required permits | X | |
| 6.6 | Water well, including required permits | X | |
| 6.7 | Water lines, including required permits | X | |
| 6.8 | Water storage tanks _____ capacity (Per rig Inventory) | | X |
| 6.9 | Potable water and bottled water | X | |
| 6.10 | Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 | Maintenance of water well, if required | X | |
| 6.12 | Water Pump | X | |
| 6.13 | Fuel for water pump | X | |
| 6.14 | Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 | Transportation of Contractor's property. | | |
| | Move in | See Paragraph 4.1 | |
| | Move out | See Paragraph 4.2 | |
| 6.16 | Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 | Special strings of drill pipe and drill collars as follows: | | |
| | Any required | X | |
| | | | |
| | | | |
| 6.18 | Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 | Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 | Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 | Rate of penetration recording device (Canrig electronic) | | X |
| 6.22 | Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 | Casing tools | X | |
| 6.24 | Power casing tongs | X | |
| 6.25 | Laydown and pickup machine | X | |
| 6.26 | Tubing tools | X | |
| 6.27 | Power tubing tong | X | |
| 6.28 | Crew Boats, Number | N/A | N/A |
| 6.29 | Service Barge | N/A | N/A |
| 6.30 | Service Tug Boat | N/A | N/A |
| 6.31 | Rat Hole | X | |
| 6.32 | Mouse Hole | X | |
| 6.33 | Reserve Pits | X | |
| 6.34 | Upper Kelly Cock | | X |
| 6.35 | Lower Kelly Valve | | X |
| 6.36 | Drill Pipe Safety Valve | | X |
| 6.37 | Inside Blowout Preventer | | X |
| 6.38 | Drilling hole for or driving for conductor pipe | X | |
| 6.39 | Charges, cost of bonds for public roads | X | |
| 6.40 | Portable Toilet | X | |
| 6.41 | Trash Receptacle | X | |
| 6.42 | ~~Linear Motion~~ Shale Shaker (Per rig Inventory) | | X |
| 6.43 | Shale Shaker Screens | X | |
| 6.44 | Mud Cleaner | X | |
| 6.45 | Mud/Gas Separator | X | |
| 6.46 | Desander | | X |
| 6.47 | Desilter | | X |
| 6.48 | Degasser (Per rig inventory) | | X |
| 6.49 | Centrifuge | X | |
| 6.50 | Rotating Head | X | |
| 6.51 | Rotating Head Rubbers | X | |
| 6.52 | Hydraulic Adjustable Choke | X | |
| 6.53 | Pit Volume Totalizer | X | |
| 6.54 | Communication, type ___(Cellular phone for rig use only) | | X |
| 6.55 | Forklift, capacity ___Model JLG G9-43A (NDUSA, LP preferred model) or a JLG G10-55A (10,000 lb lift with outriggers) with a Star Industries Quick-Tach Truss boom Model 1302-JLG | X | |
| 6.56 | Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | | |
| 6.58 | | | |
| 6.59 | | | |
| 6.60 | | | |

Form provided by Forms On-A-Disk
(214) 340-9428 · FormsOnADisk.com

7.  OTHER PROVISIONS:

Form provided by Forms On-A-Disk
(214) 340-9420 · FormsOnADisk.com



## EXHIBIT "B"

(See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)     The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)     The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4

(4)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

## EXHIBIT "C"

## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors; such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Oklahoma_May04




# NABORS DRILLING USA, LP

## PACE 1500 – RIG F26

### Programmable AC Electric 1500 HP Rig

| | |
|---|---|
| **DRAWWORKS:** | 1,500 horsepower AC drawworks featuring regenerative AC braking. Drawworks is driven by two (2) 800 horsepower AC motors. Autodrill functionality utilizing AC motor. |
| **POWER GENERATION:** | Three (3) – Caterpillar 3512B engines rated at 1,476 horsepower each, driving one (1) Kato 1365 KW generator, for a total of 4,428 horsepower. AC power generation, Variable Frequency Drive (VFD) and MCC unitized in a single house. |
| **MAST:** | Pyramid Fast Moving Land Rig 152' three section mast manufactured to API-4F specification. Static hook load of 1,000,000 lbs. on 12 lines. Mast is raised and lowered utilizing hydraulic cylinders. Mast has integrated top drive rails (enables top drive to travel in mast during rig move). |
| **SUBSTRUCTURE:** | Pyramid hydraulically elevated substructure with 30' floor height and 26' clear height under rotary beams. Substructure is rated for 1,000,000 lbs rotary load simultaneous with a 600,000 lbs setback load. |
| **DRILLER'S CONTROL:** | Climate controlled driller's cabin provides integrated joystick control utilizing PLC technology. Touch screen controls provide state-of-the-art monitoring, control of rig equipment and drilling parameters. |
| **MUD PUMPS:** | Two (2) 1,600 horsepower mud pumps. Each powered by one (1) 1600 horsepower AC motor, pumps are equipped with hydraulic liner retention and pump rod systems. |
| **MUD TANKS:** | Three (3) tank system total capacity approximately 1,500 BBL; four (4) 6" x 8" centrifugal pumps powered by 100 horsepower electric motors. 100 BBL trip tank. |
| **SOLIDS CONTROL:** | Three (3) Swaco Mongoose shale shakers<br>One (1) Swaco mud cleaner with desander / desilter. |
| **WATER STORAGE:** | One (1) 500 BBL water tank. |
| **FUEL STORAGE:** | One (1) 20,000 gallon diesel fuel tank. |
| **TRAVELING BLOCK** | 500 ton traveling block, grooved for 1 3/8" drill line. |
| **TOP DRIVE** | Canrig 1250 AC, 500 ton integrally mounted top drive system. |
| **ROTARY:** | 37-1/2" rotary table, independently driven by AC motor. |
| **ACCUMULATOR:** | Six (6) station accumulator unit with one (1) electric triplex and two (2) air operated pumps. Unit will be designed in accordance with API 16D. Remote panel will be mounted at drill floor. |
| **BLOWOUT PREVENTERS:** | Annular: 13-5/8" x 5000 psi.<br>Double Ram: 13-5/8" x 10,000 psi.<br>Single Ram: 13-5/8" x 10,000 psi.<br>Manifold: 4-1/16" x 3-1/16" 10,000 psi. |
| **DRILL PIPE:** | As per contract. |
| **DRILL COLLARS:** | As per contract. |
| **ADD. EQUIPMENT:** | Dedicated man-rider winch / Automated catwalk / pipe handling system<br>Varco ST-80 Iron Roughneck / Two (2) air operated hoists<br>BOP Handling system / Air operated slips<br>Rotating mousehole / Camera system<br>Intercom system / Vacuum degasser |



## EXHIBIT "C"

### CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 *et seq.*, Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Oklahoma_May04



**Applicant Must Read And Verify With Signature**

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me. _____ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. _____ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration. _____ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. _____ - INITIALS

This application will be considered active for thirty (30) days.

| | |
|---|---|
| _____ | _1-2-13_____ |
| Applicant's Signature | Date |

HR-105 (01/07/11)

## EXHIBIT "1-F"

## NOTICE TO APPLICANTS REGARDING
## DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1. I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2. By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

_John Paul Adams_
Name of Applicant

_[signature]_
Signature of Applicant

_1-2-13_
Date

## AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN
## DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todos los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible.

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporciona este formulario de acuse de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3. Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4. Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

_____
Nombre del Aspirante

_____
Firma del Aspirante

_____
Fecha

HR-106



**Applicant Must Read And Verify With Signature**

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me. _Adlg_ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. _Adlg_ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration. _Adlg_ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. _Adlg_ - INITIALS

This application will be considered active for thirty (30) days.

_Alfredo De la Haya_                    _7-16-13_
Applicant's Signature                      Date

**EXHIBIT "1-G"**

## NOTICE TO APPLICANTS REGARDING
### DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1    I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2.    By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.



| | |
|---|---|
| Alfredo De la Garza | Alfredo De la Garza |
| Name of Applicant | Signature of Applicant |
| 7-16-13 | Alfredo De La Garza |
| Date | |


## AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN
### DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todas los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporciona este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3.    Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4    Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

| | |
|---|---|
| Nombre del Aspirante | Firma del Aspirante |
| Fecha | |

HR-106

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

_____
Name of Employee (Print)

_____
Signature of Employee

_____
1-7-13
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

_____
Nombre del Empleado (Letra de Imprenta/Molde)

_____
Firma del Empleado

_____
Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

## EXHIBIT "1-H"

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

Alfredo De La Garza
Name of Employee (Print)

Alfredo De La Garza
Signature of Employee

7-22-13
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

Nombre del Empleado (Letra de Imprenta/Molde)

Firma del Empleado

Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

## EXHIBIT "1-I"

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR and minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § § | 281ST JUDICIAL DISTRICT |

AFFIDAVIT OF KATHERINE RYAN

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Before me, the undersigned notary, on this day personally appeared Katherine Ryan, the affiant, a person whose identity is known to me. After I administered an oath to affiant, the affiant testified:

1. "My name is Katherine Ryan. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am an in house attorney for Penn Virginia Corporation. Penn Virginia Corporation is the parent company to Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC (collectively, "Penn Virginia").

3. In my capacity as in house attorney, I am familiar with Penn Virginia's corporate structure and the relationship of its various subsidiaries and affiliated companies. I am also familiar with the Nabors Dispute Resolution Program ("DRP").

4. As evidence of Penn Virginia's intent that it participate in the DRP, on September 23, 2008, Penn Virginia Oil & Gas, L.P., on behalf of itself, its parent, subsidiary, and affiliated corporations agreed to be bound by the DRP as an "Electing Entity" pursuant to the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as

**EXHIBIT "2"**

Exhibit 1-B. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-C.

5. As further evidence of Penn Virginia's intent that it participate in the DRP, on September 8, 2010, Penn Virginia MC Energy, LLC, on behalf of itself, its parent, subsidiary, and affiliated corporations agreed to be bound by the DRP as an "Electing Entity" pursuant to the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-D. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-E.

6. As an "Electing Entity," Penn Virginia is required to resolve disputes with any past or present employee(s) or applicant(s) of Nabors Industries, Inc. or its subsidiaries in accordance with the DRP.

7. At all times relevant to this matter, Penn Virginia was engaged in interstate commerce as it is in the business of producing oil and gas resources in both Texas and other states of the United States."

FURTHER AFFIANT SAYETH NOT.

_____
Katherine Ryan

Sworn to and subscribed before me by Katherine Ryan on the 17 day of June, 2015.

VIRGINIA B SILVER
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
SEPT. 3, 2016

_____
Notary Public in and for the State of Texas
My Commission expires:

Sept 3, 2016

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR | § | |
| , minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, L.P., | § | |
| PENN VIRGINIA OIL & GAS GP, LLC, | § | |
| MIKE FERGUSON, TRIFECTA | § | |
| OILFIELD SERVICES, LLC, CUDD | § | |
| PRESSURE CONTROL, INC., | § | |
| ROYWELL SERVICES, INC. and OAKS | § | |
| PERSONNEL SERVICES, INC. d/b/a | § | |
| THE OAKS GROUP | § | 281ST JUDICIAL DISTRICT |

**ORDER ON DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP, LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE**

On the \_\_\_\_\_ day of _____, 2015, the Court considered Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC's Motion to Compel Arbitration and to Abate, pending such arbitration. After considering the motion, the Court GRANTS Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC's Motion to Compel Arbitration and to Abate.

Therefore, Plaintiff, Alfredo "Freddie" De La Garza, Individually and as Next Friend of _____, and Intervenor, John Paul "J.P." Adame, Individually and as Next Friend of _____, are ORDERED to arbitrate their claims against Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC in accordance with the Nabors Dispute Resolution Program.

It is further ORDERED that this case shall be ABATED until the resolution of such arbitration.

_____
PRESIDING JUDGE

10/1/2015 4:56:31 PM
Chris Daniel - District Clerk Harris County
Envelope No. 7196090
By: GAYLE FULLER
Filed: 10/1/2015 4:56:31 PM

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR       , minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, LP, PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § | 215TH JUDICIAL DISTRICT |

## PENN VIRGINIA OIL & GAS GP, LLC, AND PENN VIRGINIA OIL & GAS, L.P.'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO COMPEL ARBITRATION

Defendants Penn Virginia Oil & Gas GP, LLC, Penn Virginia Oil & Gas, L.P. (collectively "Penn Virginia") file this Motion for Reconsideration of this Court's **denial** of Penn Virginia's Motion to Compel Arbitration and to Abate.[1] In support of this Motion for Reconsideration, Penn Virginia would respectfully show as follows:

1. On June 18, 2015, Penn Virginia timely filed its Motion to Compel Arbitration and to Abate (hereinafter the "Motion"). An oral hearing was conducted on September 11, 2015, at which time, this Court issued an Order **denying** Penn Virginia's Motion.

2. As set forth in the Motion, Nabors Industries, Inc. ("Nabors") and its subsidiaries, one of which is Plaintiff and Intervenor's former employer NCPS, have a valid arbitration agreement which requires that disputes involving injuries to employees that are incurred during the course and scope of employment be submitted to final and binding arbitration. The

---

[1] *See* Exhibit A, Penn Virginia's Motion to Compel Arbitration and to Abate, and Exhibit B, Court's Order Denying Penn Virginia's Motion to Compel Arbitration and to Abate.

## EXHIBIT "C"

arbitration agreement applies to all direct and indirect subsidiaries of Nabors, all current and former employees of the aforementioned subsidiaries, and any "Electing Entity" that has agreed to be bound by the terms of the agreement.[2] Per the language found in the 2008 Penn Virginia Oil & Gas LP IADC Contract and the 2010 Penn Virginia MC Energy, LLC IADC Contract (the "Contracts"), Penn Virginia has agreed on more than one occasion to be bound by the terms of the arbitration agreement and to become an "Electing Entity."[3] Thus, the claims asserted by Plaintiff and Intervenor against Penn Virginia are subject to arbitration, as set forth in the Nabors Dispute Resolution Program.

3.  For the reasons set forth in the Motion, Penn Virginia's Joint Reply to Plaintiff and Intervenor's Response to the Motion, and Penn Virginia's separate Reply to Intervenor's Response, Penn Virginia respectfully requests that the Court reconsider the pleadings, the evidence set forth therein, and the arguments made by Penn Virginia.

4.  To the extent that the basis for the Court's denial was certain language contained in the Contracts, which provides that Penn Virginia is an Electing Entity as to all disputes with "present and former employees and applicants of Nabors," Penn Virginia would show that it is an Electing Entity as to all disputes involving present and former employees *at the time the dispute arises*, and not necessarily at the time the contract was entered into.[4] That is, Penn Virginia's status as an Electing Entity is not limited to present and former employees as of 2008 or 2010.[5] Instead, Penn Virginia is an Electing Entity to the Nabors Dispute Resolution Program

---

[2] *See Nabors Dispute Resolution Program ("DRP")*, a true and correct copy of which is attached as Exhibit C.
[3] *See 2008 Penn Virginia Oil & Gas, LP IADC Contract*, a true and correct copy of which is attached as Exhibit D; *see also Contractors Special Provisions*, a true and correct copy of which is attached as Exhibit 1D-1, at ¶ 16 "Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program." *See also 2010 Penn Virginia MC Energy, LLC IADC Contract*, a true and correct copy of which is attached as Exhibit E; *see also Contractors Special Provisions*, a true and correct copy of which is attached as Exhibit E-1, at ¶ 16.
[4] *See* Exhibit D-1 and E-1, both at ¶ 16.

such that arbitration applies as to all persons who are present Nabors employees or former Nabors employees at the time of the dispute.[6] In support of its position, Penn Virginia provides the affidavit of Mr. Ernie Nelson, Vice President of Contracts for Nabors, who executed the 2010 Contract on behalf of Nabors.

## PRAYER

For the foregoing reasons, Penn Virginia would urge this Court to reconsider its order **denying** Penn Virginia's Motion to Compel Arbitration and to Abate. Should this Court grant Penn Virginia's Motion for Reconsideration, Penn Virginia would urge the Court to reverse its decision and issue an order **granting** Penn Virginia's to Compel Arbitration and to Abate.[7] Penn Virginia also requests all other and further relief, both special and general, at law and in equity, to which it may be justly entitled.

---

[5] *See* Exhibit F, Affidavit of Mr. Ernie Nelson.
[6] *Id.*
[7] Exhibit G, Penn Virginia's Proposed Order granting its Motion to Compel Arbitration and to Abate.

Respectfully submitted,

/s/ Kelly C. Hartmann
Thomas J. Smith
  State Bar No. 00788934
  tsmith@gallowayjohnson.com
Kelly C. Hartmann
  State Bar No. 24055631
  khartmann@gallowayjohnson.com
Alexis B. Hester
  State Bar No. 24072807
  ahester@gallowayjohnson.com
GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777 – facsimile

**ATTORNEYS FOR DEFENDANTS, PENN VIRGINIA OIL & GAS GP, LLC AND PENN VIRGINIA OIL & GAS, L.P**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served electronically, by and through the Court approved electronic filing manager, to participating parties on this 1st day of October 2015, as follows:

John David Hart
**LAW OFFICES OF JOHN DAVID HART**
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
Phone 817-870-2102
Fax 817-332-5858
*Counsel for Plaintiffs*

Benjamin A. Escobar, Jr.
Brit T. Brown
**BEIRNE, MAYNARD & PARSON, L.L.P.**
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Phone 713-623-0887
Fax 713-960-1527
*Counsel for Defendant, Cudd Pressure Control, Inc.*

J. Javier Gutierrez
Ana Laura Gutierrez
**THE GUTIERREZ LAW FIRM, INC.**
700 East Third Street
Alice, Texas 78332
Phone 361-664-7377
Fax 361-664-7245
*Counsel for Intervenor, John Paul Adame*

J. J. Knauff
The Miller Law Firm
Turtle Creek Centre
3811 Turtle Creek Blvd., Suite 1950
Dallas, Texas 75219
Phone 469-916-2552
Fax 469-916-2555
*Counsel for Defendant, Penn Virginia MC Energy, LLC*


*/s/ Kelly C. Hartmann*
Kelly C. Hartmann

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR | § | |
|            , minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, L.P., | § | |
| PENN VIRGINIA OIL & GAS GP, LLC, | § | |
| MIKE FERGUSON, TRIFECTA | § | |
| OILFIELD SERVICES, LLC, CUDD | § | |
| PRESSURE CONTROL, INC., | § | |
| ROYWELL SERVICES, INC. and OAKS | § | |
| PERSONNEL SERVICES, INC. d/b/a | § | |
| THE OAKS GROUP | § | 281ST JUDICIAL DISTRICT |

**DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP, LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE**

Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC (collectively referred to hereinafter as "Penn Virginia" unless individual reference is necessary) file this Motion to Compel Arbitration and to Abate pending such arbitration. In support thereof, Penn Virginia would show as follows:

**I. INTRODUCTION**

1.     Plaintiff, Alfredo "Freddie" De La Garza ("Plaintiff" or "De La Garza"), Individually and as Next Friend of                                                      , and Intervenor, John Paul "J.P." Adame ("Adame"), Individually and as Next Friend of                                              , (collectively "the parties") filed personal injury claims against Penn Virginia on July 24, 2014 and November 6, 2014, respectively. Their claims arise out of an April 29, 2014 incident, which occurred at a well site

**EXHIBIT "A"**

located near Shiner, Texas while De La Garza and Adame were working in the course and scope of their employment with Nabors Completion & Production Co. ("NCPS").

2. Nabors Industries, Inc. ("Nabors") and its subsidiaries, one of which is NCPS, have a valid arbitration agreement which requires that disputes involving injuries to employees that are incurred during the course and scope of employment be submitted to final and binding arbitration. De La Garza and Adame both acknowledged and accepted the terms of the arbitration agreement.

3. The arbitration agreement applies to all direct and indirect subsidiaries of Nabors, all current and former employees of the aforementioned subsidiaries, and any "Electing Entity" that has agreed to be bound by the terms of the agreement.[1] Penn Virginia is an "Electing Entity" and has agreed on more than one occasion to be bound by the terms of the agreement.[2] De La Garza's and Adame's individual claims fall within the scope of the arbitration agreement as both were employees of NCPS at the time of the incident and allege that their injuries occurred while in the course and scope of their employment. De La Garza and Adame also filed claims as representatives of their minor children. The minors' claims are also subject to the arbitration agreement as they are derivative of De La Garza and Adame's claims. Consequently, De La Garza and Adame's individual claims against Penn Virginia and the claims filed on behalf of their minor children all fall within the scope of the arbitration agreement.

4. Therefore, Penn Virginia's Motion to Compel Arbitration should be granted, and this case should be abated or dismissed and compelled to final and binding arbitration.

---

[1] *See Nabors Dispute Resolution Program ("DRP")*, a true and correct copy of which is attached as Exhibit 1-A.

[2] *See 2008 Penn Virginia Oil & Gas, LP IADC Contract,* a true and correct copy of which is attached as Exhibit 1-B; *see also Contractors Special Provisions,* a true and correct copy of which is attached as Exhibit 1-C, at ¶ 16 "Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program." *See also 2010 Penn Virginia MC Energy, LLC IADC Contract,* a true and correct copy of which is attached as Exhibit 1-D; *see also Contractors Special Provisions,* a true and correct copy of which is attached as Exhibit 1-E, at ¶ 16.

## II. UNDISPUTED FACTS

5.      Nabors is the "Sponsor" of the Nabors Dispute Resolution Program ("DRP"), as that term is defined by the DRP.[3]

6.      The DRP is subject to the Federal Arbitration Act ("FAA").[4]

7.      By its terms, the Nabors DRP is designed to provide a means for the resolution of disputes between the "Company" and the Company's present and former employees that are related to or that arise out of a current or former employment relationship with the Company.[5]

8.      The DRP is intended to create an exclusive procedural mechanism for the final resolution of all disputes falling within its terms.[6] Consequently, the DRP requires that all disputes between De La Garza, Adame and the Company are subject to binding arbitration.[7]

9.      The DRP defines "Dispute" to include personal injuries that are incurred at the workplace or in the course and scope of employment.[8]

10.     The DRP defines "Company" as "Sponsor and every direct and indirect subsidiary...of Sponsor, **(and) any Electing Entity**."[9] As previously mentioned, Nabors is the

---

[3] *Affidavit of Keith Nicholson* ("*Nicholson Aff.*"), a true and correct copy of which is attached as Exhibit 1, at ¶ 4; *see also* Exhibit 1-A, at ¶ 2(L).

[4] *See* Exhibit 1-A at ¶ ¶ 2(C) and 8. The Federal Arbitration Act, 9 U.S.C. § 2, applies in state courts and preempts state anti-arbitration laws to the contrary. *Circuit City Stores, Inc. v. Adams*, 121 S.Ct. 1302; *Southland Corp v. Keating*, 465 U.S. 1, 16 (1984); *see also Palm Harbor Homes v. McCoy*, 944 S.W.2d 716, 721 (Tex. App.—Fort Worth 1997) (holding that FAA preempted Texas Arbitration Act's requirement that party's attorney sign agreement). Although the FAA preempts state arbitration laws, courts still must resort to general state law contract principles to determine whether an arbitration agreement will be enforced.

[5] *See* Exhibit 1-A, at ¶ 1.

[6] *See* Exhibit 1-A, at ¶ 1.

[7] *See* Exhibit 1-A.

[8] "Dispute" means all legal and equitable claims, demand and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes under the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to...**6. *any personal injury allegedly incurred in or about a Company Workplace or in the course and scope of an Employee's employment.* *See* Exhibit 1-A at ¶ 2(E) (emphasis added).

[9] *See* Exhibit 1-A at ¶ 2(D) (emphasis added).

"Sponsor" of the DRP. NCPS, De La Garza and Adame's employer at the time of the workplace incident, is a subsidiary of Nabors.[10] The DRP extends to and includes employees of NCPS.[11]

11.     Further, Penn Virginia is an "Electing Entity" and agreed to be bound by the terms of the DRP in two IADC Contracts between it and Nabors.[12] As an "Electing Entity," Penn Virginia is required to resolve disputes with any past or present employee(s) or applicants of Nabors in accordance with the DRP.[13]

12.     On January 2, 2013, Adame executed a document entitled "Application For Hourly And Daily Employment," as well as another document entitled "Notice to Applicants Regarding Dispute Resolution Program."[14] Likewise, on July 16, 2013, De La Garza executed the "Application For Hourly And Daily Employment" and the "Notice to Applicants Regarding Dispute Resolution Program."[15] De La Garza and Adame, by their signatures, acknowledged and agreed that they would be "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."[16]

13.     On January 7, 2013, Adame also executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program."[17] The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program."[18] De La Garza executed the same document on July 22, 2013.[19] De La Garza and Adame, by their

---

[10] *See Nicholson Aff.* at ¶ 6.
[11] *See Nicholson Aff.* at ¶ 6; *see also Affidavit of Katherine Ryan*, a true and correct copy of which attached as Exhibit 2.
[12] *See Nicholson Aff.* at ¶ ¶ 7 through 9; *see also* Exhibits 1-B and 1-D; *see also* Exhibits 1-C and 1-E, at ¶ 16.
[13] *See Nicholson Aff.* at ¶ 10; *see also* Exhibits 1-B – 1-G.
[14] *See Nicholson Aff.* at ¶ 12; *see also* Exhibit 1-F.
[15] *See Nicholson Aff.* at ¶ 16; *see also* Exhibit 1-G.
[16] *See Nicholson Aff.* at ¶¶ 12 and 16; *see also* Exhibit 1-F and 1-G.
[17] *Nicholson Aff.* at ¶ 13; *see also* Exhibit 1-H.
[18] *Nicholson Aff.* at ¶ 13; *see also* Exhibit 1-H.
[19] *Nicholson Aff.* at ¶ 17; *see also* Exhibit 1-I.

signatures, again acknowledged and agreed that they would be "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."[20]

14. On April 29, 2003, Adame was hired by Nabors Well Services, Ltd. as a crew worker.[21] On January 7, 2013, as a result of a business reorganization, he became a crew worker for NCPS when Nabors Well Services, Ltd. liquidated into Nabors Well Services, Co., which liquidated and dissolved into NCPS.[22] As a crew worker, Adame's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Adame's job duties also involved activities associated with rigging-up and rigging-down workover rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations.[23] Adame's job duties and responsibilities did not include the movement of goods in interstate commerce.[24] While employed by NCPS, Adame was never employed as a commercial truck driver or transportation worker.[25]

15. On July 22, 2013, De La Garza was hired by NCPS as a crew worker.[26] As a crew worker, De La Garza's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. De La Garza's job duties also involved activities associated with rigging-up and rigging-down workover rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations.[27] De La Garza's job duties and responsibilities did not include

---

[20] *Nicholson Aff.* at ¶¶ 13 and 17; *see also* Exhibit 1-E.
[21] *Nicholson Aff.* at ¶ 14.
[22] *Nicholson Aff.* at ¶ 14.
[23] *Nicholson Aff.* at ¶ 14.
[24] *Id.*
[25] *Id.*
[26] *Nicholson Aff.* at ¶ 18.
[27] *Nicholson Aff.* at ¶ 18.

the movement of goods in interstate commerce.[28] While employed by NCPS, De La Garza was never employed as a commercial truck driver or transportation worker.[29]

16.     On July 24, 2014, De La Garza filed his Original Petition, and on September 8, 2014 and October 1, 2014, De La Garza filed his First and Second Amended Petitions.[30] Likewise, on November 6, 2014 and February 19, 2015, Adame filed his Original and First Amended Petitions in Intervention.[31] A copy of all pleadings are maintained in the Court's records. De La Garza and Adame allege that on April 29, 2014 and while working for NCPS, they were injured when a piece of NCPS line pipe parted, causing both to be thrown back as a result of the released pressurized gas.[32]

### III. SUMMARY OF THE ARGUMENT

17.     The Company (defined to include Nabors, its subsidiaries, and any "Electing Entity") has a valid arbitration agreement, which both De La Garza and Adame acknowledged and accepted. Because Penn Virginia is an "Electing Entity," the parties' claims against Penn Virginia fall within the scope of the arbitration agreement. Consequently, the parties' claims must be submitted to final and binding arbitration in accordance with the DRP. Therefore, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated.

### IV. ARGUMENT & AUTHORITIES

18.     Pursuant to the DRP, the parties' lawsuit must be submitted to binding arbitration. It is undisputed that Texas courts recognize that arbitration agreements in an "at-will" employment setting apply to personal injury claims. In fact, there is a strong presumption in Texas favoring arbitration. *See Circuit City Stores, Inc. v. Adams*, 121 S. Ct. 1302 (2001);

---

[28] *Id.*

[29] *Id.*

[30] Plaintiff's Original Petition, First Amended Petition, and Second Amended Petition.

[31] Adame's Original Petition in Intervention and First Amended Petition in Intervention.

[32] *See* Plaintiff's Original Petition and First Amended Petition, as well as Adame's Original Petition in Intervention and First Amended Petition in Intervention.

*Cantella & Co. v. Goodwin*, 924 S.W.2d 943 (Tex. 1996); *Jack B. Anglin v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992). If a valid arbitration agreement exists, and the claims are within the agreement's scope, a trial court has no discretion and must compel arbitration. *Cantella*, 924 S.W.2d at 944; *Shearson Lehman Bros., Inc. v. Kilgore*, 871 S.W.2d 925, 928 (Tex. App.—Corpus Christi, 1994, orig. proceeding).

19.     The clear language of the DRP states that the Federal Arbitration Act, 9 U.S.C. § 1, et. seq. ("FAA") controls.[33]  The Texas Supreme Court has held that in cases where the FAA is stated in the agreement as the controlling law, the FAA prevails. *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 91 (Tex. 1996).  In adjudicating a motion to compel arbitration under the FAA, courts generally try to determine whether the parties agreed to arbitrate the dispute in question. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Folse v. Richard Wolf Medical Instruments Corp.*, 56 F.3d 603, 605 (5th Cir. 1995); *R.M. Perez & Assocs., Inc. v. Welch*, 960 F.2d 534, 538 (5th Cir. 1992).

20.     Under the FAA, the court applies ordinary state contract law principles in order to decide whether a valid arbitration agreement exists. *See In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); 9 U.S.C.A. §  1 et seq.; CIV. PRAC. & REM. CODE §  171.001 et seq.  Once a valid arbitration agreement is established, a presumption attaches favoring arbitration. *Dallas Cardiology Assoc., P.A. v. Mallick*, 978 S.W.2d 209, 212 (Tex. App.—Dallas, 1998, pet. denied). Then Court must then determine whether the arbitration agreement covers the non-movant's claims. *In re Jim Walter Homes, Inc.*, 207 S.W.3d 888 (Tex. App.—Houston [14th Dist.] 2006). In doing so, a court must focus on the complaint's factual allegations rather than the legal causes of action asserted. *Id.*

---

[33] *See* Exhibit 1-A at ¶ ¶ 2(C) and 8.

21.     Thus, two questions guide the determination of whether Penn Virginia's Motion to Compel should be granted: 1) is there a valid agreement to arbitrate; and 2) does the dispute in question fall within the scope of the agreement? *Associated Glass, Ltd. v. Eye Ten Oaks Invs., Ltd.*, 147 S.W.3d 507, 511 (Tex. App.—San Antonio 2004, no pet.).

**A.      Valid Agreement to Arbitrate**

22.     An "at-will" employee who receives notice of an employer's arbitration policy and continues or commences employment accepts the terms of the agreement as a matter of law. *See In re Halliburton*, 80 S.W.3d 566 (Tex. 2002); *In re Dallas Peterbilt, Ltd., L.L.P.*, 196 S.W.3d 161, 162 (Tex. 2006). In *Halliburton,* the employer created a dispute resolution program which obligated both employees and the employer to arbitrate all disputes between them. *See Halliburton*, 80 S.W.3d at 566. The Texas Supreme Court held that the employer was justified in giving notice to all employees of the program and informing them that by continuing to work after the adoption of the program, employees would be considered to have accepted the program. *See id* at 569-71.

23.     Four years later, the San Antonio Court of Appeals extended *Halliburton* even further. Relying on *Halliburton,* the Fourth Court of Appeals compelled arbitration where the employee expressly refused to sign an arbitration agreement but continued to work after receiving notice of the arbitration requirement. *In re RRGT, Inc.*, 2006 WL 622736 (Tex. App.—San Antonio 2006, orig. proceeding).

24.     It should also be noted that the San Antonio Court of Appeals has specifically considered the Nabors DRP and held that it is valid and enforceable on multiple occasions. *See NDUSA USA, LP v. Pena*, 385 S.W.3d 103 (Tex. App.—San Antonio 2012, pet. denied); *NDUSA USA, LP v. Carpenter*, 198 S.W.3d 240, 249 (Tex. App.—San Antonio 2006, orig.

proceeding). Furthermore, in October 2013 and then again in December 2013, the Texas Supreme Court denied the family of a deceased Nabors' employee's petition for review when the family sought to reverse the Fourth Court of Appeals' determination that the DRP was **valid** and **enforceable**. *See Pena*, 385 S.W.3d 103.

26. De La Garza and Adame executed documents on several occasions that clearly express both parties' agreement to the terms of the DRP.[34] The documents specifically state that De La Garza and Adame acknowledged receiving, reviewing, understanding, and accepting the DRP's requirement to submit disputes to arbitration.[35] De La Garza and Adame's signatures on the aforementioned documents is strong evidence of their actual acknowledgment and agreement that they are required to adhere to the DRP. *See In re Bunzl USA*, 155 S.W.3d 202 (Tex. App.—El Paso 2004, orig. proceeding).

26. De La Garza and Adame accepted the terms of the DRP as a matter of law. Therefore, a valid and enforceable agreement to arbitrate was formed. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006).

**B.     The Dispute Falls Within the Scope of the Agreement**

27. The parties' claims fall within the scope of the DRP. The DRP requires that disputes between the Company (defined as Nabors, its subsidiaries, and any "Electing Entity") and its current or former employees be submitted to arbitration. According to the parties' Petitions, De La Garza and Adame were both employees of a Nabors' subsidiary (NCPS) and both were allegedly injured while in the course and scope of their employment. Consequently, this dispute, which is between NCPS employees and Penn Virginia (an "Electing Entity"), falls within the scope of the agreement.

---

[34] *See Nicholson Aff.* at ¶¶ 12, 13, 16, and 17; *see also* Exhibits 1-F – 1-I.
[35] *Nicholson Aff.* at ¶¶ 12, 13, 16, and 17; *see also* Exhibits 1-F – 1-I.

28.     Whether a claim falls within the scope of an arbitration agreement depends on the factual allegations of the complaint rather than the legal causes of action asserted. *Prudential Secs., Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995); *Ikon Office Solutions, Inc. v. Eifert*, 2 S.W.3d 688, 697 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding); *Prudential-Bache Secs., Inc. v. Garza*, 848 S.W.2d 803, 807 (Tex. App.—Corpus Christi 1993). Based on the factual allegations contained in the parties' pleadings, the parties' claims fall squarely within the scope of the DRP.

29.     It is undisputed that De La Garza and Adame were employed by NCPS, which is a Nabors subsidiary.[36] It is undisputed that La Garza and Adame both alleged that they were injured at the workplace and/or in the course and scope of their employment.[37]

30.     De La Garza and Adame signed an acknowledgement that specifically states, "I have received a copy of the Nabors Dispute Resolution Program…and understand that I am required to adhere to the Dispute Resolution Program and its **requirement** for submission of disputes to…**arbitration.**"[38] All of these terms are clearly defined in the DRP.

31.     The DRP clearly and unequivocally states that it "applies to and binds the Company, each Employee and Applicant."[39] The DRP defines "Dispute" to include any personal injury that is incurred at the workplace or in the course and scope of employment.[40] According to the DRP, "Company" means "Sponsor and every direct and indirect subsidiary…of Sponsor, (and) any Electing Entity."[41]

---

[36] *Nicholson Aff.* at ¶ ¶ 6, 11 through 15; *see also* Plaintiff's Original Petition and First Amended Petition, and Adame's Original Petition in Intervention and First Amended Petition in Intervention.
[37] *See* Plaintiff's Original Petition and First Amended Petition and Adame's Original Petition in Intervention and First Amended Petition in Intervention.
[38] *Nicholson Aff.* at ¶¶ 13 and 16; *see also* Exhibits 1-H and 1-I (emphasis added).
[39] *See* Exhibit 1-A, at ¶ 1.
[40] *See* Exhibit 1-A at ¶ 2(E).
[41] *See* Exhibit 1-A at ¶ 2(D).

32.     Nabors is the "Sponsor" of the DRP.[42] NCPS is a subsidiary of Nabors.[43] Penn Virginia is an "Electing Entity" and agreed that it is bound by the terms of the DRP.[44] Therefore, Penn Virginia falls within the scope of the "Company."

33.     The parties' claims clearly fall within the scope of the arbitration agreement. Consequently, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated or dismissed and compelled to final and binding arbitration.

## V. CONCLUSION

34.     Nabors has instituted a comprehensive dispute resolution program, which requires arbitration of disputes between the Company (which is defined as Nabors Industries, Inc., its subsidiaries, and any "Electing Entity") and current or former employees. De La Garza and Adame unequivocally agreed to adhere to the DRP and its requirement to submit all claims to arbitration. The DRP applies to personal injuries that occur at the workplace or while the employee is in the course and scope of his employment. Therefore, the parties' claims, as asserted in this lawsuit, are subject to the terms of the DRP. Consequently, Penn Virginia's Motion to Compel Arbitration should be granted and this case should be abated or dismissed and compelled to final and binding arbitration.

## PRAYER

For the foregoing reasons, PENN VIRGINIA OIL & GAS, L.P. and PENN VIRGINIA OIL & GAS GP, LLC request that the Court grant this Motion, abate or dismiss this action, and order that the claims asserted by Alfredo De La Garza, Individually and as Next Friend of I

, and Intervenor, John Paul Adame, Individually and as

Next Friend of                                                                    , be

---

[42] *Nicholson Aff.* at ¶ 4; *see also* Exhibit 1-A, at ¶ 2(L).
[43] *Nicholson Aff.* at ¶ 6.
[44] *See Nicholson Aff.* at ¶ ¶ 7 through 10; *see also* Exhibits 1-C and 1-E, at *Contractors Special Provisions*, ¶16.

compelled to final and binding arbitration. PENN VIRGINIA OIL & GAS, L.P. and PENN VIRGINIA OIL & GAS GP, LLC further request all other relief to which they are entitled.

Respectfully submitted,

/s/ Thomas J. Smith

Thomas J. Smith
  State Bar No. 00788934
  tsmith@gallowayjohnson.com
Kelly C. Hartmann
  State Bar No. 24055631
  khartmann@gallowayjohnson.com
Alexis B. Hester
  State Bar No. 24072807
  ahester@gallowayjohnson.com
GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777 – facsimile

**Attorneys for Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served electronically, by and through the Court approved electronic filing manager, to participating parties on this 18th day of June 2015, as follows:

John David Hart
**LAW OFFICES OF JOHN DAVID HART**
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
Phone  817-870-2102
Fax     817-332-5858
*Counsel for Plaintiff, Individually and as*
*Next Friend of*
                     *Minor Children*

J. Javier Gutierrez
Ana Laura Gutierrez
**THE GUTIERREZ LAW FIRM, INC.**
700 East Third Street
Alice, Texas  78332
Phone  361-664-7377
Fax     361-664-7245
*Counsel for Intervenor,*
*John Paul Adame, Individually and as Next*
*Friend of*

Benjamin A. Escobar, Jr.
Brit T. Brown
**BEIRNE, MAYNARD & PARSON, L.L.P.**
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Phone  713-623-0887
Fax     713-960-1527
*Counsel for Defendant, Cudd Pressure*
*Control, Inc.*

*/s/ Thomas J. Smith*
Thomas J. Smith

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR ☐☐☐☐ ☐☐☐☐ minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, LP, PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § § | 281ST JUDICIAL DISTRICT |

## VERIFICATION

STATE OF TEXAS       §
                     §
COUNTY OF HARRIS     §

BEFORE ME, the undersigned authority on this day personally appeared Thomas J. Smith, who after being duly sworn upon his oath stated as follows:

1.      "My name is Thomas J. Smith. I am over twenty-one (21) years of age. I am of sound mind and in all ways competent to make this verification.

2.      I am one of the attorneys of record for Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC. I have personal knowledge of the facts stated in this affidavit and those facts are true and correct.

3.      I have reviewed the foregoing Motion to Compel Arbitration and to Abate this case pending such arbitration. In my personal knowledge, the Motion truly and correctly recites the factual allegations set forth in the pleadings and the evidence in the trial court record."

_____
Thomas J. Smith

SUBSCRIBED AND SWORN TO before me a notary public, which witness my hand and seal of this office this 15th day of June, 2015.

_Rhonda Schnitz_
_____
Notary Public in and for the State of Texas

RHONDA SCHNITZ
Notary Public, State of Texas
My Commission Expires
December 13, 2018

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR ☐ | § | |
| ☐, minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, LP, | § | |
| PENN VIRGINIA OIL & GAS GP, LLC, | § | |
| MIKE FERGUSON, TRIFECTA | § | |
| OILFIELD SERVICES, LLC, CUDD | § | |
| PRESSURE CONTROL, INC., | § | |
| ROYWELL SERVICES, INC. and OAKS | § | |
| PERSONNEL SERVICES, INC. d/b/a | § | |
| THE OAKS GROUP | § | 281ST JUDICIAL DISTRICT |

## AFFIDAVIT OF KEITH NICHOLSON

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared Keith Nicholson, the affiant, a person whose identity is known to me. After I administered an oath to affiant, the affiant testified:

1. "My name is Keith Nicholson. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am Assistant General Counsel for Nabors Corporate Services, Inc.

3. In my capacity as Assistant General Counsel, I am required to be familiar with Nabors Industries, Inc.'s corporate structure and the relationship of its various subsidiaries and affiliated companies. I am also required to be familiar with the Nabors Dispute Resolution Program ("DRP").

4. Nabors Industries, Inc. is the "Sponsor" of the Nabors DRP as that term is defined by the DRP. A true and correct copy of the DRP is attached to my affidavit as Exhibit 1-A.

5. The DRP provides that it applies to all direct and indirect subsidiaries of Nabors Industries, Inc., as well as all "Electing Entities" that have agreed to be bound by same.

6. Nabors Completion & Production Services Co. ("NCPS") was a subsidiary of Nabors

**EXHIBIT "1"**

Industries, Inc. at the time of the April 29, 2014 incident which makes the basis of the lawsuit.

7. On September 23, 2008, Penn Virginia Oil & Gas, LP agreed to be bound by the DRP as an "Electing Entity" in the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-B. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-C.

8. The Contractors Special Provisions page states at paragraph 16 that "Operator, its parent, subsidiary, and affiliated corporations...(collectively "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity..."

9. In addition, on September 8, 2010, Penn Virginia MC Energy, LLC agreed to be bound by the DRP as an "Electing Entity" in the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-D. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-E. It is my understanding that Penn Virginia MC Energy, LLC is a subsidiary or affiliated corporation of Penn Virginia Oil & Gas, LP and/or Penn Virginia Oil & Gas GP, LLC.

10. As an "Electing Entity," Defendants, Penn Virginia Oil & Gas, LP and Penn Virginia Oil & Gas GP, LLC are required to resolve disputes with any past or present employee(s) or applicant(s) of Nabors Industries, Inc. or its subsidiaries in accordance with the DRP.

11. Based upon my review of the personnel file of Mr. Adame, I can confirm that Mr. Adame was employed by NCPS, and that he executed various documents that acknowledged that he received, reviewed, and accepted the terms and conditions of the DRP.

12. Specifically, my review of the relevant documents confirms that on January 2, 2013, Mr. Adame executed a document entitled "Application For Hourly And Daily Employment," a true and correct copy of which is attached as Exhibit 1-F. Mr. Adame acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."

13. Further, on January 7, 2013, Mr. Adame executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program," a true and correct copy of which is attached as Exhibit 1-H. The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program." Mr. Adame acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."

14. Mr. Adame was employed by NCPS as a crew worker. As a crew worker, Mr. Adame's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Mr. Adame's job duties also involved activities associated with rigging-up and rigging-down work over rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations. While employed by NCPS, Mr. Adame was never a commercial truck driver or transportation worker.

15. Based upon my review of the personnel file of Mr. Alfredo De La Garza, I can confirm that Mr. De La Garza was employed by NCPS, and that he executed various documents that acknowledged that he received, reviewed, and accepted the terms and conditions of the DRP.

16. Specifically, my review of the relevant documents confirms that on July 16, 2013, Mr. De La Garza executed a document entitled "Application For Hourly And Daily Employment," a true and correct copy of which is attached as Exhibit 1-G. By his signature, Mr. De La Garza acknowledged and agreed that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

17. Further, on July 22, 2013, Mr. De La Garza executed a document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program," a true and correct copy of which is attached as Exhibit 1-I. The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program." Mr. De La Garza acknowledged and agreed by his signature that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to…arbitration."

18. Mr. De La Garza was employed by NCPS as a crew worker. As a crew worker, Mr. De La Garza's job duties and responsibilities included the operation of hand and power tools to perform maintenance and repairs to oil or gas wells and related equipment. Mr. De La Garza's job duties also involved activities associated with rigging-up and rigging-down work over rigs, pulling levers or turning handles to extend hydraulic or screw-type jacks to support and level the rig, laying steel production rods, tubing, and casing, and other tasks necessary to support operations. Mr. De La Garza's job duties and responsibilities did not include the movement of goods in interstate commerce. While employed by NCPS, Mr. De La Garza was never a commercial truck driver or transportation worker.

19. At all times relevant to this matter, NCPS was engaged in interstate commerce as it was in the business of providing services for the development of oil and gas resources that are placed into commerce in both Texas and other states of the United States.

20. On information and belief, Penn Virginia is also engaged in interstate commerce as it is in the business of producing oil and gas resources that are placed into commerce in both Texas and other states of the United States.

21. Attached as Exhibit 1-A to my affidavit is a true and correct copy of Nabors Industries, Inc.'s DRP booklet, in English and Spanish, respectively. These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

22. Attached as Exhibit 1-B to my affidavit is a true and correct copy of the 2008 IADC Drilling Contract between Nabors and Penn Virginia Oil & Gas, LP, and attached as Exhibit 1-C is a true and correct copy of the portion of the IADC contract titled "Contractors Special Provisions." These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

23. Attached as Exhibit 1-D to my affidavit is a true and correct copy of the 2010 IADC Drilling Contract between Nabors and Penn Virginia MC Energy, LLC, and attached as Exhibit 1-E is a true and correct copy of the portion of the IADC contract titled "Contractors Special Provisions." These records are kept by Nabors Industries, Inc. in the regular course and scope of business, and it was the regular course of business of Nabors Industries, Inc. for an employee or representative of Nabors Industries, Inc., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded.

24. The records attached as Exhibits 1-F, 1-G, 1-H, and 1-I are true and correct copies of records that are kept by NCPS in the regular course and scope of business, and it was the regular course of business of NCPS for an employee or representative of NCPS, with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time the act or event that was recorded."

FURTHER AFFIANT SAYETH NOT.

_____
Keith Nicholson

Sworn to and subscribed before me by Keith Nicholson on the 16TH day of June, 2015.

_____
Notary Public in and for the State of Texas
My Commission expires: MAy 5, 2018

MARY D. HOISINGTON
Notary Public, State of Texas
My Commission Expires
May 05, 2018

# NABORS DISPUTE RESOLUTION
# PROGRAM and RULES



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos Humanos de* **EXHIBIT 1-A** *de Nabors*

## THE I  3ORS DISPUTE RESOLUTION P!   GRAM

1. **Purpose and Construction**

   The Program is designed to provide a means for the quick, fair, accessible, and inexpensive resolution of Disputes between the Company and the Company's present and former Employees and Applicants for employment, related to or arising out of a current, former or potential employment relationship with the Company. The Program is intended to create an exclusive procedural mechanism for the final resolution of all Disputes falling within its terms. It is not intended either to abridge or enlarge substantive rights available under applicable law. The Program contractually modifies the "at-will" employment relationship between the Company and its Employees, but only to the extent expressly stated in the Program. The Program should be interpreted in accordance with these purposes.

2. **Definitions**

   A. "AAA" means the American Arbitration Association.

   B. "JAMS" means Judicial Arbitration and Mediation Services.

   C. The "Act" means the Federal Arbitration Act, 9 U.S.C.§1, et seq., as amended from time to time.

   D. "Company" means Sponsor and every direct or indirect subsidiary (whether a corporation, limited liability company, company partnership or other legal entity) of Sponsor, any Electing Entity, any entity or person alleged to have joint and several liability concerning any Dispute, and all of their directors, officers, employees, and agents, every plan of benefits, whether or not tax-exempt, established or maintained by any such entity, the fiduciaries, agents and employees of all such plans, and the successors and assigns of all such entities, plans and persons; provided, however, that in the case of an Electing Entity, "Company" shall include the Electing Entity only to the extent provided in the Electing Entity's agreement to be bound by the Program.

   E. "Dispute" means all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes

ler the Program, or between a person and by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to:

1. this Program;

2. the employment or potential reemployment of an Employee, including the terms, conditions, or termination of such employment with the Company;

3. employee benefits or incidents of employment with the Company;

4. any other matter related to or concerning the relationship between the Employee and the Company including, by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; workers' compensation retaliation; defamation; infliction of emotional distress, antitrust claim concerning wages or otherwise, or status, claim or membership with regard to any employee benefit plan;

5. an Applicant's application for employment and the Company's actions and decisions regarding such application; and

6. any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment.

"Dispute" includes all such matters regardless of when the events on which they are based occurred, including matters based on events occurring before the Employee became subject to this Program (so long as such disputes were not previously asserted in a judicial forum) or after termination of the employment relationship.

F. "Electing Entity" means any legal entity that has agreed to be bound by the Program as provided herein.

G. "Employee" means any person who is or has been in the employment of the Company on or after the effective date of this Program, whether or not employed at the time a claim is brought with respect to a Dispute, residing in the United States, or otherwise subject to

laws of the United States or any state, ~~municipality~~, or other political subdivision of the United States.

H. "Applicant" means any person who is seeking or has sought employment with the Company after the effective date of this Program.

I. "Party" means, with respect to a particular Dispute, affected persons and/or entities bound by this Program.

J. "Program" means this Nabors Dispute Resolution Program, as amended from time to time.

K. "Rules" means the Nabors Dispute Resolution Rules, as amended from time to time, which are applicable to mediation and arbitration.

L. "Sponsor" means Nabors Industries, Inc., a Delaware corporation.

## 3. Name, Application and Coverage

A. The Program shall be referred to as the "Nabors Dispute Resolution Program." Alternatively, it may be referred to as the "Dispute Resolution Program."

B. Until revoked by Sponsor pursuant to this Program, this Program applies to and binds the Company, each Employee and Applicant and the heirs, beneficiaries and assigns of any such person or entity; provided, however, that this Program shall not apply to any Employee in a unit of Employees represented by a labor organization, or to the Company with respect to such employees, except to the extent permitted in an applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

C. Except as provided for herein, this Program applies to any Dispute.

D. Notwithstanding anything to the contrary in this Program, the Program does not apply to claims for workers' compensation benefits or unemployment compensation benefits.

E. Mediation and arbitration are only available for Disputes involving legally protected rights.

F.   twithstanding any other provision  eof, any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under the Program. Furthermore, an action under The Limitation of Ship Owners Liability Act, 46 U.S.C. §§181-189, shall not be subject to this Program.

4. **Resolution of Disputes**

All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules.

5. **No Retaliation**

No employee shall be subject to any form of discipline or retaliation for initiating or participating in good faith in any process or proceeding under this Program.

6. **Amendment**

A. This Program may be amended by Sponsor at any time by giving at least 10 days' notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules, unless otherwise agreed.

B. Sponsor may amend the Rules at any time by serving notice of the amendments on AAA and JAMS. However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules unless otherwise agreed.

7. **Termination**

This Program may be terminated by Sponsor at any time by giving at least 10 days' notice of termination to current Employees. However, termination shall not be effective as to Disputes for which a proceeding has been initiated pursuant to the Rules prior to the date of termination unless otherwise agreed.

8. **Applicable Law**

A. The Act shall apply to this Program, the Rules, and any proceedings under the Program or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Program or the Rules.

B.   ' arbitrations held pursuant to this Prog   n shall be convened as near as possible to the worksite where the events in dispute occurred if Nabors continues to perform work at that location.   Otherwise the arbitration will occur at the place most convenient for the majority of the witnesses.

C.   Other than as expressly provided herein, or in the Rules, the substantive legal rights, remedies, and defenses of all Parties are preserved.   In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all relief, legal or equitable, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceeding.

D.   Other than as expressly provided herein, or in the Rules, the Program shall not be construed to grant additional substantive, legal, or contractual rights, remedies or defenses which would not be applied by a court of competent jurisdiction in the absence of the Program.

E.   Notwithstanding the provisions of the preceding sub-section, in any proceeding before an arbitrator, the arbitrator, in his or her discretion, may allow a prevailing Employee or Applicant a reasonable attorney's fee as part of the award.   The discretion to allow an award of fees under this subsection is in addition to any discretion, right or power which the arbitrator may have under applicable law.   If the arbitrator awards attorney fees without authorization for such an award by statute or contract, such award will be limited to $2,500.00.

## 9.  Administrative Proceedings

A.   This Program shall apply to a Dispute pending before any local, state or federal administrative body or court unless prohibited by law.

B.   Participation in any administrative or judicial proceeding by the Company shall not affect the applicability of the Program to any such Dispute upon termination of the administrative or judicial proceedings.   A finding, recommendation or decision by an administrative body on the merits of a Dispute shall have the same legal weight or effect under the Program as it would in a court of competent jurisdiction.

## 10. Ex( ive Remedy

Proceedings under the Program shall be the exclusive, final and binding method by which Disputes are resolved.

## 11. Electing Entities

A. Corporations or other legal entities, not otherwise Parties, may elect to be bound by this Program by written agreement with Sponsor.

B. Election may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity.

## 12. Effective Date

The Effective Date of this Program shall be April 15, 2001.

## 13. Severability

The terms of this Program and the Rules are severable. The invalidity or unenforceability of any provision therein shall not affect the application of any other provision. Where possible, consistent with the purposes of the Program, any otherwise invalid provision of the Program or the Rules may be reformed and, as reformed, enforced.

## 14. Assent

Employment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program, both during the employment and after termination of employment. Submission of an application, regardless of form, for employment constitutes consent by both the Applicant and the Company to be bound by this Program.

# NABORS DISPUTE RESOLUTION RULES

## 1. Definitions

All definitions included in the Nabors Dispute Resolution Program apply to these Rules.

## 2. Application

A. If different rules are applicable to a specific class of Disputes, and have been adopted by Sponsor and served on AAA or JAMS, these Rules shall not apply to such class of Disputes.

B.   se Rules apply in the form existing   the time proceedings are initiated under them.

C. To the extent consistent with these Rules, the Employment Dispute Resolution Rules of AAA or JAMS also apply to all proceedings governed by these Rules.

## 3. Initiation of the Process

A. A Party may initiate proceedings under these Rules at any time, subject to any defenses including those applicable to the timeliness of the claim, including limitations and laches.

B. A Party may initiate proceedings by serving a written request to initiate proceedings on AAA or JAMS, and tendering the appropriate administrative fee.

C. Copies of the request shall be served on all other Parties to the Dispute by AAA or JAMS. The request shall describe the nature of the Dispute, the amount involved, if any, the remedy sought, and the proceeding locale requested.

D. Proceedings may also be initiated by an Employee or Applicant by serving a written request to initiate proceedings on the Company's Dispute Resolution Program Administrator. In such a case, the Company shall promptly forward any properly served request it has received to AAA or JAMS.

E. Parties against whom a claim is asserted shall file an answering statement within 21 days of receiving notice of intent to arbitrate or a specification of claims, which shall include any counterclaims and any request that the arbitrator (if any) prepare a statement of reasons for the award.

## 4. Administrative Conference

AAA or JAMS shall convene an administrative conference as soon as possible after receipt of the answering statement or after expiration of the time for filing an answering statement if one has not been filed. The conference may be held in person or by telephone. At the conference, AAA or JAMS will determine whether the Parties are in agreement on a method to resolve the Dispute. If the Parties are in agreement, AAA or JAMS will implement the procedure in accordance with their rules upon payment of any applicable fee. If the Parties cannot agree, or if the

Par have previously attempted and failed resolve the Dispute by mediation or another nonbinding mechanism, the Dispute shall be arbitrated under these Rules.

## 5. Appointment of Arbitrator

Immediately after payment of the arbitration fee, AAA or JAMS shall simultaneously send each Party an identical list of names of persons chosen from a panel of qualified arbitrators which AAA or JAMS shall select and maintain. Each Party to the Dispute shall have fourteen (14) days from the transmittal date to strike any names objected to, number the remaining names in order of preference, and return the list to AAA or JAMS. If a Party does not return the list within the time specified, all persons therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the order of mutual preference, AAA or JAMS shall invite the acceptance of the arbitrator or arbitrators to serve. In those cases where more than $2,000,000 is in controversy, either Party shall have the right to require that the arbitration proceed before a three member panel rather than a single arbitrator. The Party who elects for a panel in these circumstances shall notify the other Parties during the administrative conference described in Section 4 of the Program. Any Party shall have the right to strike one list of arbitrators in its entirety. When a Party exercises this right, AAA or JAMS shall issue a new list of arbitrators consistent with the above procedures.

## 6. Qualifications of the Arbitrator

No person shall serve as an arbitrator in any matter in which that person has any financial or personal interest. Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias. Upon receipt of such information from the arbitrator or any other source, AAA or JAMS will either replace that person or communicate the information to the Parties for comment. Thereafter, AAA or JAMS may disqualify that person, and its decision shall be conclusive.

## 7. Vacancies

If a vacancy occurs for any reason or if an appointed arbitrator is unable to serve promptly, the appointment procedure in Section 5 shall apply to the selection of a substitute arbitrator.

**8. Da** **Time and Place of Hearings**

A. The arbitrator shall set the date, time and place of any proceeding pursuant to the requirements of Section 8B of the Program.

B. Notice of any hearing shall be given at least ten (10) days in advance, unless the arbitrator determines or the Parties agree that a shorter time is necessary.

C. The arbitrator shall make every effort, without unduly incurring expense, to accommodate the Employee or Applicant in the selection of a proceeding location.

**9. Conferences**

At the request of AAA or JAMS, or of a Party or on the initiative of the arbitrator, the arbitrator or AAA or JAMS may notice and hold conferences for the discussion and determination of any matter which will expedite the proceeding, including:

A. venue,

B. clarification of issues,

C. determination of preliminary issues, including summary determination of dispositive legal issues,

D. discovery,

E. the time and location of proceedings or conferences,

F. interim legal or equitable relief authorized by applicable law,

G. pre- or post-hearing memoranda,

H. stipulations; and/or

I. any other matter of substance or procedure.

**10. Mode of Hearings and Conferences**

In the discretion of the arbitrator or by agreement of the Parties, conferences and hearings may be conducted by telephone or by written submission, as well as in person.

## 11. Pre aring Discovery

A. On any schedule determined by the arbitrator, each Party shall submit in advance the names and addresses of the witnesses it intends to produce and any documents it intends to present.

B. The arbitrator shall have discretion to determine the form, amount and frequency of discovery by the Parties.

C. Discovery may take any form permitted by the Federal Rules of Civil Procedure, as amended from time to time, subject to any restrictions imposed by the arbitrator.

## 12. Representation

Any Party may be represented by counsel or by any other authorized representative.

## 13. Attendance at Hearings

The arbitrator shall maintain the privacy of the proceedings to the extent permitted by law. Any person having a direct interest in the matter is entitled to attend the proceedings.

The arbitrator shall otherwise have the power to exclude any witness, other than a Party or other essential person, during the testimony of any other witness. The arbitrator shall determine whether any other person may attend the proceeding. Upon the request of any Party, the arbitrator shall exclude any witness during the testimony of any other witness.

## 14. Postponement

A. The arbitrator, for good cause shown by a Party, or on agreement of the Parties, may postpone any proceeding or conference.

B. The pendency of court proceedings related to the same matter is not good cause for postponement.

## 15. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by any Party, shall do so.

## 16. Rec 1 of Proceedings

There shall be no stenographic, audio, or video record of the proceedings unless either requested by one of the Parties or specified by the arbitrator. The Party requesting the record shall bear the entire cost of producing the same. Copies of the record shall be furnished to all other Parties upon request and upon payment of the cost of reproduction.

## 17. Procedure

The proceedings shall be conducted by the arbitrator in whatever order and manner will most expeditiously permit full presentation of the evidence and arguments of the Parties.

## 18. Arbitration in the Absence of a Party

The arbitrator may proceed in the absence of Parties or representatives who, after due notice, fail to be present or fail to obtain a postponement. An award shall not be made solely on the default of a Party. The arbitrator shall require any Party who is present to submit such evidence as the arbitrator may require for the making of an award.

## 19. Evidence

A. The arbitrator shall be the sole judge of the relevancy, materiality, and admissibility of evidence offered. Conformity to legal rules of evidence shall not be necessary.

B. The arbitrator may subpoena witnesses or documents at the request of a Party or on the arbitrator's own initiative.

C. The arbitrator may consider the evidence of witnesses, by affidavit or declaration, but shall give it only such weight as the arbitrator deems appropriate after consideration of any objection made to its admission.

## 20. Post-Hearing Submissions

All documentary evidence to be considered by the arbitrator shall be filed at the hearing unless the arbitrator finds good cause to permit a post-hearing submission. All Parties shall be afforded an opportunity to examine and comment on any post-hearing evidence. The arbitrator shall permit the filing of post-hearing briefs at the request of a Party and shall determine the procedure and timing of such filings.

**21. Clo   g and Reopening of Proceedings**

A. When the arbitrator is satisfied that the record is complete, including the submission of any post-hearing briefs or documents permitted by the arbitrator, the arbitrator shall declare the proceeding closed.

B. The proceeding may be reopened on the arbitrator's initiative or upon application of a Party at any time before the award is made.

**22. Waiver of Procedures**

Any Party who fails to object in writing, after knowledge that any provision or requirements of these procedures and Rules have not been complied with, shall be deemed to have waived the right to object.

**23. Service of Notices and Papers**

Any papers, notices, or process necessary or proper for the initiation or continuation of any proceeding under these Rules (including the award of the arbitrator, any court action in connection therewith, or the entry of judgment on an award made under these procedures) may be served on a Party by mail addressed to the Party or his or her representative at the last known address or by personal service. AAA, JAMS, the Parties, and the arbitrator may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give any notices required by these Rules.

**24. Communications with the AAA, JAMS, and the Company**

A. Any Party may notice, serve or communicate with AAA by contacting:

> Regional Administrator
> American Arbitration Association
> 1001 Fannin St., Suite 1005
> Houston, Texas 77002
> (713) 739-1302
> Fax: (713) 739-1702

B. Any Party may notice, serve or communicate with JAMS by contacting:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

C.    y notice, service or communicati(    with the
Company will be to:

> Legal Department
> Nabors Industries, Inc.
> 515 West Greens Road, Suite 1200
> Houston, Texas 77067-4525
> (281) 874-0035
> Fax:  (281) 775-8431

## 25. Communication with the Arbitrator

There shall be no communication between the Parties and
the arbitrator other than at any oral hearings or confer-
ences. Any other oral or written communications from the
parties to the arbitrator shall be directed to the AAA or
JAMS (and copied to the Parties) for transmission to the
arbitrator, unless the Parties and the arbitrator agree other-
wise.

## 26. Time of Award

The award shall be promptly made by the arbitrator,
unless otherwise agreed by the Parties or specified by
applicable law, no later than thirty (30) days from the date
of the closing of the proceeding or, if applicable, the
closing of a reopened proceeding.

## 27. Form of Award

The award shall be in writing and shall be signed by the
arbitrator. The arbitrator shall write a statement of reasons
for the award if requested to do so in the request to
initiate proceedings or in the answering statement. The
award shall be executed in any manner required by appli-
cable law.

## 28. Modification of Award

On order of a court of competent jurisdiction, or on agree-
ment of the Parties, the arbitrator shall modify any award.
The arbitrator may modify an award on the motion of a
Party if the arbitrator finds that the award, as rendered, is
ambiguous or defective in form, or if the award requires
an illegal or impossible act. These are the only circum-
stances under which an arbitrator shall have jurisdiction to
withdraw or modify an award.

## 29. Set    nent

If the Parties settle their Dispute during the course of the arbitration, the arbitrator may set out the terms of the settlement in a consent award.

## 30. Scope of Arbitrator's Authority

The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

## 31. Judicial Proceedings and Exclusion of Liability

A. Neither AAA, JAMS, nor any arbitrator is a necessary Party in any judicial proceedings relating to proceedings under these Rules,

B. Neither AAA, JAMS, nor any arbitrator shall be liable to any Party for any act or omission in connection with any proceedings within the scope of these Rules.

C. Any court with jurisdiction over the Parties may compel a Party to proceed under these Rules at any place and may enforce any award made.

D. Parties to these Rules shall be deemed to have consented that judgment upon the award of the arbitrator may be entered and enforced in any federal or state court having jurisdiction of the Parties.

E. Initiation of, participation in, or removal of a legal proceeding shall not constitute waiver of the right to proceed under these Rules.

F. Any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met, pending the institution of proceedings under these Rules.

### 32. Fee nd Expenses

A. The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.

B. All attorneys' fees shall be borne by the Party incurring them except as otherwise provided by law, by the Program, or in the award of the arbitrator.

C. Discovery costs (e.g., court reporter fees for original transcripts) shall be borne by the Party initiating the discovery. The cost of copies of deposition transcripts or other discovery shall be borne by the Party ordering the copy.

D. The fees and expenses of experts, consultants and others retained or consulted by a Party shall be borne by the Party utilizing those services.

E. The Employee or Applicant shall pay a $150 fee if he or she initiates arbitration or mediation. Otherwise, Employee/Applicant Parties shall not be responsible for payment of fees and expenses of proceedings under these Rules, including required travel of an arbitrator or a mediator, expenses of an arbitrator, mediator, AAA or JAMS, and the cost of any proof produced at the discretion of an arbitrator.

F. If the demand for mediation or arbitration is initiated by the Company, such fees will be paid by the Company.

G. Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

### 33. Interpretation and Application of These Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. All other rules shall be in interpreted and applied by the AAA or JAMS.

### 34. Applicable Law

A. Proceedings under these Rules and any judicial review of awards shall be governed by the Act.

B. Except where otherwise expressly provided in these Rules, the substantive law applied shall be state or federal substantive law which would be applied by a United States District Court sitting at the place of the proceeding.

## 35. Mediation

At any time before the proceeding is closed, the Parties may agree to mediate their dispute by notifying AAA or JAMS. AAA or JAMS shall determine what procedures apply to any such mediation.

## 36. Spanish

A copy of this Program is available in Spanish.

Nabors Industries, Inc.
April 2001



**January 17, 2007**

**TO:** All Employees of Nabors Industries, Inc. and Subsidiaries

**RE:** Nabors Dispute Resolution Program

Dear Employee:

Effective ten (10) days after the date of this notice, pursuant to Section 6 of the Nabors Dispute Resolution Program, Nabors Industries, Inc. ("Nabors") and its subsidiaries are amending the Nabors Dispute Resolution Program and Rules for the determination of all disputes between employees and Nabors or one of its subsidiaries.

The amendments to the Program and Rules are enclosed on the back of this page. Nabors is amending one (1) section of the Nabors Dispute Resolution Program and one (1) section of the Nabors Dispute Resolution Rules. You should already have a copy of the current Program and Rules, or they may be found on the Nabors Intranet under policy number 200.80.1 at http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

As before, the Nabors Dispute Resolution Program, as amended, gives you the most effective and efficient means of resolving any disputes you may have through a process which encourages resolution at the earliest opportunity. Employees do not waive any substantive legal rights under the Program. Rather, the Program, as amended, provides that any substantive legal issues you may have will be resolved on an individual basis in mediation or before a neutral arbitrator, whose decision will be final and binding on you and the Company. Under the Program, as amended, however, you waive any procedural rights you may have to bring a court action, on an individual or on a class, collective or representative basis; and you waive your right to a jury trial concerning any dispute you may have with the Company or any Electing Entity (as defined in the Program), including any personal injury claims or claims of discrimination based on race, national origin, gender, religion, age or disability under any federal or state civil rights statute.

Every individual who works for Nabors Industries, Inc. or a subsidiary is subject to the Program, as amended, except that the amended provisions will affect only disputes initiated after the effective date of the amendments, and not any matters pending before the effective date. Your continued employment after the date you receive this notice will constitute your acceptance of the amendments to the Program, both during and after your employment with the Company.

We look forward to continuing to work together. If you have any questions about the amendments to the Program and Rules or any other term of your employment, please do not hesitate to contact the Human Resources Department of your employer.

Sincerely,

NABORS INDUSTRIES, INC.

*\*A copy of this notice is available in Spanish, upon request,
from any Nabors subsidiary's Human Resources Department.*

*\* Una copia de esta noticia está disponible en español con solo requerirla
al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.*



## Amendment to THE NABORS DISPUTE RESOLUTION PROGRAM:

### 4. Resolution of Disputes

A. All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules. The Parties forego any right either may have to a jury trial on claims relating in any way to any Dispute.

B. Each Dispute shall be arbitrated on an individual basis. The Parties forego and waive any right to join or consolidate claims in arbitration with others or to make claims in arbitration as a representative or as a member of a class or in a private attorney general or similar capacity, unless such procedures are agreed to by all Parties. Neither the Company nor any Employee or Applicant may pursue any Dispute on a class action, collective action or consolidated basis or in a representative capacity on behalf of other persons or entities who are claimed to be similarly situated, or participate as a class member in such a proceeding. The arbitrator in any proceeding under this Program shall have no authority to conduct the matter as a consolidated, class, collective or representative action.

C. If the procedural limitation in Paragraph B of this Section is held unenforceable by a court in a proceeding in which a party seeks to pursue a consolidated, class or collective action or otherwise act in a representative capacity, then this Program shall apply to such proceeding only to the following extent. The court will decide whether the Dispute should proceed on a consolidated, class, collective or other representative basis and, if so, will define the scope of the class. None of the foregoing determinations shall be submitted to the arbitrator, and in no event shall the arbitrator have the power to determine class, collective or representative action certification. The court's decisions will be subject to appeal pursuant to the applicable rules of procedure. If the court certifies a class, collective or other representative action, then all other determinations in or related to the Dispute shall be made by the arbitrator. The arbitrator shall determine questions of liability to or of the class as a whole and remedies available to or from the class as a whole. The arbitrator shall also decide the relief, if any, to which a party or class member may be entitled individually. If the court, however, ultimately denies a party's request to proceed on a consolidated, class, collective or representative basis, then that party's individual claim(s) shall still be subject to this Program and referable to arbitration pursuant to its terms.

## Amendment to NABORS DISPUTE RESOLUTION RULES:

### 30. Scope of Arbitrator's Authority

A. The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

B. The arbitrator shall not have the power to hear any claims in arbitration as a class or collective action, or in a private attorney general or similar capacity, or on any other representative capacity basis, or, absent the consent of all parties, on a consolidated basis. The arbitrator shall be authorized to decide only the disputed claims between the individual parties.

# PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE NABORS



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors*

**PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE NABORS**

1. **1. Propósito y Diseño**

El Programa está diseñado con el fin de proporcionar un medio para la resolución rápida, justa, accesible y económica de conflictos entre la Compañía y los Empleados actuales y anteriores de la Compañía y los Aspirantes para puestos de empleo, con respecto a o como consecuencia de una relación de empleo actual, anterior o potencial con la Compañía. El Programa está diseñado para facilitar un proceso para la resolución definitiva de todas los Conflictos descriptos en los términos del mismo. No está diseñada para limitar o aumentar los derechos fundamentales disponibles bajo las leyes aplicables. El Programa modifica en forma contractual la relación de empleo efectuado entre la Compañía y sus Empleados, pero sólo en la medida en que esté expresamente establecido en el Programa. El Programa deberá ser interpretado de acuerdo con esta intención.

2. **Definiciones**

A. "AAA" significará la Asociación Americana de Arbitraje (the American Arbritration Association).

B. "JAMS" significará los Servicios de Mediación y Arbitraje Judiciales (Judicial Arbitration and Mediation Services)

C. La "Ley" significará la Ley Federal de Arbitraje (the Federal Arbitration Act)

D. La "Compañía" significará el patrocinador del Programa y las filiales directas o indirectas (ya sean una corporación, una compañía de responsabilidad limitada, una sociedad u otra entidad legal) del patrocinador, la Entidad que Selecciona el Programa, la entidad o persona que se alega tiene responsabilidad asociada o separada con respecto a cualquier Conflicto, y todos sus directores, funcionarios, empleados y agentes, plan de beneficios, ya sea exento o no-exento de impuestos, establecido o mantenido por dicha entidad, los fiduciarios, agentes y empleados de dichos planes, y los sucesores y beneficiarios de dichas entidades, planes y personas; siempre y cuando, en el caso de la Entidad que selecciona el Programa, "La Compañía" deberá incluir la Entidad que Selecciona el Programa solamente en la medida establecida en el contrato de dicha Entidad en la que estará obligada por el Programa.

E. "Conflicto" significará todas las demandas legales y justas, los reclamos y controversias, de cualquier índole o tipo, ya fueren contractuales, o de responsabilidad extracontractual, de acuerdo con el derecho escrito o las regulaciones o alguna otra ley, entre las partes obligadas por el Programa o por un contrato para resolver los Conflictos de acuerdo al Programa, o entre una persona obligada por el Programa y una persona o entidad con derecho a recibir sus beneficios, incluyendo pero sin limitarse a lo siguiente:

1.  este Programa;

2.  la contratación o la posible recontratación de un Empleado, incluyendo los términos, condiciones o el cese de dicho empleo con la Compañía;

3.  los beneficios o incidentes de empleo con la Compañía;

4.  todo asunto relacionado con la relación entre el Empleado y la Compañía incluyendo, por ejemplo pero sin limitarse a: la discriminación basada en la raza, el sexo, la religión, el origen nacional, la edad, la condición de veterano de guerra o cualquier incapacidad; el acuso sexual u cualquier otro tipo de acoso; las represalias por concepto de compensación laboral; la difamación, la imposición de un agravio emocional, la reclamación de antimonopolio relacionado con sueldos o el estado de, una reclamación por o una membresía relacionado con los planes de beneficios para empleados;

5.  la solicitud de un Aspirante para un puesto de empleo y las acciones y decisiones de la Compañía con respecto a dicha solicitud; y

6.  cualquier lesión personal supuestamente incurrida en o alrededor del sitio de trabajo de una Compañía o durante el término y alcance de las actividades laborales de un Empleado,

El "Conflicto" incluye todo lo anteriormente mencionado, independientemente del momento en que hayan ocurrido los eventos en los cuales estén basados, incluyendo los asuntos basados en eventos que hayan sucedido antes de que el Empleado estuviera sujeto a este Programa (siempre y cuando dichos conflictos no fueren establecidos con anterioridad en un tribunal jurídico) o después de la terminación de la relación de empleo

F. La "Entidad que Selecciona el Programa" significará toda entidad legal que hubiera acordado una obligación por medio el Programa de acuerdo a las disposiciones de este documento.

G. El "Empleado" significará toda persona que estuviera o hubiera sido empleada por la Compañía a la fecha o después de la fecha de vigencia de este Programa, incluso si estuviera o no estuviera empleado por la Compañía en el momento en que una demanda fuera presentada en relación con un Conflicto, y que residiera en los Estados Unidos de América, o que estuviera sujeto a las leyes de los Estados Unidos o de cualquier estado, municipalidad u otra subdivisión política de los Estados Unidos.

H. El "Aspirante" significará toda persona que estuviera buscando o que haya buscado empleo con la Compañía después de la fecha de vigencia de este Programa.

I. Las "Partes" significarán, las personas perjudicadas en relación con un Conflicto particular, y/o las entidades que obligadas y vinculadas por este Programa.

J. El "Programa" significará este Programa de Resolución de Conflictos de Nabors, y como fuere modificado de tiempo en tiempo.

K. Las "Reglas" significarán las Reglas para la Resolución de Conflictos de Nabors, según fueran modificadas de tiempo en tiempo, que sean aplicables a la mediación y el arbitraje.

L. El "Patrocinador" significará Nabors Industries, Inc., una corporación del estado de Delaware.

## 3. Nombre, Aplicación y Cobertura

A. El Programa será denominado el "Programa de Resolución de Conflictos de Nabors". De forma alternativa, podrá ser referido como el "Programa de Resolución de Conflictos".

B. Hasta que sea revocado por la entidad Patrocinadora de acuerdo con lo dispuesto en este Programa, dicho Programa se aplica y obliga la Compañía, cada Empleado y cada Aspirante y sus herederos, los beneficiarios y los cesionarios de dicha persona o entidad; siempre que este Programa no se aplique a un Empleado que sea parte de un grupo de Empleados representados por una organización laboral o a la Compañía relacionada con dichos empleados, excepto

en la medida permitida en un convenio de negociación colectiva (entre patronos y sindicatos obreros) o legalmente impuesto por la Compañía cuando ningún convenio de negociación colectiva estuviera vigente.

C. Este Programa se aplica a todo Conflicto, salvo se estipule lo contrario en este documento.

D. Sin perjuicio de lo estipulado en este Programa, el mismo no se aplica a las reclamaciones por concepto de indemnización o compensación de beneficios para obreros o de beneficios por concepto de desempleo.

E. La mediación y el arbitraje están solamente disponibles para los Conflictos que involucren derechos que estuvieren protegidos legalmente.

F. Sin perjuicio de otras disposiciones establecidas en este documento, todo tribunal con jurisdicción sobre las Partes puede emitir órdenes judiciales (incluyendo requerimientos judiciales preliminares) si los requerimientos legales y equitativos de acuerdo a las leyes aplicables se cumplieran durante la institución de las demandas bajo el Programa. Adicionalmente, una demanda bajo la Ley denominada The Limitation of Ship Owners Liability Act, 46 U.S.S §§181-189, no estará sujeta a este Programa.

## 4. Resolución de Conflictos

Los conflictos que no fueren resueltos por las Partes serán definitivamente resueltos de acuerdo con este Programa y sus Reglas.

## 5. Artículo referente a Represalias

No se podrá imponer ninguna forma de disciplina, ni se deberá tomar represalias con los empleados por haber iniciado o participado de buena fe en un proceso o una demanda de acuerdo con este Programa.

## 6. Enmienda

A. Este Programa puede ser modificado por el Patrocinador en cualquier momento mediante una notificación previa a los empleados actuales de por lo menos 10 días. Sin embargo, no se deberá aplicar ninguna enmienda a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas salvo se convenga lo contrario

B. El Patrocinador puede modificar las Reglas en cualquier momento por medio de la notificación de las enmiendas en AAA y JAMS. Sin embargo, ninguna enmienda de

las Reglas deberá aplicar a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas, salvo se acuerde lo contrario.

## 7. Terminación del Programa

Este Programa podrá ser terminado por el Patrocinador en cualquier momento mediante la notificación a los Empleados actuales en un plazo no mayor de 10 días previo a la terminación antedicha. Sin embargo, la terminación no entrará en vigencia para los Conflictos para los cuales una demanda haya sido iniciada de acuerdo con las Reglas antes de la fecha de terminación, salvo se acuerde lo contrario.

## 8. Ley Aplicable

A. La Ley se aplicará a este Programa, las Reglas y cualquier demanda realizada de acuerdo al Programa o las Reglas, incluyendo las demandas para obligar, hacer cumplir, anular o confirmar demandas, adjudicaciones, órdenes de un árbitro, o resoluciones de acuerdo al Programa o las Reglas.

B. Todos los arbitrajes efectuados de acuerdo con este Programa deberán ser convocados tan cerca como fuera posible del sitio de trabajo donde sucedieron los eventos en disputa, en caso que Nabors continúe realizando labores en esa ubicación. De lo contrario, el arbitraje tomará lugar en el sitio más conveniente para la mayor parte de los testigos.

C. Salvo se establezca de manera expresa en las Reglas contenidas en este documento, se conservan los derechos legales fundamentales, los recursos y los mecanismos de defensa de todas la Partes. En caso de arbitraje, el árbitro tendrá la autoridad para determinar las leyes aplicables y de ordenar las compensaciones legales o equitativas, que una Parte pudiera obtener de un tribunal de jurisdicción competente en base a las reclamaciones presentadas en la demanda.

D. Salvo se estipule de forma expresa en este documento, o en las Reglas del mismo, no se deberá interpretar el Programa con el propósito de otorgar derechos, recursos o mecanismos de defensa fundamentales, legales o contractuales adicionales, los cuales no podrían ser aplicados por un tribunal de una jurisdic-

ción competente en ausencia del Programa.

E. Sin perjuicio de las disposiciones establecidas en la subcláusula anterior, en toda demanda presentada ante un árbitro, el árbitro, a su total discreción, podrá permitir que un Empleado o Aspirante prevaleciente reciba los honorarios para el pago de abogados como parte del fallo dictado. La discreción para permitir la concesión de una asignación de honorarios de acuerdo a esta subcláusula será adicional a toda discreción, derecho o autoridad que el árbitro pudiera tener de acuerdo a las leyes aplicables. Si el árbitro concede los honorarios de abogado sin la autorización para dicha asignación por derecho escrito o contrato, dicha asignación estará limitada a $2,500.00.

## 9. Procesos Administrativos

A. Este Programa se deberá aplicar a un Conflicto que estuviera pendiente ante toda entidad administrativa o tribunal local, estatal o federal, a menos que estuviera prohibido por la ley.

B. La participación en todo proceso administrativo o judicial por la Compañía no deberá afectar la aplicabilidad del Programa a dicho Conflicto una vez que fuere terminado el proceso administrativo o judicial. Un fallo, una recomendación o una decisión efectuada por una entidad administrativa en base a los méritos de un Conflicto deberá tener el mismo peso o efecto legal de acuerdo al Programa como si hubieran sido dictados por un tribunal de una jurisdicción competente.

## 10. Recurso Exclusivo

Los procesos efectuados de acuerdo al Programa deberán ser el método exclusivo, inapelable y vinculante por medio de los cuales se resolverán los Conflictos.

## 11. Las Entidades que Seleccionen el Programa

A. Las Corporaciones u otras entidades legales, que no fuesen Partes del mismo, tienen la opción de decidir si quisieren estar vinculadas y obligadas por este Programa mediante un contrato escrito con el Patrocinador.

B. Dicha opción para participar en este Programa puede ser efectuada en relación con algunos tipos de Conflictos, o en relación con algunas personas, a discreción de la Entidad que Seleccione el Programa.

## 12. La Fecha de Vigencia

La Fecha de Vigencia de este Programa será el 15 de abril de 2001.

## 13. Atribución de Separación

Los términos de este Programa y las Reglas son separables. La falta de validez o de la obligación para que se cumplieran algunas de las disposiciones en este documento no afectará la aplicación de las otras disposiciones. Donde fuere posible, y en forma consistente con los propósitos del Programa, toda disposición que fuera invalidada en el Programa o en las Reglas se podrá modificar y después de modificada, se podrá obligar su cumplimiento.

## 14. Asentimiento

El empleo o la continuación del empleo después de la Fecha en Vigencia de este Programa constituyen el consentimiento por parte del Empleado y la Compañía para estar obligados por las disposiciones de este Programa, durante la duración del empleo y después del cese del mismo. La presentación de una solicitud de empleo, independientemente del formulario utilizado, constituye el consentimiento por parte del Aspirante y la Compañía para estar obligados por las disposiciones de este Programa.

# REGLAS PARALA RESOLUCIÓN
# DE CONFLICTOS DE NABORS

## 1. Definiciones

Todas las definiciones incluidas en el Programa de Resolución de Conflictos de Nabors se aplicarán a estas Reglas.

## 2. Aplicación

A. Si hubieran reglas diferentes que fueran aplicables a una determinada clase específica de Conflicto, y éstas hubieran sido adoptadas por el Patrocinador y notificadas a AAA y JAMS, estas Reglas no se aplicarán a dicha clase de Conflictos.

B. Estas Reglas se aplican de la forma en que existieran en el momento en que se iniciaran los procesos establecidos de acuerdo con las mismas.


A. En la medida que fuera consistente con estas

las Reglas de Resolución de Conflictos Laborales de AAAo JAMS también se aplicarán a todos los procesos reglamentados por estas Reglas.

3. **El Inicio del Proceso**

   A. Una Parte puede iniciar la demanda de acuerdo con lo establecido por estas Reglas en cualquier momento, sujeto a los mecanismos de defensa e incluyendo aquellos que apliquen en el tiempo oportuno de la reclamación, incluyendo las limitaciones y demoras indebidas.

   B. Una Parte puede iniciar la demanda mediante la entrega de una solicitud escrita para iniciar la demanda en AAAo JAMS y después del pago de cargo administrativo correspondiente.

   C. Las copias de la solicitud deberán ser entregadas a todas las otras Partes del Conflicto por AAAo JAMS. La solicitud deberá describir la índole del Conflicto, el monto involucrado, si lo hubiese, el recurso que se solicita y el sitio solicitado para el proceso.

   D. Las demandas también pueden ser iniciadas por un Empleado o Aspirante mediante la entrega de una solicitud escrita para iniciar los procesos al Administrador del Programa de Resolución de Conflictos de la Compañía. En dicho caso, la Compañía deberá entregar en la brevedad posible a AAA o JAMS toda solicitud que hubiera recibido y que hubiera sido entregada en forma apropiada.

   E. Las Partes contra quienes se haya presentado una demanda deberán presentar una declaración en respuesta a dicha demanda dentro del plazo de 21 días de la fecha a partir de la que se recibió la notificación de la intención de arbitrar o la descripción de las reclamaciones, la cual deberá incluir las contrademandas y las solicitudes para que el árbitro (si lo hubiera) prepare una declaración fundamentando las razones por las cuales se concede la indemnización.

4. **Junta Administrativa**

   AAA o JAMS deberán convocar una junta administrativa tan pronto como sea posible después de haber recibido la declaración de respuesta o después del vencimiento del plazo para la presentación de la declaración de respuesta, si

dicha declaración no hubiera sido presentada. La junta puede ser sostenida en persona o por teléfono. En la junta,

A.      En la medida que fuera consistente con estas

AAAo JAMS determinarán si las Partes han acordado un método para resolver el Conflicto. Si las Partes estuvieran de acuerdo, AAA o JAMS implementarán el proceso de acuerdo con sus reglas una vez que se haya efectuado el pago del cargo correspondiente. Si las Partes no pueden llegar a un acuerdo, o si las Partes hubieran intentado llegar a un acuerdo y no pudieron resolver el Conflicto por medio de la mediación u otro mecanismo que no fuera vinculante u obligatorio, el Conflicto deberá ser arbitrado de acuerdo con estas Reglas.

## 5. El Nombramiento de un Árbitro

Inmediatamente después del pago del cargo por concepto de arbitraje, AAA o JAMS deberán enviar simultáneamente a cada Parte involucrada una lista idéntica de los nombres de las personas que fueron escogidas de un panel de árbitros calificados que AAA o JAMS deberá seleccionar y mantener. Cada una de las Partes del Conflicto tendrá catorce (14) días a partir de la fecha del comunicado para tachar los nombres que no prefiere, numerar en orden de preferencia los nombres restantes y devolver la lista a AAA o JAMS. Si una de las Partes no regresara la lista dentro del plazo especificado, todas las personas en la misma serán consideradas como aceptables. Entre las personas que hayan sido aprobadas en ambas listas, y de acuerdo con el orden de preferencia mutua, AAAo JAMS deberán invitar a que uno de ellos o más de uno ejerza/n de árbitro/s. En los casos en los cuales más de $2,000,000 esté en controversia, cualquiera de las partes tendrá el derecho de solicitar que el arbitraje proceda delante de un panel de tres miembros en vez de un solo árbitro. La Parte que escoja un panel en estas circunstancias deberá notificar a las otras Partes durante la junta administrativa descrita en la Cláusula 4 del Programa. Cualquiera de las Partes tendrá el derecho de tachar una lista de árbitros en su totalidad. Cuando una de las Partes ejercita este derecho, AAAo JAMS deberá emitir una nueva lista de árbitros de manera consistente con los procesos anteriormente mencionados.

## 6. Requisitos para la designación de un Árbitro

Ninguna persona deberá ejercer como árbitro en ningún caso en el cual dicha persona tuviera un interés financiero o personal. Antes de aceptar el nombramiento, el posible candidato deberá revelar cualquier circunstancia que posiblemente pudiera impedir una audiencia oportuna o crear la presunción de parcialidad. Una vez recibida dicha información por parte del árbitro o de cualquier otra fuente, AAA o JAMS tendrá que sustituir esa persona o comunicar la información a las Partes involucradas para que

puedan formular sus comentarios. A partir de entonces, AAA o JAMS podrán descalificar dicha persona y su decisión será concluyente.

## 7. Vacantes

Si hubiera una vacante por cualquier razón o si un árbitro designado no pudiera ejercer en forma oportuna, se deberá aplicar el proceso para determinar nombramientos descripto en la Cláusula 5 para la selección de un árbitro substituto.

## 8. Fecha, Hora y Sitio para las Audiencias

A. El árbitro deberá fijar la fecha, hora y sitio de cualquier proceso efectuado de acuerdo con las disposiciones de la Cláusula 8B del Programa.

B. Se proporcionará la notificación de la audiencia con un plazo no mayor de diez (10) días de anticipación, salvo que el árbitro determinara o que las Partes convengan que un periodo más corto fuera necesario.

C. El árbitro deberá realizar su labor, sin incurrir en gastos indebidos, para acomodar el Empleado o el Aspirante en la selección de un sitio para el proceso.

## 9. Juntas

A pedido de AAA o JAMS, o de una de las Partes o por iniciativa del árbitro, el árbitro de AAA o JAMS podrá convocar a juntas previa notificación para la discusión y la determinación de cualquier asunto que agilice el proceso, incluyendo:

A. la jurisdicción,

B. la aclaración de asuntos de especial interés

C. la determinación de asuntos preliminares, incluyendo el sumario de las consideraciones y disposiciones legales

D. la junta previa a la audiencia

E. el tiempo y sitio para los procesos o juntas de arbitraje

F. los recursos equitativos o legales interinos autorizados por las leyes aplicables

G. los memorandums anteriores o posteriores a la audiencia

H. las disposiciones, y/o

I. cualquier otro asunto o proceso fundamental

## 10. La modalidad para realizarAudiencias y Juntas

A discreción del árbitro o por común acuerdo entre las Partes, se podrán realizar juntas y audiencias por teléfono o por escrito, así como en persona.

## 11. La Junta previa a la Audiencia

A. En un horario que será determinado por el árbitro, cada una de las partes deberá entregar por adelantado los nombres y direcciones de los testigos que se pro-pone presentar y también los documentos que tiene planeado presentar.

B. El árbitro tendrá la discreción para determinar el for-mato, la cantidad y la frecuencia de las juntas con las Partes involucradas.

C. Las juntas antedichas podrán tomar el formato permi-tido por las Reglas Federales para Procesos Civiles, ser modificadas de tiempo en tiempo, y estar sujetas a las restricciones impuestas por el árbitro.

## 12. Representación

Cualquiera de las Partes podrá ser representada por un abogado o por cualquier otro representante autorizado.

## 13. La Asistencia a las Audiencias

El árbitro deberá guardar la privacidad de los procesos hasta donde fuera permitido por la ley. Todas aquellas personas que tienen un interés personal en el caso a ser tratado ten-drán el derecho de asistir a los procesos de arbitraje.

El árbitro deberá tener la autoridad de excluir a cualquier testigo que no fuera una de las Partes u otra persona esen-cial, durante del testimonio de otros testigos. El árbitro deberá determinar si alguna otra persona podrá asistir al proceso. A pedido de cualquiera de las Partes, el árbitro deberá excluir cualquier testigo durante el testimonio de otros testigos.

## 14. Aplazamiento de los procesos o juntas de arbitraje

A. El árbitro, debido a una causa justificada demostrada por una de las Partes, o de común acuerdo con las Partes, podrá postergar cualquier proceso o junta de

arbitraje.

B. La realización de procesos judiciales pendientes y relacionados con el mismo asunto no constituye una causa justificada para su aplazamiento.

## 15. Declaración Jurada

Antes de proseguir con la primera audiencia, cada árbitro podrá tomar el juramento para el ejercicio de su cargo y así lo hará si fuera requerido por la ley. El árbitro puede requerir que los testigos testifiquen bajo juramento conducido por una persona debidamente calificada y así lo hará si fuera requerido por la ley o requerido por alguna de las Partes.

## 16. Registro de los Procesos de Arbitraje

No habrá ningún registro estenográfico, de audio o video de los procesos de arbitraje salvo que fueran solicitados por alguna de las Partes o determinado por el árbitro. La Parte que solicite el registro deberá pagar el costo total de su producción. Se suministrarán copias del registro a pedido de las otras Partes y una vez que se haya pagado el costo de la reproducción.

## 17. Proceso

El Proceso deberá ser dirigido por el árbitro en el orden y de la manera que permita la más rápida presentación de la evidencia y de los argumentos de las Partes.

## 18. El Arbitraje en Ausencia de una de las Partes

El árbitro podrá proseguir en ausencia de una de las Partes o representantes que, después de la debida notificación, no se presentaran o no obtuvieran un aplazamiento. No se alcanzará un fallo solamente en base a la falta de asistencia de una de las Partes. El árbitro deberá requerir que cualquiera de las Partes presentes presente toda la evidencia que el árbitro requiriera con el fin de alcanzar un fallo o conceder una asignación.

## 19. Evidencia

A. El árbitro será el único que juzgará la relevancia, la importancia, y la admisibilidad de la evidencia que fuera presentada. La conformidad con las reglas legales referentes a evidencia no será necesaria.

B. El árbitro puede citar con una orden de comparecencia a testigos o documentos a pedido de una de las Partes o

por la iniciativa propia del árbitro.

C. El árbitro puede considerar la evidencia de los testigos mediante una declaración jurada o una declaración, pero le deberá dar el peso que el árbitro considere apropiado después de haber considerado cualquier objeción hecha para su admisión al proceso de arbitraje.

## 20. Presentación de la Evidencia después de la Audiencia

La evidencia documentada a ser considerada por el árbitro deberá ser presentada en la audiencia salvo que el árbitro encuentre una justificación para que se permita una presentación posterior a dicha audiencia. Se les deberá proporcionar a todas las Partes la oportunidad para examinar y comentar sobre cualquier evidencia que fuera presentada posteriormente a la audiencia. El árbitro deberá permitir la presentación de expedientes a pedido de una de las Partes y deberá determinar el proceso y el momento oportuno de dicha presentación.

## 21. El Cierre y la Reapertura de los Procesos de Arbitraje

A. Cuando el árbitro esté satisfecho que el registro está completo, incluyendo los expedientes que hayan sido presentados con su permiso después de la audiencia, el árbitro deberá declarar el cierre del proceso.

B. Se podrá reabrir el proceso por iniciativa del árbitro o mediante la solicitud de una de las Partes en cualquier momento anterior al fallo del árbitro.

## 22. Renuncia al Derecho de Objetar en el Proceso de Arbitraje

Después de haber tenido conocimiento de que no se hubiera cumplido con las disposiciones o requerimientos relacionados con estos procesos y reglas de arbitraje, cualquiera de las Partes que no se oponga por escrito será considerada como que hubiera renunciado al derecho de objetar.

## 23. Notificaciones

Cualquier comunicado, notificaciones o procesos necesarios o apropiados para la iniciación o la continuación de cualquier proceso de arbitraje efectuado de acuerdo con estas Reglas (incluyendo el fallo del árbitro, cualquier demanda judicial en relación con el mismo, o la adjudicación de una indemnización efectuada de acuerdo con estos procesos) puede ser enviado por correo dirigido a la Parte o su representante a la dirección más reciente de la cual se

tuviera conocimiento o entregado mediante un servicio de mensajería. AAAo JAMS, las Partes, y el árbitro también podrán usar la transmisión por facsímile, telex, telegrama, u cualquier otra forma escrita de comunicación electrónica con el fin de entregar cualquier notificación requerida por esta Reglas.

## 24. La Comunicación con AAA, JAMS y la Compañía

A. Cualquiera de las Partes podrá notificar o comunicarse con AAA, comunicándose con:

> Regional Administrador
> (Administrador Regional)
> American Arbitration Association
> (Asociación Americana de Arbitraje)
> 1001 Fannin St. Suite 1005
> Houston, Texas 77002
> (713) 739-13022
> Fax: (713) 739-1702

B. Cualquiera de las Partes podrá notificar o comunicarse con JAMS, comunicándose con:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

C. Cualquier notificación o comunicado con la Compañía deberá ser dirigido a:

> Legal Department (Departamento Legal)
> Nabors Industries, Inc.
> 515 West Greens Road, Suite 1200
> Houston, Texas 77067-4525
> (281) 874-0035
> Fax: (281) 775-8431

## 25. Comunicación con el Árbitro

No habrá ninguna comunicación con las Partes y el árbitro aparte de la comunicación en las audiencias o juntas de arbitraje. Cualquier otra forma de comunicación ya sea oral o escrita de las partes al árbitro deberán ser dirigidas a AAA o JAMS (y su copia enviada a las Partes) para ser transmitidas al árbitro, salvo que las Partes y el árbitro acuerden lo contrario.

## 26. Plazo para efectuar el Fallo de Arbitraje

El fallo se efectuará rápidamente por el árbitro, salvo que se hubiera acordado lo contrario por las Partes o que estu-

viera estipulado por las leyes aplicables, en un plazo no mayor de treinta (30) días a partir de la fecha del cierre de los procesos o, si fuera aplicable, del cierre de un proceso de arbitraje que haya sido reabierto.

## 27. El Formato del Fallo de Arbitraje

El fallo del arbitraje deberá ser por escrito y deberá ser firmado por el árbitro. El árbitro deberá redactar una declaración de las razones para el fallo, si fuera requerido en la solicitud para iniciar los procesos o en la declaración de respuesta que se hubieran presentado. El fallo del árbi - tro deberá ser ejecutado de la manera requerida por las leyes aplicables.

## 28. Modificaciones del Fallo del Árbitro

Como consecuencia de un mandato de un tribunal de jurisdicción competente, o por común acuerdo entre las Partes, el árbitro deberá modificar cualquier fallo que se hubiera dictado. El árbitro podrá modificar un fallo mediante la moción de alguna de las Partes si el árbitro considera que el fallo fuera ambiguo o presentara algún defecto, o si el fallo requiriera un acto ilegal o imposible de realizar. Estas son las únicas circunstancias por medio de las cuales un árbitro tendrá jurisdicción para retirar o modificar un dictamen o fallo.

## 29. Resolución

Si las Partes resuelven su Disputa durante el transcurso del arbitraje, el árbitro podrá describir los términos de la resolución en un fallo de consentimiento.

## 30. Alcance de la Autoridad del Árbitro

La autoridad del árbitro deberá estar limitada a la resolución de Conflictos legales entre las Partes. Como tal, el

árbitro deberá estar obligado por y deberá aplicar las leyes aplicables, incluyendo las que estén relacionadas con la determinación del peso de la prueba, así como las leyes fundamentales. El árbitro tendrá la autoridad para limitar o extender los derechos fundamentales protegidos por las leyes aplicables. El árbitro podrá también conceder un recurso de emergencia o provisional que esté o que podría estar autorizado por las leyes aplicables. El árbitro deberá estar obligado a cumplir con las disposiciones del Programa y las Reglas.

## 31. Los Procesos Judiciales y la Exclusión de Responsabilidad

A. Ni AAA, JAMS o ningún árbitro deberán constituir

ninguna de las Partes de ningún proceso judicial en relación con los procesos de arbitraje efectuados de acuerdo con estas Reglas.

B. Ni AAA, JAMS o ningún árbitro será responsable ante ninguna de las Partes por ningún acto de omisión en relación con cualquier proceso que se encuentre dentro del alcance de estas Reglas.

C. Cualquier tribunal con jurisdicción sobre las Partes podrá obligar a alguna de las Partes a proceder de acuerdo con estas Reglas en cualquier lugar y podrá hacer cumplir cualquier fallo que se haya dictado.

D. Se considerará que las Partes bajo estas Reglas consienten en que el fallo del árbitro podrá ser admitido y que dicho fallo se podrá hacer cumplir en cualquier tribunal federal o estatal que tuviera jurisdicción sobre las Partes.

E. La iniciación de, la participación en, o la eliminación de un proceso legal no constituirá una renuncia al derecho a proceder de acuerdo con estas Reglas.

F. Cualquier tribunal con jurisdicción sobre las Partes podrá presentar órdenes judiciales (incluyendo órdenes preliminares) si se cumplieran los requisitos legales necesarios y equitativos de acuerdo con las leyes aplicables, en espera de la institución de los procesos de arbitraje efectuados de acuerdo con estas Reglas.

## 32. Honorarios y Gastos

A. Los gastos de los testigos deberán ser pagados por la Parte que presenta dichos testigos, salvo se indique lo contrario en las leyes aplicables o en el fallo del árbitro.

B. Todos los honorarios de los abogados deberán ser pagados por la Parte que los contrató, salvo se indique lo contrario en las leyes aplicables, en el Programa o en el fallo del árbitro.

C. Los costos de las juntas a realizarse (por ejemplo: los honorarios del relator para la transcripción original) deberán ser pagados por la Parte que inicia la junta. El costo de las copias de la transcripción de la declaración jurada y cualquier otro costo deberá ser pagado por la Parte que solicite la copia.

D. Los honorarios y los gastos de los peritos, asesores y demás que fueren presentados o consultados por una de las Partes, deberán ser pagados por la Parte que utilice dichos servicios.

E. El Empleado o Aspirante deberá pagar un cargo de $150 si él o ella inicia el arbitraje o mediación. Aparte de dicho cargo, el Empleado / Aspirante no será responsable de pagar los honorarios y gastos del proceso efectuado de acuerdo a estas Reglas, incluyendo los viáticos requeridos de un árbitro o mediador, AAA o JAMS, y el costo de cualquier evidencia que fuere presentada a la discreción del árbitro.

F. Si la demanda para mediación o arbitraje es iniciada por la Compañía, dichos honorarios serán pagados por la Compañía.

G. Salvo se indique lo contrario en las leyes vigentes o en el fallo del árbitro, todos los otros gastos, honorarios y costos del proceso efectuado de acuerdo a estas Reglas serán pagados de manera equitativa por las Partes que no son Empleados/Aspirantes.

## 33. Interpretación y Aplicación de Estas Reglas

El árbitro deberá interpretar y aplicar estas Reglas en lo que respecta a los poderes y deberes del árbitro. Todas las otras reglas deberán ser interpretadas y aplicadas por AAA o JAMS.

## 34. Ley Aplicable

A. Los Procesos efectuados de acuerdo a estas Reglas y la revisión judicial de los fallos deberán ser regidos por la Ley.

B. Salvo se indique lo contrario de forma expresa en estas Reglas, las leyes fundamentales aplicadas

deberán ser leyes estatales o leyes federales fundamentales que serían aplicadas por un Tribunal de Distrito de los Estados Unidos que tomara el lugar del proceso de arbitraje.

## 35. Mediación

En cualquier momento después de que el proceso de arbitraje haya concluido, las Partes podrán acordar la mediación de su disputa por medio de la notificación de AAAo JAMS. AAAo JAMS deberán determinar que procesos se aplican a dicha mediación.

## 36. Español

Este Programa de Resolución de Conflictos se encuentra disponible en inglés y en español

**Nabors Industries, Inc.**
April 2001



**17 de enero de 2007**

**A:**    Todos los Empleados de Nabors Industries, Inc. y Subsidiarias

**REF:**  Programa de Resolución de Disputa de Nabors

Estimado Empleado:

A partir de diez (10) días después de la fecha de este aviso, de conformidad con la Sección 6 del Programa de Resolución de Disputa de Nabors de Nabors Industries, Inc. ("Nabors") y sus subsidiarias están enmendando el Programa y Reglamentos de Resolución de Disputa de Nabors para la determinación de todas las disputas entre los empleados y Nabors o una de sus subsidiarias.

Las enmiendas al Programa y Reglamentos están anexas en la parte posterior de esta página. Nabors estás enmendando una (1) sección del Programa de Resolución de Disputa de Nabors y una (1) sección de los Reglamentos de Resolución de Disputa de Nabors. Usted debe ya tener una copia del programa y los reglamentos actuales o pueden encontrarse en la Intranet de Nabors, de acuerdo a la política número 200.80.1, en http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

Como antes, el Programa de Resolución de Disputa de Nabors, incluyendo sus enmiendas, le da los medios más efectivos y eficientes para resolver cualquier disputa que pueda tener, a través del proceso que estimula la resolución a la oportunidad más inmediata. Los empleados no renuncian a algún derecho legal sustantivo de acuerdo al Programa. En su lugar, el programa, incluyendo sus enmiendas, estipula que cualquier asunto legal sustantivo que pueda tener, sea resuelto sobre una base individual por mediación o ante un árbitro neutral, cuya decisión será final y que lo obliga a usted y a la Compañía. De acuerdo al programa. incluyendo sus enmiendas, sin embargo, usted renuncia a todo derecho de procedimiento que pueda tener para iniciar una acción judicial en base individual, colectiva, de clase o representativa; y usted renuncia al derecho de un juicio ante jurado en relación con alguna disputa que pueda tener con la Compañía o alguna Entidad Electora (como es definida en el Programa), que incluye alguna reclamación de lesión o reclamación de discriminación en base a raza, origen nacional, género, religión, edad o discapacidad ,de acuerdo con cualquier estatuto de derechos civiles federales o estatales.

Cada individuo que trabaja para Nabors Industries, Inc. o una subsidiaria está sujeto al Programa, incluyendo sus enmiendas, excepto que las disposiciones enmendadas afecten solamente a las disputas iniciadas después de la fecha efectiva de la enmiendas y sin asuntos pendientes antes de la fecha efectiva. Su empleo continuado después de la fecha en que reciba este aviso constituirá su aceptación de las enmiendas al Programa, tanto durante y después de su empleo con la Compañía.

Esperamos continuar trabajando juntos. Si tiene alguna pregunta acerca de estas enmiendas al Programa y a los Reglamentos o a cualquier otro término de su empleo, por favor, no dude en comunicarse con el Departamento de Recursos Humanos de su empleador.

Atentamente,

NABORS INDUSTRIES, INC.

*\*Una copia de este aviso está disponible en español,*
*si la solicita al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.*



## Enmienda al PROGRAMA DE RESOLUCIÓN DE DISPUTA DE NABORS:

### 4. Resolución de disputas

A. Todas las disputas que no sean de otro modo establecidas por las Partes serán finales y resueltas de manera concluyente, de acuerdo a este Programa y a los Reglamentos. Las partes renuncian a todo derecho que puedan tener a un juicio ante jurado sobre reclamaciones relacionadas de alguna manera a cualquier disputa.

B. Cada disputa será arbitrada sobre una base individual. Las Partes preceden y renuncian a cualquier derecho para unirse o consolidar reclamaciones en arbitraje cono otros o para hacer reclamaciones al arbitraje como un representante o como un miembro de una clase o en capacidad de abogado particular o similar, a menos que tales procedimientos sean convenidos por todas las partes. Ni la Compañía ni algún Empleado o Solicitante puede continuar alguna Disputa sobre una base de acción de clase, de acción colectiva o consolidada o en capacidad de representación de otras personas o entidades que hayan reclamado estar situados similarmente o participado como un miembro de clase en tal demanda. El árbitro en alguna demanda de acuerdo a este Programa no tendrá autoridad para conducir el asunto como una acción consolidada, de clase colectiva o de representación.

C. Si la limitación del procedimiento en el Párrafo B de esta Sección no puede hacerse cumplir por un tribunal en una demanda en la cual una parte busca ejercer una acción consolidada, de clase o colectiva, o actuar de otra manera en una capacidad de representación, entonces este programa aplicará a tal demanda sólo al siguiente alcance. El tribunal decidirá si la Disputa debe proceder sobre una base consolidada, de clase, colectiva u otra de representación y, si es así, definirá el alcance de la clase. Ninguna de las determinaciones anteriores será remitida al árbitro y en ningún caso el árbitro tendrá el poder para determinar la certificación de acción de clase, colectiva o de representación. Las decisiones del tribunal estarán sujetas a apelación en conformidad a las reglas de procedimiento aplicables. Si el tribunal certifica una acción de clase, colectiva u otra representación, entonces todas las otras determinaciones, dentro o relacionadas con la Disputa, serán hechas por el árbitro. El árbitro determinará las preguntas de responsabilidad para, o de la clase, como un todo y los remedios disponibles para o de la clase, como un todo. En árbitro también decidirá el desagravio, si lo hay, al cual una parte o miembro de clase puede tener derecho individualmente. Si el tribunal, no obstante, niega en última instancia una solicitud de una parte para proceder sobre una base consolidada, de clase, colectiva o de representación, entonces esa reclamación individual de la parte estará todavía sujeta a este Programa y referible al arbitraje en conformidad a sus términos.

## Enmienda a los REGLAMENTOS DE RESOLUCIÓN DE DISPUTA DE NABORS:

### 30. Alcance de la Autoridad del Árbitro

A. La autoridad del árbitro será limitada a la resolución de Disputas legales entre las Partes. Como tal, el árbitro estará obligado y aplicará la ley pertinente, que incluye aquello relacionado con la ubicación de la carga de la prueba, así como la ley sustantiva. El árbitro no tendrá la autoridad, ya sea de abreviar o aumentar, los derechos sustantivos disponibles de acuerdo con la ley aplicable. El árbitro también puede otorgar desagravio de emergencia o temporal que sea o sería autorizado por la ley aplicable. El árbitro estará obligado y cumplirá con las disposiciones del Programa y los Reglamentos.

B. El árbitro no tendrá el poder de escuchar reclamaciones en el arbitraje como una acción de clase o colectiva, o en capacidad de abogado particular o similar o sobre otra base de capacidad de representación, o ausente el consentimiento de todas las partes, sobre una base consolidada. El árbitro estará autorizado a decidir solamente las reclamaciones disputadas entre las partes individuales.



## Applicant Must Read And Verify With Signature

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me. ___Adlg___ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. ___Adlg___ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration. ___Adlg___ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. ___Adlg___ - INITIALS

This application will be considered active for thirty (30) days.

_alfredo le h Haya_
Applicant's Signature

_7-16-13_
Date

## NOTICE TO APPLICANTS REGARDING
## DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1   I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2.  By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

_____
Name of Applicant

_____
Signature of Applicant

__7-16-13__
Date

Alfredo De La Garza

## AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN
## DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todas los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible.

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporciona este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3.  Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4   Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

_____
Nombre del Aspirante

_____
Firma del Aspirante

_____
Fecha

HR-106

# EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

Alfredo De La Garza
Name of Employee (Print)

Alfredo De La Garza
Signature of Employee

7-22-13
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

Nombre del Empleado (Letra de Imprenta/Molde)

Firma del Empleado

Fecha

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of this form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.



Revised April, 2003

**INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS**
**DRILLING BID PROPOSAL**
**AND**
**DAYWORK DRILLING CONTRACT - U.S.**

TO: __NABORS DRILLING USA, LP__

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____ this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M on _____ , 20_____ , to the following address: _____

---

**THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY,**
**RELEASE OF LIABILITY, AND ALLOCATION OF RISK –**
**SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14**

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| | |
|---|---|
| **OPERATOR:** | Penn Virginia Oil & Gas, LP |
| **Address:** | 840 Gessner Road, Suite 800 |
| | Houston, Texas 77024 |
| **CONTRACTOR:** | NABORS DRILLING USA, LP |
| **Address:** | 515 W. Greens Road, Suite 1000 |
| | Houston, Texas 77067 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.

1. **LOCATION OF WELL:**
   Well Name
   and Number: **To be advised by Operator**
   Parish/
   County: **Jefferson**  State: **Texas**  Field Name: _____
   Well location and
   land description: **To be advised by Operator**
   1.1 Additional Well Locations or Areas: **None.**
   Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**
   Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the _____ day of _____ , 20_____ or **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Contractor shall have the right to terminate this Contract unless Operator pays Contractor the Standby Time Rate from such release date until the location is ready. If Contractor so terminates, the termination shall be deemed to be a termination at Operator's election, and the provisions of Sub-paragraph 6.4(a) shall apply.**

3. **DEPTH:**
   3.1 Well Depth: The well(s) shall be drilled to a depth of approximately **10,500'** Feet, or to the formation, whichever is deeper, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____ feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4. **DAYWORK RATES:**
   Contractor shall be paid at the following rates for the work performed hereunder.

   4.1 Mobilization: Operator shall pay Contractor a mobilization fee of $ _____ or a mobilization day rate of $ **19,000\*** per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include. **Move-in and rig up on the new well site.**
   **\*Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string up services.**

   4.2 Demobilization: Operator shall pay Contractor a demobilization fee of $ _____ or a demobilization day rate during tear-down of $ **19,000\*** per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.**
   **\*Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string down services.**

   4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ , Operator shall pay Contractor a sum of $ _____ per twenty-four (24) hour day.

   4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with __**Five (5)**__ man crew the operating day rate shall be:

| Depth Intervals | | Without Drill Pipe | | With Drill Pipe | |
|---|---|---|---|---|---|
| From | To | | | | |
| 0 | Rig Release | $ 21,000 per day | | $ 21,000 per day | |
| | | $ _____ per day | | $ _____ per day | |
| | | $ _____ per day | | $ _____ per day | |

Using Operator's drill pipe $ **21,000** per day.

The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.


**EXHIBIT "1-B"**

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | | Size | Grade | Directional or Uncontrollable Deviated Hole | | Size | Grade |
|---|---|---|---|---|---|---|---|
| $ N/A | per ft. | | | $ N/A | per ft | | |
| $ N/A | per ft. | | | $ N/A | per ft. | | |
| $ N/A | per ft. | | | $ N/A | per ft. | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 **Repair Time:** In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of ___eight (8)___ hours for any one rig repair job, but not to exceed twenty-four (24) hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____zero (0)_____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6 **Standby Time Rate:** $ __ 100% of the Operating Day Rate__ per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 **Drilling Fluid Rates:** When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

    (a) $___20___ per man per day for Contractor's rig-site personnel.
    (b) $___110___ per day additional operating rate; and
    (c) Cost of all labor, material and services plus ___twenty-four (24)___ hours operating rate to clean rig and related equipment.

4.8 **Force Majeure Rate:** $ __100% of the Operating Day Rate__ per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 **Reimbursable Costs:** Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____ten (10)_____ percent for such cost of handling. When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.

4.10 **Revision in Rates:** The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than ___zero (0)___ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

    (a) Labor costs, including all benefits, of Contractor's personnel;
    (b) Contractor's cost of insurance premiums;
    (c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $__N/A__; Operator shall provide all fuel.
    (d) Contractor's cost of catering, when applicable;
    (e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
    ~~(f) Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU119103) to determine to what extent a price variance has occurred in said spare parts and supplies;~~
    (g)(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

## 5. TIME OF PAYMENT

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 **Disputed Invoices and Late Payment:** Operator shall pay all invoices within ___thirty (30)___ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of ___1 1/2___ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3

## 6. TERM:

6.1 **Duration of Contract:** This Contract shall remain in full force and effect until drilling operations are completed on the well or wells specified in Paragraph 1 above, or for a term of _____ commencing on the date specified in Paragraph 2 above

6.2 ~~Extension of Term: Operator may extend the term of this Contract for _____ well(s) or for a period of _____ by giving notice to Contractor at least _____ days prior to completion of the well then being drilled or by~~ __Not used.__

6.3 **Early Termination:**

    (a) **By Either Party:** Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.



(b)  By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c)  By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.5 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4  Early Termination Compensation:

(a)  Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty ~~a sum equal to the standby time rate (Subparagraph 4.5) for a period of ___ days or~~ a lump sum of $   105,000   .

(b)  Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or~~   plus, as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate.

(c)  Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for   five (5)   days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, a lump sum of $ ___ ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or~~ as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate.

7.  CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

8.  DRILLING METHODS AND PRACTICES:

8.1  Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2  Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3  Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4  Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5  If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

9.  INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

10.  SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com  NDUSA

advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.

### 11. EQUIPMENT CAPACITY

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder or where canal or water depths are in excess of _____ feet. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment

### 12. TERMINATION OF LOCATION LIABILITY:

When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.

### 13. INSURANCE

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extent of the indemnification obligations assumed herein.

### 14. RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:

14.1 *Contractor's Surface Equipment:* Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.

14.2 *Contractor's In-Hole Equipment:* Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or _____100_____ percent of current new replacement cost of such equipment delivered to the well site.

14.3 *Contractor's Equipment - Environmental Loss or Damage:* Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.

14.4 *Operator's Equipment:* Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.

14.5 *The Hole:* In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.

14.6 *Underground Damage:* Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.

14.7 *Inspection of Materials Furnished by Operator:* Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from, and shall protect, defend and indemnify Contractor from and against, any such liability.

14.8 *Contractor's Indemnification of Operator:* Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.9 *Operator's Indemnification of Contractor:* Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or

Form provided by Forms On-A-Disk
(214) 340-9429 - FormsOnADisk.com

NDUSA

damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the Indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

of    THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.
NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT

19.   INFORMATION CONFIDENTIAL:

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

20.   SUBCONTRACTS:

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

21.   ATTORNEY'S FEES

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

22.   CLAIMS AND LIENS:

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located

23.   ASSIGNMENT:

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

24.   NOTICES AND PLACE OF PAYMENT:

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

25.   CONTINUING OBLIGATIONS:

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

26.   ENTIRE AGREEMENT:

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

27.   SPECIAL PROVISIONS:

27.1  Exhibit "C" – Contractors Special Provisions is attached hereto and made a part hereof.

27.2  In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas. Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3  For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $19,000 per day.

27.4  Epoch Well Services, Inc. ("Epoch"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Epoch $280 per day (spud to release) for rental of the Epoch Rig Watch system.

The Epoch Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included with option for 6 additional probes), trip tank volume probes (1 probe included with option for 1 additional probe), and return flow paddle.

28.   ACCEPTANCE OF CONTRACT:

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this 23 day of Sep , 20 08

OPERATOR:   Penn Virginia Oil & Gas

By:   _____

Title:   Ops MRG

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this 22nd day of September , 20 08 , which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within Seven (7) days of the above date Contractor shall be in no manner bound by its signature thereto.

CONTRACTOR:   Nabors Drilling USA, LP By NDUSA Holdings Corp., Its General Partner

By:   _____

Title:   Vice President Marketing and Sales

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NDUSA

## EXHIBIT "A"

To Daywork Contract dated ___September 22___ , 20 _08_

Operator __Penn Virginia Oil & Gas, LP_____     Contractor ___Nabors Drilling USA, LP_____

Well Name and Number ___To be advised by Operator_____

### SPECIFICATIONS AND SPECIAL PROVISIONS

**1. CASING PROGRAM (See Paragraph 7)**

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | in. | in. | lbs/ft. | | ft. | hrs |
| Surface | in. | in. | lbs/ft. | | ft. | hrs |
| Protection | in. | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |
| Production | in. | in. | lbs/ft. | | ft. | hrs |
| Liner | in. | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |

**2. MUD CONTROL PROGRAM (See Subparagraph 8.2)**

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Other mud specifications: _____

_____

_____

_____

**3. INSURANCE (See Paragraph 13)**

3.1  Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___one (1) million___ covering all of Contractor's employees working under this Contract.

3.2  Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___one (1) million___ combined single limit per occurrence for Bodily Injury and Property Damage.

3.3  Automobile Public Liability Insurance with limits of $___one (1) million___ for the death or injury of each person and $___one (1) million___ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $___one (1) million___ for each accident.

3.4  In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoremen's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.

3.5  Other insurance: __Excess liability Insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.__

**4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:**

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract

4.1  Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. ___712*___ , the major items of equipment being:

Drawworks: Make and Model ___Per rig inventory attached hereto and made a part hereof._____

Engines: Make, Model, and H.P. _____

No. on Rig _____

Pumps: No. 1 Make, Size, and Power _____

No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W P _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive* Type _____

Drill Pipe: Size ___4 1/2"___ in _weights and grades as necessary to maintain 100,000 lbs overpull_ ft. Size: _____ in _____ ft

Drill Collars: Number and Size ___25-6 ½" (nominal); 6-8" (nominal)_____

Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|------|-------------------|--------------|--------|
| | | | |
| | | | |
| | | | |
| | | | |

B.O.P. Closing Unit: _____
B.O.P. Accumulator: _____

4.2   Derrick timbers.
4.3   Normal strings of drill pipe and drill collars specified above.
4.4   Conventional drift indicator.
4.5   Circulating mud pits.
4.6   Necessary pipe racks and rigging up material.
4.7   Normal storage for mud and chemicals.
4.8   Shale Shaker.
4.9   _____
4.10   _____
4.11   _____
4.12   _____
4.13   _____
4.14   _____
4.15   _____
4.16   _____
4.17   _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract.

5.1   Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.
5.2   Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.
5.3   Test tanks with pipe and fittings.
5.4   Mud storage tanks with pipe and fittings.
5.5   Separator with pipe and fittings.
5.6   Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.
5.7   Labor to disconnect and clean test tanks and mud gas separator.
5.8   Drilling mud, chemicals, lost circulation materials and other additives.
5.9   Pipe and connections for oil circulating lines.
5.10   Labor to lay, bury and recover oil circulating lines.
5.11   Drilling bits, reamers, reamer cutters, stabilizers and special tools.
5.12   Contract fishing tool services and tool rental.
5.13   Wire line core bits or heads, core barrels and wire line core catchers if required.
5.14   Conventional core bits, core catchers and core barrels.
5.15   Diamond core barrel with head.
5.16   Cement and cementing service.
5.17   Electrical wireline logging services.
5.18   Directional, caliper, or other special services.
5.19   Gun or jet perforating services.
5.20   Explosives and shooting devices.
5.21   Formation testing, hydraulic fracturing, acidizing and other related services.
5.22   Equipment for drill stem testing.
5.23   Mud logging services.
5.24   Sidewall coring service.
5.25   Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.
5.26   Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment.
5.27   Casing scratchers and centralizers.
5.28   Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.
5.29   Special or added storage for mud and chemicals.
5.30   Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.
5.31   Blowout preventer testing packoff and testing services.
5.32   Replacement of BOP rubbers, elements and seals, if required, after initial test.
5.33   Casing Thread Protectors and Casing Lubricants.
5.34   $H_2S$ training and equipment as necessary or as required by law.
5.35   Site septic systems.
5.36   Ditching around rig and location.
5.37   Third party BOP testing service.
5.38   _____
5.39   _____
5.40   _____
5.41   _____
5.42   _____
5.43   _____
5.44   _____
5.45   _____
5.46   _____
5.47   _____
5.48   _____
5.49   _____
5.50   _____

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NDUSA

**6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:**

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column

|  | Item | To Be Provided By and At The Expense Of | |
|---|---|---|---|
|  |  | Operator | Contractor |
| 6.1 | Cellar and Runways | X | |
| 6.2 | Ditches and sumps | X | |
| 6.3 | Fuel (located at _____ ) | X | |
| 6.4 | Fuel Lines (length ___ of rig only ) | | X |
| 6.5 | Water at source, including required permits | X | |
| 6.6 | Water well, including required permits | X | |
| 6.7 | Water lines, including required permits | X | |
| 6.8 | Water storage tanks _____ capacity (Per rig inventory) | | X |
| 6.9 | Potable water and bottled water | X | |
| 6.10 | Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 | Maintenance of water well, if required | X | |
| 6.12 | Water Pump | X | |
| 6.13 | Fuel for water pump | X | |
| 6.14 | Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 | Transportation of Contractor's property: | | |
|  | Move in | See Paragraph 4.1 | |
|  | Move out | See Paragraph 4.2 | |
| 6.16 | Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 | Special strings of drill pipe and drill collars as follows: Any required | X | |
| 6.18 | Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 | Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 | Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 | Rate of penetration recording device (Epoch electronic) | | X |
| 6.22 | Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 | Casing tools | X | |
| 6.24 | Power casing tongs | X | |
| 6.25 | Laydown and pickup machine | X | |
| 6.26 | Tubing tools | X | |
| 6.27 | Power tubing tong | X | |
| 6.28 | Crew Boats, Number | N/A | N/A |
| 6.29 | Service Barge | N/A | N/A |
| 6.30 | Service Tug Boat | N/A | N/A |
| 6.31 | Rat Hole | X | |
| 6.32 | Mouse Hole | X | |
| 6.33 | Reserve Pits | X | |
| 6.34 | Upper Kelly Cock | | X |
| 6.35 | Lower Kelly Valve | | X |
| 6.36 | Drill Pipe Safety Valve | | X |
| 6.37 | Inside Blowout Preventer | | X |
| 6.38 | Drilling hole for or driving for conductor pipe | X | |
| 6.39 | Charges, cost of bonds for public roads | X | |
| 6.40 | Portable Toilet | X | |
| 6.41 | Trash Receptacle | X | |
| 6.42 | Linear Motion Shale Shaker (Per rig inventory) | | X |
| 6.43 | Shale Shaker Screens | X | |
| 6.44 | Mud Cleaner | X | |
| 6.45 | Mud/Gas Separator | X | |
| 6.46 | Desander | | X |
| 6.47 | Desilter | | X |
| 6.48 | Degasser | X | |
| 6.49 | Centrifuge | X | |
| 6.50 | Rotating Head | X | |
| 6.51 | Rotating Head Rubbers | X | |
| 6.52 | Hydraulic Adjustable Choke | X | |
| 6.53 | Pit Volume Totalizer | X | |
| 6.54 | Communication, type (Cellular phone for rig use only) | | X |
| 6.55 | Forklift, capacity | X | |
| 6.56 | Corrosion inhibitor for protecting drill string | X | |
| 6.57 | | | |
| 6.58 | | | |
| 6.59 | | | |
| 6.60 | | | |

Form provided by Forms On-A-Disk (214) 340-9429 · FormsOnADisk.com



7. OTHER PROVISIONS:

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

*Revised April, 2003*

## EXHIBIT "B"

### (See Subparagraph 6.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)     The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)     The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

*(U.S. Daywork Contract - "Exhibit B" - Page 1)*
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



## CONTRACTORS SPECIAL PROVISIONS

1.  Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2.  Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3.  Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4.  Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5.  Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6.  Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7.  Operator shall furnish all screens for shale shakers.

8.  Operator shall furnish all potable water for Operator and Contractor personnel.

9.  Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Texas_May04

  

# NABORS DRILLING USA, LP

## Rig No. 712

### Diesel Electric Land Rig

**DRAWWORKS:** Mid - Continent U712 EA, with an input rating of 1,000 horsepower, Baylor 6032 Dynamatic brake, crown-o-matic and Foster catheads. Drum is lebus grooved for a 1 1/4" drilling line.

**PRIMARY POWER:** Three Caterpillar D-399 engines rated at 1,215 horsepower each, driving three KATO 1030 KW generators with a Ross Hill SCR system.

**MAST:** Dreco 136' cantilever, 136' clear height x 21' base at floor. API static hook load of 571,000 lbs. w/ 10 lines strung.

**SUBSTRUCTURE:** Dreco "Slingshot", with a 22' floor height and 18' clear height under the rotary beams. Substructure is designed for a 600,000 lbs. casing load simultaneous with a setback load of 350,000 lbs.

**MUD PUMPS:** Two Gardner Denver PZ-10 triplex mud pumps rated at 1,300 horsepower each, driven by one 1000 horsepower GE 752 motors each.

**MUD TANKS:** Two tank, 970 barrel system with a 75 barrel slugging compartment in the suction tank. Mud system is equipped with stirring guns and clean out gates. Mud mixing and 10 HP mud agitators.

**SOLIDS CONTROL:** 12 cone desilter.
2 cone desander.
Two linear motion shale shakers.

**WATER STORAGE:** One 500 barrel tank.

**FUEL STORAGE:** One 12,000 gallon tank.

**HOOK/BLOCK:** BJ 5350 Hook and National 545G Block, both rated at 350 tons.

**SWIVEL:** CE LB 400. 400 ton.

**ROTARY:** GD 27 1/2".

**ACCUMULATOR:** Koomey, 180 gallon, eight station, with an electric powered triplex pump, two air operated pumps, regulating valves and eight station remote control.

**BLOWOUT PREVENTERS:** One 11" x 5,000 psi, Annular, H2S Trim.
One 11" x 5,000 psi, Single ram, H2S Trim.
One 11" x 5,000 psi, Double ram, H2S Trim.
One 3 1/8 x 5,000 psi, choke manifold, H2S Trim.

**DRILL PIPE:** As per contract

**DRILL COLLARS:** As per contract

**MISC. EQUIPMENT:**
Automatic driller
Wireline unit
4 Pen drilling recorder
Upper Kelly valve
Full opening safety valve
Vapor proof lighting system
Spinning wrench

One air hoist
0-7 degree drill indicator
Lower Kelly valve
Inside BOP
5 ¼" x 40' Hex Kelly
Kelly spinner

## EXHIBIT "C"

### CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial Inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.



Exhibit_C_01_Texas_May04

# EXHIBIT "1-C"

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.

Revised April, 2003

INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS
# DRILLING BID PROPOSAL
## AND
## DAYWORK DRILLING CONTRACT - U.S.

TO: __NABORS DRILLING USA, LP__

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M on _____ , 20 ____ .
to the following address: _____

## THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY, AND ALLOCATION OF RISK – SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| | |
|---|---|
| **OPERATOR:** | Penn Virginia MC Energy, LLC |
| **Address:** | 110 West 7th, Suite 1800 |
| | Tulsa, Oklahoma 74119 |
| **CONTRACTOR:** | NABORS DRILLING USA, LP |
| **Address:** | 515 W. Greens Road, Suite 1000 |
| | Houston, Texas 77067 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). *When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.*

**1.   LOCATION OF WELL:**
Well Name and Number: To be advised by Operator   HUERTA #1-30H AW CO

Parish/ County: ~~Weehita~~ LOGAN AW   State: Oklahoma   Field Name: ___ AW CO

Well location and land description: To be advised by Operator   Sec 30-16N-3W AW CO

1.1 Additional Well Locations or Areas:   None.

Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

**2.   COMMENCEMENT DATE:**
Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the _____ day of _____ , 20 ____ . **or immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Operator shall pay Contractor the Standby Time Rate from such release date until the location is ready.** OPERATOR ACCEPTS RIG UPON EXECUTION OF CONTRACT AW CO

**3.   DEPTH:**
3.1 Well Depth: The well(s) shall be drilled to a depth of approximately ____TBA____ Feet, or to the ~~formation, whichever is deeper~~, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____** feet, unless Contractor and Operator mutually agree to drill to a greater depth   ** Not to exceed capacity of rig as described on the rig inventory attached herein.

**4.   DAYWORK RATES:**
Contractor shall be paid at the following rates for the work performed hereunder.

4.1 Mobilization: Operator shall pay Contractor ~~a mobilization fee of $~~ _____ or a mobilization day rate of $ ____17,000*____ per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: **Move-in and rig up on the new well site.**
*Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string up services.

4.2 Demobilization: Operator shall pay Contractor ~~a demobilization fee of $~~ _____ or a demobilization day rate ~~during tear-down~~ of $ ____17,000*____ per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.** IF THE RIG HAS NO LOCATIONS TO MOVE ON. AW CO
*Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string down services.

~~4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ , Operator shall pay Contractor a sum of $ _____ per twenty-four (24) hour day.~~

4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with ____Five (5)____ man crew the operating day rate shall be:

| Depth Intervals | | Without Drill Pipe | | With Drill Pipe | |
|---|---|---|---|---|---|
| From | To | | | | |
| 0 | Rig Release | $ 20,000** | per day | $ 20,000** | per day |
| | | $ | per day | $ | per day |
| | | $ | per day | $ | per day |

Using Operator's drill pipe $ ____20,000**____ per day. **The Operating Day Rate includes a Canrig top drive.

The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.


## EXHIBIT "1-D"

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

**DRILL PIPE RATE PER 24-HOUR DAY**

| Straight Hole | | Size | Grade | Directional or Uncontrollable Deviated Hole | | Size | Grade |
|---|---|---|---|---|---|---|---|
| $ N/A per ft. | | | | $ N/A per ft. | | | |
| $ N/A per ft. | | | | $ N/A per ft. | | | |
| $ N/A per ft. | | | | $ N/A per ft. | | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 **Repair Time:** In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of _four (4)_ ~~eight (8)~~ hours for any one rig repair job, but not to exceed _Twenty-four (24)_ ~~thirty-six (36)~~ hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____ zero (0)_____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig and top drive maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

100% of the Operating Day Rate
4.6 **Standby Time Rate:** $____/____ per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 **Drilling Fluid Rates:** When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a) $ 20 per man per day for Contractor's rig-site personnel.
(b) $ 110 per day additional operating rate; and
(c) Cost of all labor, material and services plus ___twenty-four (24)___ hours operating rate to clean rig and related equipment

100% of the Operating Day Rate
4.8 **Force Majeure Rate:** $____/____ per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 **Reimbursable Costs:** Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus ____fifteen (15)____ percent for such cost of handling. *When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.*

4.10 **Revision in Rates:** The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than ____zero (0)____ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a) Labor costs, including all benefits, of Contractor's personnel;
(b) Contractor's cost of insurance premiums;
(c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $__N/A__; Operator shall provide all fuel.
(d) Contractor's cost of catering, when applicable;
(e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
(f) ~~Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU110102) to determine to what extent a price variance has occurred in said spare parts and supplies;~~
(g)(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

5. **TIME OF PAYMENT**

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 **Disputed Invoices and Late Payment:** Operator shall pay all invoices within ____thirty (30)____ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of ____1 1/2____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3.

6. **TERM:**

6.1 **Duration of Contract:** This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of _____~~ commencing on the date specified in Paragraph 2 above.

6.2 ~~Extension of Term: Operator may extend the term of this Contract for _____ well(s) or for a period of _____ by giving notice to Contractor at least _____ days prior to completion of the well then being drilled or by~~ Not used. _DPERATOR NOTIFICATION WITHIN 15 DAYS AFTER SPUD HAS THE RIGHT TO EXTEND_

6.3 **Early Termination:** _For additional well or for period of time subject to mutually agreed rates, terms and conditions._
(a) **By Either Party:** Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

(b) By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c) By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4 Early Termination Compensation:

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty ~~a sum equal to the standby time rate (Subparagraph 4.6) for a period of~~ _____ days or a lump sum of $ __140,000__

(b) Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or~~ __plus, as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate__

(c) Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for __seven (7)__ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, ~~a lump sum of $_____ provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or~~ __as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate__

7. CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

8. DRILLING METHODS AND PRACTICES:

8.1 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2 Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3 Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4 Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5 If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

9. INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

10. SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. *In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.*

## 11. EQUIPMENT CAPACITY

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder ~~or where canal or water~~ depths ~~are in excess of~~ _____ feet. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

## 12. TERMINATION OF LOCATION LIABILITY:

When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.

## 13. INSURANCE

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extend of the indemnification obligations assumed herein.

## 14. RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:

*14.1 Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.*

*14.2 Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or* __100__ *percent of current new replacement cost of such equipment delivered to the well site.*

*14.3 Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.*

*14.4 Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.*

*14.5 The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.*

*14.6 Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.*

*14.7 Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from , and shall protect, defend and indemnify Contractor from and against, any such liability.*

*14.8 Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.*

*14.9 Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or*

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



Revised April, 2003

of  THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT _____.

19.  INFORMATION CONFIDENTIAL:

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

20.  SUBCONTRACTS:

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

21.  ATTORNEY'S FEES

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

22.  CLAIMS AND LIENS:

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located

23.  ASSIGNMENT:

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

24.  NOTICES AND PLACE OF PAYMENT:

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein

25.  CONTINUING OBLIGATIONS:

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

26.  ENTIRE AGREEMENT:

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

27.  SPECIAL PROVISIONS:

27.1  Exhibit "C" – Contractors Special Provisions is attached hereto and made a part hereof.

27.2  In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas.  Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3  For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $17,000 per day.

27.4  Canrig Drilling Technology Ltd. ("Canrig"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Canrig $260 per day (spud to release) for rental of the Canrig Rig Watch system.

The Canrig Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included), trip tank volume probes (1 probe included), and return flow paddle.

28.  ACCEPTANCE OF CONTRACT:

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this 8th day of Sept, 20 10.

OPERATOR: _Penn Virgina MC Energy, LLC_

By: _____

Title: _Regional Mgr_

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this _3rd_ day of _September_, 20_10_, which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within _Seven (7)_ days of the above date Contractor shall be in no manner bound by its signature thereto.

CONTRACTOR: _Nabors Drilling USA, LP By: NDUSA Holdings Corp., Its General Partner_

By: _E. Nelson_

Title: _Vice President Contracts_

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

# EXHIBIT "A"

To Daywork Contract dated _____ September 3 _____, 20 _10_

Operator __Penn Virginia MC Energy, LLC_____   Contractor __Nabors Drilling USA, LP_____

Well Name and Number ___To be advised by Operator___

## SPECIFICATIONS AND SPECIAL PROVISIONS

### 1. CASING PROGRAM (See Paragraph 7)

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | in. | in. | lbs/ft | | ft | hrs |
| Surface | in | in. | lbs/ft | | ft. | hrs |
| Protection | in. | in. | lbs/ft | | ft. | hrs |
| | in | in | lbs/ft | | ft. | hrs |
| Production | in | in. | lbs/ft. | | ft. | hrs |
| Liner | in | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |

### 2. MUD CONTROL PROGRAM (See Subparagraph 6.2)

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Other mud specifications: _____

### 3. INSURANCE (See Paragraph 13)

3.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___one (1) million____ covering all of Contractor's employees working under this Contract.

3.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___one (1) million_____ combined single limit per occurrence for Bodily Injury and Property Damage

3.3 Automobile Public Liability Insurance with limits of $___one (1) million_____ for the death or injury of each person and $____one (1) million_____ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $_____one (1) million_____ for each accident.

3.4 ~~In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoremen's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.~~

3.5 Other insurance: _Excess liability insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract._

### 4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract.

4.1 Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. ____F28"_____, the major items of equipment being:

Drawworks: Make and Model ___Per rig inventory attached hereto and made a part hereof.___

Engines: Make, Model, and H.P _____

No. on Rig _____

Pumps: No 1 Make, Size, and Power _____

No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W.P _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive: Type _____

Drill Pipe: Size _____5"_____ in. weights and grades as necessary to maintain 100,000 lbs overpull ft ; Size: _____ In. _____ ft.

Drill Collars: Number and Size ___43-6 3/9" (nominal); 10-8" (nominal)____



Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

B.O.P. Closing Unit: _____

B.O.P. Accumulator: _____

4.2 Derrick timbers.

4.3 Normal strings of drill pipe and drill collars specified above.

4.4 Conventional drift indicator

4.5 Circulating mud pits.

4.6 Necessary pipe racks and rigging up material.

4.7 Normal storage for mud and chemicals.

4.8 Shale Shaker.

4.9 _____

4.10 _____

4.11 _____

4.12 _____

4.13 _____

4.14 _____

4.15 _____

4.16 _____

4.17 _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract

5.1 Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.

5.2 Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.

5.3 Test tanks with pipe and fittings.

5.4 Mud storage tanks with pipe and fittings

5.5 Separator with pipe and fittings.

5.6 Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.

5.7 Labor to disconnect and clean test tanks and mud gas separator.

5.8 Drilling mud, chemicals, lost circulation materials and other additives.

5.9 Pipe and connections for oil circulating lines.

5.10 Labor to lay, bury and recover oil circulating lines.

5.11 Drilling bits, reamers, reamer cutters, stabilizers and special tools.

5.12 Contract fishing tool services and tool rental.

5.13 Wire line core bits or heads, core barrels and wire line core catchers if required.

5.14 Conventional core bits, core catchers and core barrels.

5.15 Diamond core barrel with head

5.16 Cement and cementing service.

5.17 Electrical wireline logging services

5.18 Directional, caliper, or other special services

5.19 Gun or jet perforating services.

5.20 Explosives and shooting devices

5.21 Formation testing, hydraulic fracturing, acidizing and other related services.

5.22 Equipment for drill stem testing.

5.23 Mud logging services

5.24 Sidewall coring service.

5.25 Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.

5.26 Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment

5.27 Casing scratchers and centralizers

5.28 Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.

5.29 Special or added storage for mud and chemicals

5.30 Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.

5.31 Blowout preventer testing packoff and testing services.

5.32 Replacement of BOP rubbers, elements and seals, if required, after initial test

5.33 Casing Thread Protectors and Casing Lubricants

5.34 H$_2$S training and equipment as necessary or as required by law.

5.35 Site septic systems.

5.36 _Ditching around rig and location._

5.37 _Third party BOP testing service._

5.38 _____

5.39 _____

5.40 _____

5.41 _____

5.42 _____

5.43 _____

5.44 _____

5.45 _____

5.46 _____

5.47 _____

5.48 _____

5.49 _____

5.50 _____

6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column.

| | Item | To Be Provided By and At The Expense Of Operator | Contractor |
|---|---|---|---|
| 6.1 | Cellar and Runways | X | |
| 6.2 | Ditches and sumps | X | |
| 6.3 | Fuel (located at ____ ) | X | |
| 6.4 | Fuel Lines (length ____ of rig only ____ ) | | X |
| 6.5 | Water at source, including required permits | X | |
| 6.6 | Water well, including required permits | X | |
| 6.7 | Water lines, including required permits | X | |
| 6.8 | Water storage tanks ____ capacity (Per rig inventory) | | X |
| 6.9 | Potable water and bottled water | X | |
| 6.10 | Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 | Maintenance of water well, if required | X | |
| 6.12 | Water Pump | X | |
| 6.13 | Fuel for water pump | X | |
| 6.14 | Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 | Transportation of Contractor's property: | | |
| | Move in | See Paragraph 4.1 | |
| | Move out | See Paragraph 4.2 | |
| 6.16 | Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 | Special strings of drill pipe and drill collars as follows: | | |
| | Any required | X | |
| | | | |
| 6.18 | Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 | Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 | Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 | Rate of penetration recording device (Canrig electronic) | | X |
| 6.22 | Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 | Casing tools | X | |
| 6.24 | Power casing tongs | X | |
| 6.25 | Laydown and pickup machine | X | |
| 6.26 | Tubing tools | X | |
| 6.27 | Power tubing tong | X | |
| 6.28 | Crew Boats, Number ____ | N/A | N/A |
| 6.29 | Service Barge | N/A | N/A |
| 6.30 | Service Tug Boat | N/A | N/A |
| 6.31 | Rat Hole | X | |
| 6.32 | Mouse Hole | X | |
| 6.33 | Reserve Pits | X | |
| 6.34 | Upper Kelly Cock | | X |
| 6.35 | Lower Kelly Valve | | X |
| 6.36 | Drill Pipe Safety Valve | | X |
| 6.37 | Inside Blowout Preventer | | X |
| 6.38 | Drilling hole for or driving for conductor pipe | X | |
| 6.39 | Charges, cost of bonds for public roads | X | |
| 6.40 | Portable Toilet | X | |
| 6.41 | Trash Receptacle | X | |
| 6.42 | Linear Motion Shale Shaker (Per rig inventory) | | X |
| 6.43 | Shale Shaker Screens | X | |
| 6.44 | Mud Cleaner | X | |
| 6.45 | Mud/Gas Separator | X | |
| 6.46 | Desander | | X |
| 6.47 | Desilter | | X |
| 6.48 | Degasser (Per rig inventory) | | X |
| 6.49 | Centrifuge | X | |
| 6.50 | Rotating Head | X | |
| 6.51 | Rotating Head Rubbers | X | |
| 6.52 | Hydraulic Adjustable Choke | X | |
| 6.53 | Pit Volume Totalizer | X | |
| 6.54 | Communication, type ____ (Cellular phone for rig use only) | | X |
| 6.55 | Forklift, capacity ____ Model JLG G9-43A (NDUSA, LP preferred model) or a JLG G10-55A (10,000 lb lift with outriggers) with a Star Industries Quick-Tach Truss boom Model 1302-JLG | X | |
| 6.56 | Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | | |
| 6.58 | | | |
| 6.59 | | | |
| 6.60 | | | |

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

7.   OTHER PROVISIONS:

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

# EXHIBIT "B"

## (See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)     The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)     The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4

(4)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15,20.

## EXHIBIT "C"

## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Oklahoma_May04




# NABORS DRILLING USA, LP

## PACE 1500 – RIG F26

## Programmable AC Electric 1500 HP Rig

**DRAWWORKS:**
1,500 horsepower AC drawworks featuring regenerative AC braking. Drawworks is driven by two (2) 800 horsepower AC motors. Autodrill functionality utilizing AC motor.

**POWER GENERATION:**
Three (3) – Caterpillar 3512B engines rated at 1,476 horsepower each, driving one (1) Kato 1365 KW generator, for a total of 4,428 horsepower. AC power generation, Variable Frequency Drive (VFD) and MCC unitized in a single house.

**MAST:**
Pyramid Fast Moving Land Rig 152' three section mast manufactured to API-4F specification. Static hook load of 1,000,000 lbs. on 12 lines. Mast is raised and lowered utilizing hydraulic cylinders. Mast has integrated top drive rails (enables top drive to travel in mast during rig move).

**SUBSTRUCTURE:**
Pyramid hydraulically elevated substructure with 30' floor height and 26' clear height under rotary beams. Substructure is rated for 1,000,000 lbs rotary load simultaneous with a 600,000 lbs setback load.

**DRILLER'S CONTROL:**
Climate controlled driller's cabin provides integrated joystick control utilizing PLC technology. Touch screen controls provide state-of-the-art monitoring, control of rig equipment and drilling parameters.

**MUD PUMPS:**
Two (2) 1,600 horsepower mud pumps. Each powered by one (1) 1600 horsepower AC motor, pumps are equipped with hydraulic liner retention and pump rod systems.

**MUD TANKS:**
Three (3) tank system total capacity approximately 1,500 BBL; four (4) 6" x 8" centrifugal pumps powered by 100 horsepower electric motors. 100 BBL trip tank.

**SOLIDS CONTROL:**
Three (3) Swaco Mongoose shale shakers
One (1) Swaco mud cleaner with desander / desilter.

**WATER STORAGE:**
One (1) 500 BBL water tank.

**FUEL STORAGE:**
One (1) 20,000 gallon diesel fuel tank.

**TRAVELING BLOCK**
500 ton traveling block, grooved for 1 3/8" drill line.

**TOP DRIVE**
Canrig 1250 AC, 500 ton integrally mounted top drive system.

**ROTARY:**
37-1/2" rotary table, independently driven by AC motor.

**ACCUMULATOR:**
Six (6) station accumulator unit with one (1) electric triplex and two (2) air operated pumps. Unit will be designed in accordance with API 16D. Remote panel will be mounted at drill floor.

**BLOWOUT PREVENTERS:**
Annular: 13-5/8" x 5000 psi.
Double Ram: 13-5/8" x 10,000 psi.
Single Ram: 13-5/8" x 10,000 psi.
Manifold: 4-1/16" x 3-1/16" 10,000 psi.

**DRILL PIPE:**
As per contract.

**DRILL COLLARS:**
As per contract.

**ADD. EQUIPMENT:**

| | |
|---|---|
| Dedicated man-rider winch | Automated catwalk / pipe handling system |
| Varco ST-80 Iron Roughneck | Two (2) air operated hoists |
| BOP Handling system | Air operated slips |
| Rotating mousehole | Camera system |
| Intercom system | Vacuum degasser |

## EXHIBIT "C"

### CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

# EXHIBIT "1-E"

Exhibit_C_01_Oklahoma_May04



**Applicant Must Read And Verify With Signature**

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me. _____ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. _____ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration. _____ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. _____ - INITIALS

This application will be considered active for thirty (30) days.

| | |
|---|---|
| _____ | 1-2-13 |
| Applicant's Signature | Date |

HR-105 (01/07/11)

**EXHIBIT "1-F"**

# NOTICE TO APPLICANTS REGARDING

## DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries, have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1. I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2. By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment or consideration.

_____   _____
Name of Applicant                          Signature of Applicant

_____
Date

---

# AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN
## DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todos los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible.

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante o un empleado no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporcionó este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3. Se me ha petmitido revisar el Programa de Resolución de Conflictos de Nabors.

4. Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

_____   _____
Nombre del Aspirante                       Firma del Aspirante

_____
Fecha

HR-106



**Applicant Must Read And Verify With Signature**

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me. _Adlg_ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. _Adlg_ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration. _Adlg_ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried/hourly employees and complete the Payroll Direct Deposit Authorization Form to implement the Payroll Direct Deposit System for my pay. _Adlg_ - INITIALS

This application will be considered active for thirty (30) days.

_Alfredo De la Haya_
Applicant's Signature

_7-16-13_
Date

HR-105 (01/07/11)

**EXHIBIT "1-G"**

## NOTICE TO APPLICANTS REGARDING
### DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1    I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2.   By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

_Alfredo De la Garza_
_____
Name of Applicant

_Alfredo De la Garza_
_____
Signature of Applicant

Alfredo De La Garza

_7-16-13_
_____
Date

## AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN
### DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todas los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporciona este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3.   Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4    Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

_____
Nombre del Aspirante

_____
Firma del Aspirante

_____
Fecha

HR-106

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

_____
Name of Employee (Print)

_____
Signature of Employee

1-7-13
_____
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

_____
Nombre del Empleado (Letra de Imprenta/Molde)

_____
Firma del Empleado

_____
Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

# EXHIBIT "1-H"

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

Alfredo De La Garza
Name of Employee (Print)

Alfredo De La Garza
Signature of Employee

7-22-13
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

Nombre del Empleado (Letra de Imprenta/Molde)

Firma del Empleado

Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

## EXHIBIT "1-I"

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR ☐ ☐ ☐ ☐ , minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § § | 281ST JUDICIAL DISTRICT |

## AFFIDAVIT OF KATHERINE RYAN

| | |
|---|---|
| **STATE OF TEXAS** | § § |
| **COUNTY OF HARRIS** | § |

Before me, the undersigned notary, on this day personally appeared Katherine Ryan, the affiant, a person whose identity is known to me. After I administered an oath to affiant, the affiant testified:

1. "My name is Katherine Ryan. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am an in house attorney for Penn Virginia Corporation. Penn Virginia Corporation is the parent company to Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC (collectively, "Penn Virginia").

3. In my capacity as in house attorney, I am familiar with Penn Virginia's corporate structure and the relationship of its various subsidiaries and affiliated companies. I am also familiar with the Nabors Dispute Resolution Program ("DRP").

4. As evidence of Penn Virginia's intent that it participate in the DRP, on September 23, 2008, Penn Virginia Oil & Gas, L.P., on behalf of itself, its parent, subsidiary, and affiliated corporations agreed to be bound by the DRP as an "Electing Entity" pursuant to the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as

**EXHIBIT "2"**

Exhibit 1-B. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-C.

5. As further evidence of Penn Virginia's intent that it participate in the DRP, on September 8, 2010, Penn Virginia MC Energy, LLC, on behalf of itself, its parent, subsidiary, and affiliated corporations agreed to be bound by the DRP as an "Electing Entity" pursuant to the "Contractors Special Provisions" contained in the International Association of Drilling Contractors ("IADC") Drilling Contract between it and Nabors Drilling USA LP. A true and correct copy of the IADC Contract is attached in its entirety to my affidavit as Exhibit 1-D. The Contractors Special Provisions portion has been pulled out for reference and is attached as Exhibit 1-E.

6. As an "Electing Entity," Penn Virginia is required to resolve disputes with any past or present employee(s) or applicant(s) of Nabors Industries, Inc. or its subsidiaries in accordance with the DRP.

7. At all times relevant to this matter, Penn Virginia was engaged in interstate commerce as it is in the business of producing oil and gas resources in both Texas and other states of the United States."

FURTHER AFFIANT SAYETH NOT.

_____
Katherine Ryan

Sworn to and subscribed before me by Katherine Ryan on the 17 day of June, 2015.

VIRGINIA B SILVER
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
SEPT. 3, 2016

_____
Notary Public in and for the State of Texas
My Commission expires:

Sept 3, 2016

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR | § | |
| , minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, L.P., | § | |
| PENN VIRGINIA OIL & GAS GP, LLC, | § | |
| MIKE FERGUSON, TRIFECTA | § | |
| OILFIELD SERVICES, LLC, CUDD | § | |
| PRESSURE CONTROL, INC., | § | |
| ROYWELL SERVICES, INC. and OAKS | § | |
| PERSONNEL SERVICES, INC. d/b/a | § | |
| THE OAKS GROUP | § | 281ST JUDICIAL DISTRICT |

**ORDER ON DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP, LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE**

On the _____ day of _____, 2015, the Court considered Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC's Motion to Compel Arbitration and to Abate, pending such arbitration. After considering the motion, the Court GRANTS Defendants Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC's Motion to Compel Arbitration and to Abate.

Therefore, Plaintiff, Alfredo "Freddie" De La Garza, Individually and as Next Friend of and Intervenor, John Paul "J.P." Adame, Individually and as Next Friend of , are ORDERED to arbitrate their claims against Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC in accordance with the Nabors Dispute Resolution Program.

It is further ORDERED that this case shall be ABATED until the resolution of such arbitration.

_____
PRESIDING JUDGE

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR [____] minors | § § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC., and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § | 215th JUDICIAL DISTRICT |

## ORDER DENYING DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE

On __11TH__ day of __September__, 2015, came to be considered Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's Motion to Compel Arbitration and to Abate. After considering the motion and hearing the arguments of counsel, this Court is of the opinion that the Motion should be DENIED, ~~and that Plaintiffs' claims against Defendant Mike Ferguson and Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group be severed from and proceed to trial on October 19, 2015.~~

**FILED**
Chris Daniel
District Clerk

SEP 11 2015
Time:_____
Harris County, Texas
By_____
Deputy

SIGNED this __11TH__ day of __September__, 2015

Elaine H. Palmer
JUDGE, 215TH DISTRICT COURT

RECORDER'S MEMORANDUM
This instrument is of poor quality at the time of imaging

Order Denying Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's    Page 1 of 1
Motion to Compel Arbitration and to Abate

**EXHIBIT "B"**

# NABORS DISPUTE RESOLUTION
# PROGRAM and RULES



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.*

## EXHIBIT "C"

**THE ] BORS DISPUTE RESOLUTION P! GRAM**

1. **Purpose and Construction**

   The Program is designed to provide a means for the quick, fair, accessible, and inexpensive resolution of Disputes between the Company and the Company's present and former Employees and Applicants for employment, related to or arising out of a current, former or potential employment relationship with the Company. The Program is intended to create an exclusive procedural mechanism for the final resolution of all Disputes falling within its terms. It is not intended either to abridge or enlarge substantive rights available under applicable law. The Program contractually modifies the "at-will" employment relationship between the Company and its Employees, but only to the extent expressly stated in the Program. The Program should be interpreted in accordance with these purposes.

2. **Definitions**

   A. "AAA" means the American Arbitration Association.

   B. "JAMS" means Judicial Arbitration and Mediation Services.

   C. The "Act" means the Federal Arbitration Act, 9 U.S.C.§1, ct seq., as amended from time to time.

   D. "Company" means Sponsor and every direct or indirect subsidiary (whether a corporation, limited liability company, company partnership or other legal entity) of Sponsor, any Electing Entity, any entity or person alleged to have joint and several liability concerning any Dispute, and all of their directors, officers, employees, and agents, every plan of benefits, whether or not tax-exempt, established or maintained by any such entity, the fiduciaries, agents and employees of all such plans, and the successors and assigns of all such entities, plans and persons; provided, however, that in the case of an Electing Entity, "Company" shall include the Electing Entity only to the extent provided in the Electing Entity's agreement to be bound by the Program.

   E. "Dispute" means all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes

der the Program, or between a person and by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to:

1. this Program;

2. the employment or potential reemployment of an Employee, including the terms, conditions, or termination of such employment with the Company;

3. employee benefits or incidents of employment with the Company;

4. any other matter related to or concerning the relationship between the Employee and the Company including, by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; workers' compensation retaliation; defamation; infliction of emotional distress, antitrust claim concerning wages or otherwise, or status, claim or membership with regard to any employee benefit plan;

5. an Applicant's application for employment and the Company's actions and decisions regarding such application; and

6. any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment.

"Dispute" includes all such matters regardless of when the events on which they are based occurred, including matters based on events occurring before the Employee became subject to this Program (so long as such disputes were not previously asserted in a judicial forum) or after termination of the employment relationship.

F. "Electing Entity" means any legal entity that has agreed to be bound by the Program as provided herein.

G. "Employee" means any person who is or has been in the employment of the Company on or after the effective date of this Program, whether or not employed at the time a claim is brought with respect to a Dispute, residing in the United States, or otherwise subject to

laws of the United States or any state, municipality, or other political subdivision of the United States.

H. "Applicant" means any person who is seeking or has sought employment with the Company after the effective date of this Program.

I. "Party" means, with respect to a particular Dispute, affected persons and/or entities bound by this Program.

J. "Program" means this Nabors Dispute Resolution Program, as amended from time to time.

K. "Rules" means the Nabors Dispute Resolution Rules, as amended from time to time, which are applicable to mediation and arbitration.

L. "Sponsor" means Nabors Industries, Inc., a Delaware corporation.

3. **Name, Application and Coverage**

A. The Program shall be referred to as the "Nabors Dispute Resolution Program." Alternatively, it may be referred to as the "Dispute Resolution Program."

B. Until revoked by Sponsor pursuant to this Program, this Program applies to and binds the Company, each Employee and Applicant and the heirs, beneficiaries and assigns of any such person or entity; provided, however, that this Program shall not apply to any Employee in a unit of Employees represented by a labor organization, or to the Company with respect to such employees, except to the extent permitted in an applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

C. Except as provided for herein, this Program applies to any Dispute.

D. Notwithstanding anything to the contrary in this Program, the Program does not apply to claims for workers' compensation benefits or unemployment compensation benefits.

E. Mediation and arbitration are only available for Disputes involving legally protected rights.

F.     ...twithstanding any other provision...eof, any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under the Program. Furthermore, an action under The Limitation of Ship Owners Liability Act, 46 U.S.C. §§181-189, shall not be subject to this Program.

## 4. Resolution of Disputes

All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules.

## 5. No Retaliation

No employee shall be subject to any form of discipline or retaliation for initiating or participating in good faith in any process or proceeding under this Program.

## 6. Amendment

A. This Program may be amended by Sponsor at any time by giving at least 10 days' notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules, unless otherwise agreed.

B. Sponsor may amend the Rules at any time by serving notice of the amendments on AAA and JAMS. However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules unless otherwise agreed.

## 7. Termination

This Program may be terminated by Sponsor at any time by giving at least 10 days' notice of termination to current Employees. However, termination shall not be effective as to Disputes for which a proceeding has been initiated pursuant to the Rules prior to the date of termination unless otherwise agreed.

## 8. Applicable Law

A. The Act shall apply to this Program, the Rules, and any proceedings under the Program or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Program or the Rules.

B. arbitrations held pursuant to this Program shall be convened as near as possible to the worksite where the events in dispute occurred if Nabors continues to perform work at that location. Otherwise the arbitration will occur at the place most convenient for the majority of the witnesses.

C. Other than as expressly provided herein, or in the Rules, the substantive legal rights, remedies, and defenses of all Parties are preserved. In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all relief, legal or equitable, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceeding.

D. Other than as expressly provided herein, or in the Rules, the Program shall not be construed to grant additional substantive, legal, or contractual rights, remedies or defenses which would not be applied by a court of competent jurisdiction in the absence of the Program.

E. Notwithstanding the provisions of the preceding subsection, in any proceeding before an arbitrator, the arbitrator, in his or her discretion, may allow a prevailing Employee or Applicant a reasonable attorney's fee as part of the award. The discretion to allow an award of fees under this subsection is in addition to any discretion, right or power which the arbitrator may have under applicable law. If the arbitrator awards attorney fees without authorization for such an award by statute or contract, such award will be limited to $2,500.00.

## 9. Administrative Proceedings

A. This Program shall apply to a Dispute pending before any local, state or federal administrative body or court unless prohibited by law.

B. Participation in any administrative or judicial proceeding by the Company shall not affect the applicability of the Program to any such Dispute upon termination of the administrative or judicial proceedings. A finding, recommendation or decision by an administrative body on the merits of a Dispute shall have the same legal weight or effect under the Program as it would in a court of competent jurisdiction.

## 10. Ex( ive Remedy

Proceedings under the Program shall be the exclusive, final and binding method by which Disputes are resolved.

## 11. Electing Entities

A. Corporations or other legal entities, not otherwise Parties, may elect to be bound by this Program by written agreement with Sponsor.

B. Election may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity.

## 12. Effective Date

The Effective Date of this Program shall be April 15, 2001.

## 13. Severability

The terms of this Program and the Rules are severable. The invalidity or unenforceability of any provision therein shall not affect the application of any other provision. Where possible, consistent with the purposes of the Program, any otherwise invalid provision of the Program or the Rules may be reformed and, as reformed, enforced.

## 14. Assent

Employment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program, both during the employment and after termination of employment. Submission of an application, regardless of form, for employment constitutes consent by both the Applicant and the Company to be bound by this Program.

# NABORS DISPUTE RESOLUTION RULES

## 1. Definitions

All definitions included in the Nabors Dispute Resolution Program apply to these Rules.

## 2. Application

A. If different rules are applicable to a specific class of Disputes, and have been adopted by Sponsor and served on AAA or JAMS, these Rules shall not apply to such class of Disputes.

B. :se Rules apply in the form existing the time proceedings are initiated under them.

C. To the extent consistent with these Rules, the Employment Dispute Resolution Rules of AAA or JAMS also apply to all proceedings governed by these Rules.

## 3. Initiation of the Process

A. A Party may initiate proceedings under these Rules at any time, subject to any defenses including those applicable to the timeliness of the claim, including limitations and laches.

B. A Party may initiate proceedings by serving a written request to initiate proceedings on AAA or JAMS, and tendering the appropriate administrative fee.

C. Copies of the request shall be served on all other Parties to the Dispute by AAA or JAMS. The request shall describe the nature of the Dispute, the amount involved, if any, the remedy sought, and the proceeding locale requested.

D. Proceedings may also be initiated by an Employee or Applicant by serving a written request to initiate proceedings on the Company's Dispute Resolution Program Administrator. In such a case, the Company shall promptly forward any properly served request it has received to AAA or JAMS.

E. Parties against whom a claim is asserted shall file an answering statement within 21 days of receiving notice of intent to arbitrate or a specification of claims, which shall include any counterclaims and any request that the arbitrator (if any) prepare a statement of reasons for the award.

## 4. Administrative Conference

AAA or JAMS shall convene an administrative conference as soon as possible after receipt of the answering statement or after expiration of the time for filing an answering statement if one has not been filed. The conference may be held in person or by telephone. At the conference, AAA or JAMS will determine whether the Parties are in agreement on a method to resolve the Dispute. If the Parties are in agreement, AAA or JAMS will implement the procedure in accordance with their rules upon payment of any applicable fee. If the Parties cannot agree, or if the

Par  have previously attempted and failed  esolve the Dispute by mediation or another nonbinding mechanism, the Dispute shall be arbitrated under these Rules.

5. **Appointment of Arbitrator**

Immediately after payment of the arbitration fee, AAA or JAMS shall simultaneously send each Party an identical list of names of persons chosen from a panel of qualified arbitrators which AAA or JAMS shall select and maintain. Each Party to the Dispute shall have fourteen (14) days from the transmittal date to strike any names objected to, number the remaining names in order of preference, and return the list to AAA or JAMS. If a Party does not return the list within the time specified, all persons therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the order of mutual preference, AAA or JAMS shall invite the acceptance of the arbitrator or arbitrators to serve. In those cases where more than $2,000,000 is in controversy, either Party shall have the right to require that the arbitration proceed before a three member panel rather than a single arbitrator. The Party who elects for a panel in these circumstances shall notify the other Parties during the administrative conference described in Section 4 of the Program. Any Party shall have the right to strike one list of arbitrators in its entirety. When a Party exercises this right, AAA or JAMS shall issue a new list of arbitrators consistent with the above procedures.

6. **Qualifications of the Arbitrator**

No person shall serve as an arbitrator in any matter in which that person has any financial or personal interest. Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias. Upon receipt of such information from the arbitrator or any other source, AAA or JAMS will either replace that person or communicate the information to the Parties for comment. Thereafter, AAA or JAMS may disqualify that person, and its decision shall be conclusive.

7. **Vacancies**

If a vacancy occurs for any reason or if an appointed arbitrator is unable to serve promptly, the appointment procedure in Section 5 shall apply to the selection of a substitute arbitrator.

8. **Da[ Time and Place of Hearings**

   A. The arbitrator shall set the date, time and place of any proceeding pursuant to the requirements of Section 8B of the Program.

   B. Notice of any hearing shall be given at least ten (10) days in advance, unless the arbitrator determines or the Parties agree that a shorter time is necessary.

   C. The arbitrator shall make every effort, without unduly incurring expense, to accommodate the Employee or Applicant in the selection of a proceeding location.

9. **Conferences**

   At the request of AAA or JAMS, or of a Party or on the initiative of the arbitrator, the arbitrator or AAA or JAMS may notice and hold conferences for the discussion and determination of any matter which will expedite the proceeding, including:

   A. venue,

   B. clarification of issues,

   C. determination of preliminary issues, including summary determination of dispositive legal issues,

   D. discovery,

   E. the time and location of proceedings or conferences,

   F. interim legal or equitable relief authorized by applicable law,

   G. pre- or post-hearing memoranda,

   H. stipulations; and/or

   I. any other matter of substance or procedure.

10. **Mode of Hearings and Conferences**

    In the discretion of the arbitrator or by agreement of the Parties, conferences and hearings may be conducted by telephone or by written submission, as well as in person.

## 11. Pre aring Discovery

A. On any schedule determined by the arbitrator, each Party shall submit in advance the names and addresses of the witnesses it intends to produce and any documents it intends to present.

B. The arbitrator shall have discretion to determine the form, amount and frequency of discovery by the Parties.

C. Discovery may take any form permitted by the Federal Rules of Civil Procedure, as amended from time to time, subject to any restrictions imposed by the arbitrator.

## 12. Representation

Any Party may be represented by counsel or by any other authorized representative.

## 13. Attendance at Hearings

The arbitrator shall maintain the privacy of the proceedings to the extent permitted by law. Any person having a direct interest in the matter is entitled to attend the proceedings.

The arbitrator shall otherwise have the power to exclude any witness, other than a Party or other essential person, during the testimony of any other witness. The arbitrator shall determine whether any other person may attend the proceeding. Upon the request of any Party, the arbitrator shall exclude any witness during the testimony of any other witness.

## 14. Postponement

A. The arbitrator, for good cause shown by a Party, or on agreement of the Parties, may postpone any proceeding or conference.

B. The pendency of court proceedings related to the same matter is not good cause for postponement.

## 15. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by any Party, shall do so.

## 16. Record of Proceedings

There shall be no stenographic, audio, or video record of the proceedings unless either requested by one of the Parties or specified by the arbitrator. The Party requesting the record shall bear the entire cost of producing the same. Copies of the record shall be furnished to all other Parties upon request and upon payment of the cost of reproduction.

## 17. Procedure

The proceedings shall be conducted by the arbitrator in whatever order and manner will most expeditiously permit full presentation of the evidence and arguments of the Parties.

## 18. Arbitration in the Absence of a Party

The arbitrator may proceed in the absence of Parties or representatives who, after due notice, fail to be present or fail to obtain a postponement. An award shall not be made solely on the default of a Party. The arbitrator shall require any Party who is present to submit such evidence as the arbitrator may require for the making of an award.

## 19. Evidence

A. The arbitrator shall be the sole judge of the relevancy, materiality, and admissibility of evidence offered. Conformity to legal rules of evidence shall not be necessary.

B. The arbitrator may subpoena witnesses or documents at the request of a Party or on the arbitrator's own initiative.

C. The arbitrator may consider the evidence of witnesses. by affidavit or declaration, but shall give it only such weight as the arbitrator deems appropriate after consideration of any objection made to its admission.

## 20. Post-Hearing Submissions

All documentary evidence to be considered by the arbitrator shall be filed at the hearing unless the arbitrator finds good cause to permit a post-hearing submission. All Parties shall be afforded an opportunity to examine and comment on any post-hearing evidence. The arbitrator shall permit the filing of post-hearing briefs at the request of a Party and shall determine the procedure and timing of such filings.

### 21. Closing and Reopening of Proceedings

A. When the arbitrator is satisfied that the record is complete, including the submission of any post-hearing briefs or documents permitted by the arbitrator, the arbitrator shall declare the proceeding closed.

B. The proceeding may be reopened on the arbitrator's initiative or upon application of a Party at any time before the award is made.

### 22. Waiver of Procedures

Any Party who fails to object in writing, after knowledge that any provision or requirements of these procedures and Rules have not been complied with, shall be deemed to have waived the right to object.

### 23. Service of Notices and Papers

Any papers, notices, or process necessary or proper for the initiation or continuation of any proceeding under these Rules (including the award of the arbitrator, any court action in connection therewith, or the entry of judgment on an award made under these procedures) may be served on a Party by mail addressed to the Party or his or her representative at the last known address or by personal service. AAA, JAMS, the Parties, and the arbitrator may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give any notices required by these Rules.

### 24. Communications with the AAA, JAMS, and the Company

A. Any Party may notice, serve or communicate with AAA by contacting:

> Regional Administrator
> American Arbitration Association
> 1001 Fannin St., Suite 1005
> Houston, Texas 77002
> (713) 739-1302
> Fax: (713) 739-1702

B. Any Party may notice, serve or communicate with JAMS by contacting:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

C. y notice, service or communicatic with the Company will be to:

> Legal Department
> Nabors Industries, Inc.
> 515 West Greens Road, Suite 1200
> Houston, Texas 77067-4525
> (281) 874-0035
> Fax: (281) 775-8431

### 25. Communication with the Arbitrator

There shall be no communication between the Parties and the arbitrator other than at any oral hearings or conferences. Any other oral or written communications from the parties to the arbitrator shall be directed to the AAA or JAMS (and copied to the Parties) for transmission to the arbitrator, unless the Parties and the arbitrator agree otherwise.

### 26. Time of Award

The award shall be promptly made by the arbitrator, unless otherwise agreed by the Parties or specified by applicable law, no later than thirty (30) days from the date of the closing of the proceeding or, if applicable, the closing of a reopened proceeding.

### 27. Form of Award

The award shall be in writing and shall be signed by the arbitrator. The arbitrator shall write a statement of reasons for the award if requested to do so in the request to initiate proceedings or in the answering statement. The award shall be executed in any manner required by applicable law.

### 28. Modification of Award

On order of a court of competent jurisdiction, or on agreement of the Parties, the arbitrator shall modify any award. The arbitrator may modify an award on the motion of a Party if the arbitrator finds that the award, as rendered, is ambiguous or defective in form, or if the award requires an illegal or impossible act. These are the only circumstances under which an arbitrator shall have jurisdiction to withdraw or modify an award.

**29. Set   nent**

If the Parties settle their Dispute during the course of the arbitration, the arbitrator may set out the terms of the settlement in a consent award.

**30. Scope of Arbitrator's Authority**

The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

**31. Judicial Proceedings and Exclusion of Liability**

A. Neither AAA, JAMS, nor any arbitrator is a necessary Party in any judicial proceedings relating to proceedings under these Rules,

B. Neither AAA, JAMS, nor any arbitrator shall be liable to any Party for any act or omission in connection with any proceedings within the scope of these Rules.

C. Any court with jurisdiction over the Parties may compel a Party to proceed under these Rules at any place and may enforce any award made.

D. Parties to these Rules shall be deemed to have consented that judgment upon the award of the arbitrator may be entered and enforced in any federal or state court having jurisdiction of the Parties.

E. Initiation of, participation in, or removal of a legal proceeding shall not constitute waiver of the right to proceed under these Rules.

F. Any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met, pending the institution of proceedings under these Rules.

## 32. Fee id Expenses

A. The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.

B. All attorneys' fees shall be borne by the Party incurring them except as otherwise provided by law, by the Program, or in the award of the arbitrator.

C. Discovery costs (e.g., court reporter fees for original transcripts) shall be borne by the Party initiating the discovery. The cost of copies of deposition transcripts or other discovery shall be borne by the Party ordering the copy.

D. The fees and expenses of experts, consultants and others retained or consulted by a Party shall be borne by the Party utilizing those services.

E. The Employee or Applicant shall pay a $150 fee if he or she initiates arbitration or mediation. Otherwise, Employee/Applicant Parties shall not be responsible for payment of fees and expenses of proceedings under these Rules, including required travel of an arbitrator or a mediator, expenses of an arbitrator, mediator, AAA or JAMS, and the cost of any proof produced at the discretion of an arbitrator.

F. If the demand for mediation or arbitration is initiated by the Company, such fees will be paid by the Company.

G. Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

## 33. Interpretation and Application of These Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. All other rules shall be in interpreted and applied by the AAA or JAMS.

## 34. Applicable Law

A. Proceedings under these Rules and any judicial review of awards shall be governed by the Act.

B. ⲭcept where otherwise expressly prov⸗ 1 in these ꓘules, the substantive law applied shall be state or federal substantive law which would be applied by a United States District Court sitting at the place of the proceeding.

## 35. Mediation

At any time before the proceeding is closed, the Parties may agree to mediate their dispute by notifying AAA or JAMS. AAA or JAMS shall determine what procedures apply to any such mediation.

## 36. Spanish

A copy of this Program is available in Spanish.

**Nabors Industries, Inc.**
April 2001



January 17, 2007

TO: All Employees of Nabors Industries, Inc. and Subsidiaries

RE: Nabors Dispute Resolution Program

Dear Employee:

Effective ten (10) days after the date of this notice, pursuant to Section 6 of the Nabors Dispute Resolution Program, Nabors Industries, Inc. ("Nabors") and its subsidiaries are amending the Nabors Dispute Resolution Program and Rules for the determination of all disputes between employees and Nabors or one of its subsidiaries.

The amendments to the Program and Rules are enclosed on the back of this page. Nabors is amending one (1) section of the Nabors Dispute Resolution Program and one (1) section of the Nabors Dispute Resolution Rules. You should already have a copy of the current Program and Rules, or they may be found on the Nabors Intranet under policy number 200.80.1 at http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

As before, the Nabors Dispute Resolution Program, as amended, gives you the most effective and efficient means of resolving any disputes you may have through a process which encourages resolution at the earliest opportunity. Employees do not waive any substantive legal rights under the Program. Rather, the Program, as amended, provides that any substantive legal issues you may have will be resolved on an individual basis in mediation or before a neutral arbitrator, whose decision will be final and binding on you and the Company. Under the Program, as amended, however, you waive any procedural rights you may have to bring a court action, on an individual or on a class, collective or representative basis; and you waive your right to a jury trial concerning any dispute you may have with the Company or any Electing Entity (as defined in the Program), including any personal injury claims or claims of discrimination based on race, national origin, gender, religion, age or disability under any federal or state civil rights statute.

Every individual who works for Nabors Industries, Inc. or a subsidiary is subject to the Program, as amended, except that the amended provisions will affect only disputes initiated after the effective date of the amendments, and not any matters pending before the effective date. Your continued employment after the date you receive this notice will constitute your acceptance of the amendments to the Program, both during and after your employment with the Company.

We look forward to continuing to work together. If you have any questions about the amendments to the Program and Rules or any other term of your employment, please do not hesitate to contact the Human Resources Department of your employer.

Sincerely,

NABORS INDUSTRIES, INC.

*A copy of this notice is available in Spanish, upon request,
from any Nabors subsidiary's Human Resources Department.

* Una copia de esta noticia está disponible en español con solo requerirla
al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.



## Amendment to THE NABORS DISPUTE RESOLUTION PROGRAM:

### 4. Resolution of Disputes

A. All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules. The Parties forego any right either may have to a jury trial on claims relating in any way to any Dispute.

B. Each Dispute shall be arbitrated on an individual basis. The Parties forego and waive any right to join or consolidate claims in arbitration with others or to make claims in arbitration as a representative or as a member of a class or in a private attorney general or similar capacity, unless such procedures are agreed to by all Parties. Neither the Company nor any Employee or Applicant may pursue any Dispute on a class action, collective action or consolidated basis or in a representative capacity on behalf of other persons or entities who are claimed to be similarly situated, or participate as a class member in such a proceeding. The arbitrator in any proceeding under this Program shall have no authority to conduct the matter as a consolidated, class, collective or representative action.

C. If the procedural limitation in Paragraph B of this Section is held unenforceable by a court in a proceeding in which a party seeks to pursue a consolidated, class or collective action or otherwise act in a representative capacity, then this Program shall apply to such proceeding only to the following extent. The court will decide whether the Dispute should proceed on a consolidated, class, collective or other representative basis and, if so, will define the scope of the class. None of the foregoing determinations shall be submitted to the arbitrator, and in no event shall the arbitrator have the power to determine class, collective or representative action certification. The court's decisions will be subject to appeal pursuant to the applicable rules of procedure. If the court certifies a class, collective or other representative action, then all other determinations in or related to the Dispute shall be made by the arbitrator. The arbitrator shall determine questions of liability to or of the class as a whole and remedies available to or from the class as a whole. The arbitrator shall also decide the relief, if any, to which a party or class member may be entitled individually. If the court, however, ultimately denies a party's request to proceed on a consolidated, class, collective or representative basis, then that party's individual claim(s) shall still be subject to this Program and referable to arbitration pursuant to its terms.

## Amendment to NABORS DISPUTE RESOLUTION RULES:

### 30. Scope of Arbitrator's Authority

A. The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

B. The arbitrator shall not have the power to hear any claims in arbitration as a class or collective action, or in a private attorney general or similar capacity, or on any other representative capacity basis, or, absent the consent of all parties, on a consolidated basis. The arbitrator shall be authorized to decide only the disputed claims between the individual parties.

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.



Revised April, 2003

### INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS
### DRILLING BID PROPOSAL
### AND
### DAYWORK DRILLING CONTRACT - U.S.

TO: **NABORS DRILLING USA, LP**

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____

this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M on _____ , 20 ____ . to the following address: _____

### THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY,
### RELEASE OF LIABILITY, AND ALLOCATION OF RISK –
### SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| | |
|---|---|
| **OPERATOR:** | Penn Virginia Oil & Gas, LP |
| **Address:** | 840 Gessner Road, Suite 800 |
| | Houston, Texas 77024 |
| **CONTRACTOR:** | NABORS DRILLING USA, LP |
| **Address:** | 515 W. Greens Road, Suite 1000 |
| | Houston, Texas 77067 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.

1. **LOCATION OF WELL:**

   Well Name and Number: **To be advised by Operator**

   Parish/County: **Jefferson**    State: **Texas**    Field Name: _____

   Well location and land description: **To be advised by Operator**

   1.1 Additional Well Locations or Areas: **None.**

   Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**

   Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the _____ day of _____ , 20 ____ ,

   or **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Contractor shall have the right to terminate this Contract unless Operator pays Contractor the Standby Time Rate from such release date until the location is ready. If Contractor so terminates, the termination shall be deemed to be a termination at Operator's election, and the provisions of Sub-paragraph 6.4(a) shall apply.**

3. **DEPTH:**

   3.1 Well Depth: The well(s) shall be drilled to a depth of approximately **10,500'** Feet, or to the _____ formation, whichever is deeper, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____ ** feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4. **DAYWORK RATES:**

   Contractor shall be paid at the following rates for the work performed hereunder.

   4.1 Mobilization: Operator shall pay Contractor a mobilization fee of $ _____ or a mobilization day rate of $ **19,000*** per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: **Move-in and rig up on the new well site.**
   ***Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string up services.**

   4.2 Demobilization: Operator shall pay Contractor a demobilization fee of $ _____ or a demobilization day rate during tear-down of $ **19,000*** per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.**
   ***Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string down services.**

   4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ , Operator shall pay Contractor a sum of $ _____ per twenty-four (24) hour day.

   4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with **Five (5)** man crew the operating day rate shall be:

| Depth Intervals | | Without Drill Pipe | | With Drill Pipe | |
|---|---|---|---|---|---|
| From | To | | | | |
| 0 | Rig Release | $ 21,000 per day | | $ 21,000 per day | |
| | | $ _____ per day | | $ _____ per day | |
| | | $ _____ per day | | $ _____ per day | |

   Using Operator's drill pipe $ **21,000** per day.

   The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.



## EXHIBIT "D"

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | Size | Grade | Directional or Uncontrollable Deviated Hole | Size | Grade |
|---|---|---|---|---|---|
| $ **N/A** per ft. | | | $ **N/A** per ft | | |
| $ **N/A** per ft. | | | $ **N/A** per ft. | | |
| $ **N/A** per ft | | | $ **N/A** per ft. | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 **Repair Time:** In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of ___eight (8)___ hours for any one rig repair job, but not to exceed twenty-four (24) hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____zero (0)_____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6 **Standby Time Rate:** $ 100% of the Operating Day Rate / per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 **Drilling Fluid Rates:** When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a) $ 20 per man per day for Contractor's rig-site personnel;
(b) $ 110 per day additional operating rate; and
(c) Cost of all labor, material and services plus _____twenty-four (24)_____ hours operating rate to clean rig and related equipment.

4.8 **Force Majeure Rate:** $ 100% of the Operating Day Rate / per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 **Reimbursable Costs:** Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____ten (10)_____ percent for such cost of handling. *When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.*

4.10 **Revision in Rates:** The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than _____zero (0)_____ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a) Labor costs, including all benefits, of Contractor's personnel;
(b) Contractor's cost of insurance premiums;
(c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $ N/A ; Operator shall provide all fuel.
(d) Contractor's cost of catering, when applicable;
(e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
(f) ~~Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute _____ percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU119102) to determine to what extent a price variance has occurred in said spare parts and supplies;~~
(g)(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

5. **TIME OF PAYMENT**

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 **Disputed Invoices and Late Payment:** Operator shall pay all invoices within _____thirty (30)_____ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of _____1 1/2_____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3

6. **TERM:**

6.1 **Duration of Contract:** This Contract shall remain in full force and effect until drilling operations are completed on the well or wells specified in Paragraph 1 above, or for a term of_____ commencing on the date specified in Paragraph 2 above.

6.2 ~~Extension of Term: Operator may extend the term of this Contract for_____well(s) or for a period of_____ by giving notice to Contractor at least_____days prior to completion of the well then being drilled or by~~ Not used.

6.3 **Early Termination:**

(a) **By Either Party:** Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

(b)  By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c)  By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.5 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4  Early Termination Compensation:

(a)  Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty ~~a sum equal to the standby time rate (Subparagraph 4.6) for a period of~~ ——— ~~days or~~ a lump sum of $ __105,000__ .

(b)  Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or__ plus, as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate__

(c)  Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for __ five (5) __ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, a lump sum of $ ———————— ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or~~ __as liquidated damages and not as penalty, a lump sum equal to five (5) days at the Standby Time Rate.__

7.  CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

8.  DRILLING METHODS AND PRACTICES:

8.1  Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2  Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3  Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4  Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5  If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

9.  INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

10.  SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com  NDUSA

advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. *In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.*

## 11. EQUIPMENT CAPACITY

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder ~~or where canal or water depths are in excess of~~_____feet. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

## 12. TERMINATION OF LOCATION LIABILITY:

*When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.*

## 13. INSURANCE

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extent of the indemnification obligations assumed herein.

## 14. RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:

*14.1 Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.*

*14.2 Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or ____100____ percent of current new replacement cost of such equipment delivered to the well site.*

*14.3 Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.*

*14.4 Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.*

*14.5 The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.*

*14.6 Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.*

*14.7 Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from, and shall protect, defend and indemnify Contractor from and against, any such liability.*

*14.8 Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.*

*14.9 Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or*

Form provided by Forms On-A-Disk
(214) 340-9429 • FormsOnADisk.com

NDUSA

damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 *Liability for Wild Well:* Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 *Pollution or Contamination:* Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 *Consequential Damages:* Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 *Indemnity Obligation:* Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

of THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT.

**19. INFORMATION CONFIDENTIAL:**

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

**20. SUBCONTRACTS:**

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

**21. ATTORNEY'S FEES**

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

**22. CLAIMS AND LIENS:**

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

**23. ASSIGNMENT:**

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

**24. NOTICES AND PLACE OF PAYMENT:**

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

**25. CONTINUING OBLIGATIONS:**

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

**26. ENTIRE AGREEMENT:**

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

**27. SPECIAL PROVISIONS:**

27.1 Exhibit "C" – <u>Contractors Special Provisions</u> is attached hereto and made a part hereof.

27.2 In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas. Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3 For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $19,000 per day.

27.4 Epoch Well Services, Inc. ("Epoch"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Epoch $280 per day (spud to release) for rental of the Epoch Rig Watch system.

The Epoch Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included with option for 6 additional probes), trip tank volume probes (1 probe included with option for 1 additional probe), and return flow paddle.

**28. ACCEPTANCE OF CONTRACT:**

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this 23 day of Sep, 20 08.

OPERATOR: Penn Virginia Oil & Gas

By: _____

Title: OPS MRG

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this 22nd day of September, 20 08, which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within Seven (7) days of the above date Contractor shall be in no manner bound by its signature thereto.

CONTRACTOR: Nabors Drilling USA, LP By NDUSA Holdings Corp., its General Partner

By: _____

Title: Vice President Marketing and Sales

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



# EXHIBIT "A"

To Daywork Contract dated ___September 22___ 20 _08_

Operator __Penn Virginia Oil & Gas, LP__    Contractor __Nabors Drilling USA, LP__

Well Name and Number ___To be advised by Operator___

## SPECIFICATIONS AND SPECIAL PROVISIONS

### 1. CASING PROGRAM (See Paragraph 7)

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | in. | in. | lbs/ft. | | ft. | hrs |
| Surface | in. | in. | lbs/ft. | | ft. | hrs |
| Protection | in. | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |
| Production | in. | in. | lbs/ft. | | ft. | hrs |
| Liner | in. | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft | | ft. | hrs |

### 2. MUD CONTROL PROGRAM (See Subparagraph 8.2)

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Other mud specifications: _____

### 3. INSURANCE (See Paragraph 13)

3.1  Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $___one (1) million___ covering all of Contractor's employees working under this Contract.

3.2  Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $___one (1) million___ combined single limit per occurrence for Bodily Injury and Property Damage.

3.3  Automobile Public Liability Insurance with limits of $__one (1) million__ for the death or injury of each person and $___one (1) million___ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $___one (1) million___ for each accident.

3.4  ~~In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoremen's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.~~

3.5  Other Insurance: __Excess liability Insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.__

### 4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract

4.1  Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. ___712*___ the major items of equipment being:

Drawworks: Make and Model ___Per rig inventory attached hereto and made a part hereof.___

Engines: Make, Model, and H.P. ___

No. on Rig ___

Pumps: No. 1 Make, Size, and Power ___

No. 2 Make, Size, and Power ___

Mud Mixing Pump: Make, Size, and Power ___

Boilers: Number, Make, H.P. and W.P ___

Derrick or Mast: Make, Size, and Capacity ___

Substructure: Size and Capacity ___

Rotary Drive: Type ___

Drill Pipe: Size __4 1/2"__ in weights and grades as necessary to maintain 100,000 lbs overpull ft. Size: ___ in ___ ft

Drill Collars: Number and Size ___25-6 ½" (nominal); 8-8" (nominal)___

Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

B O.P. Closing Unit: _____

B O.P. Accumulator: _____

4.2 Derrick timbers.

4.3 Normal strings of drill pipe and drill collars specified above.

4.4 Conventional drill indicator.

4.5 Circulating mud pits.

4.6 Necessary pipe racks and rigging up material.

4.7 Normal storage for mud and chemicals.

4.8 Shale Shaker.

4.9 _____

4.10 _____

4.11 _____

4.12 _____

4.13 _____

4.14 _____

4.15 _____

4.16 _____

4.17 _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract.

5.1 Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.

5.2 Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.

5.3 Test tanks with pipe and fittings.

5.4 Mud storage tanks with pipe and fittings.

5.5 Separator with pipe and fittings.

5.6 Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.

5.7 Labor to disconnect and clean test tanks and mud gas separator.

5.8 Drilling mud, chemicals, lost circulation materials and other additives.

5.9 Pipe and connections for oil circulating lines.

5.10 Labor to lay, bury and recover oil circulating lines.

5.11 Drilling bits, reamers, reamer cutters, stabilizers and special tools.

5.12 Contract fishing tool services and tool rental.

5.13 Wire line core bits or heads, core barrels and wire line core catchers if required.

5.14 Conventional core bits, core catchers and core barrels.

5.15 Diamond core barrel with head.

5.16 Cement and cementing service.

5.17 Electrical wireline logging services.

5.18 Directional, caliper, or other special services.

5.19 Gun or jet perforating services.

5.20 Explosives and shooting devices.

5.21 Formation testing, hydraulic fracturing, acidizing and other related services.

5.22 Equipment for drill stem testing.

5.23 Mud logging services.

5.24 Sidewall coring service.

5.25 Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.

5.26 Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment.

5.27 Casing scratchers and centralizers.

5.28 Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well.

5.29 Special or added storage for mud and chemicals.

5.30 Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.

5.31 Blowout preventer testing packoff and testing services.

5.32 Replacement of BOP rubbers, elements and seals, if required, after initial test.

5.33 Casing Thread Protectors and Casing Lubricants.

5.34 H2S training and equipment as necessary or as required by law.

5.35 Site septic systems.

5.36 Ditching around rig and location. _____

5.37 Third party BOP testing service. _____

5.38 _____

5.39 _____

5.40 _____

5.41 _____

5.42 _____

5.43 _____

5.44 _____

5.45 _____

5.46 _____

5.47 _____

5.48 _____

5.49 _____

5.50 _____

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

NDUSA

**6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:**

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column

| | Item | To Be Provided By and At The Expense Of | |
|---|---|:---:|:---:|
| | | Operator | Contractor |
| 6.1 | Cellar and Runways | X | |
| 6.2 | Ditches and sumps | X | |
| 6.3 | Fuel (located at _____ ) | X | |
| 6.4 | Fuel Lines (length ___ of rig only ___ ) | | X |
| 6.5 | Water at source, including required permits | X | |
| 6.6 | Water well, including required permits | X | |
| 6.7 | Water lines, including required permits | X | |
| 6.8 | Water storage tanks _____ capacity (Per rig inventory) | | X |
| 6.9 | Potable water and bottled water | X | |
| 6.10 | Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 | Maintenance of water well, if required | X | |
| 6.12 | Water Pump | X | |
| 6.13 | Fuel for water pump | X | |
| 6.14 | Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 | Transportation of Contractor's property: | | |
| | Move in | See Paragraph 4.1 | |
| | Move out | See Paragraph 4.2 | |
| 6.16 | Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 | Special strings of drill pipe and drill collars as follows: Any required | X | |
| 6.18 | Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 | Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 | Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 | Rate of penetration recording device (Epoch electronic) | | X |
| 6.22 | Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 | Casing tools | X | |
| 6.24 | Power casing tongs | X | |
| 6.25 | Laydown and pickup machine | X | |
| 6.26 | Tubing tools | X | |
| 6.27 | Power tubing tong | X | |
| 6.28 | Crew Boats, Number _____ | N/A | N/A |
| 6.29 | Service Barge | N/A | N/A |
| 6.30 | Service Tug Boat | N/A | N/A |
| 6.31 | Rat Hole | X | |
| 6.32 | Mouse Hole | X | |
| 6.33 | Reserve Pits | X | |
| 6.34 | Upper Kelly Cock | | X |
| 6.35 | Lower Kelly Valve | | X |
| 6.36 | Drill Pipe Safety Valve | | X |
| 6.37 | Inside Blowout Preventer | | X |
| 6.38 | Drilling hole for or driving for conductor pipe | X | |
| 6.39 | Charges, cost of bonds for public roads | X | |
| 6.40 | Portable Toilet | X | |
| 6.41 | Trash Receptacle | X | |
| 6.42 | Linear Motion Shale Shaker (Per rig inventory) | | X |
| 6.43 | Shale Shaker Screens | X | |
| 6.44 | Mud Cleaner | X | |
| 6.45 | Mud/Gas Separator | X | |
| 6.46 | Desander | | X |
| 6.47 | Desilter | | X |
| 6.48 | Degasser | X | |
| 6.49 | Centrifuge | X | |
| 6.50 | Rotating Head | X | |
| 6.51 | Rotating Head Rubbers | X | |
| 6.52 | Hydraulic Adjustable Choke | X | |
| 6.53 | Pit Volume Totalizer | X | |
| 6.54 | Communication, type ___ (Cellular phone for rig use only) ___ | | X |
| 6.55 | Forklift, capacity _____ | X | |
| 6.56 | Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | | |
| 6.58 | | | |
| 6.59 | | | |
| 6.60 | | | |


NDUSA

7. OTHER PROVISIONS:

*(U.S. Daywork Contract - "Exhibit A" - Page 4)*
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



Revised April, 2003

## EXHIBIT "B"

### (See Subparagraph 6.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)     The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)     The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

Form provided by Forms On-A-Disk
(214) 340-9429 - FormsOnADisk.com



## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Texas_May04




# NABORS DRILLING USA, LP

## Rig No. 712

**Diesel Electric Land Rig**

| | |
|---|---|
| **DRAWWORKS:** | Mid - Continent U712 EA, with an input rating of 1,000 horsepower, Baylor 6032 Dynamatic brake, crown-o-matic and Foster catheads. Drum is lebus grooved for a 1 1/4" drilling line. |
| **PRIMARY POWER:** | Three Caterpillar D-399 engines rated at 1,215 horsepower each, driving three KATO 1030 KW generators with a Ross Hill SCR system. |
| **MAST:** | Dreco 136' cantilever, 136' clear height x 21' base at floor. API static hook load of 571,000 lbs. w/ 10 lines strung. |
| **SUBSTRUCTURE:** | Dreco "Slingshot", with a 22' floor height and 18' clear height under the rotary beams. Substructure is designed for a 600,000 lbs. casing load simultaneous with a setback load of 350,000 lbs. |
| **MUD PUMPS:** | Two Gardner Denver PZ-10 triplex mud pumps rated at 1,300 horsepower each, driven by one 1000 horsepower GE 752 motors each. |
| **MUD TANKS:** | Two tank, 970 barrel system with a 75 barrel slugging compartment in the suction tank. Mud system is equipped with stirring guns and clean out gates. Mud mixing and 10 HP mud agitators. |
| **SOLIDS CONTROL:** | 12 cone desilter.<br>2 cone desander.<br>Two linear motion shale shakers. |
| **WATER STORAGE:** | One 500 barrel tank. |
| **FUEL STORAGE:** | One 12,000 gallon tank. |
| **HOOK/BLOCK:** | BJ 5350 Hook and National 545G Block, both rated at 350 tons. |
| **SWIVEL:** | CE LB 400. 400 ton. |
| **ROTARY:** | GD 27 1/2". |
| **ACCUMULATOR:** | Koomey, 180 gallon, eight station, with an electric powered triplex pump, two air operated pumps, regulating valves and eight station remote control. |
| **BLOWOUT PREVENTERS:** | One 11" x 5,000 psi, Annular, H2S Trim.<br>One 11" x 5,000 psi, Single ram, H2S Trim.<br>One 11" x 5,000 psi, Double ram, H2S Trim.<br>One 3 1/8 x 5,000 psi, choke manifold, H2S Trim. |
| **DRILL PIPE:** | As per contract |
| **DRILL COLLARS:** | As per contract |

**MISC. EQUIPMENT:**

| | |
|---|---|
| Automatic driller | One air hoist |
| Wireline unit | 0-7 degree drill indicator |
| 4 Pen drilling recorder | Lower Kelly valve |
| Upper Kelly valve | Inside BOP |
| Full opening safety valve | 5 ¼" x 40' Hex Kelly |
| Vapor proof lighting system | Kelly spinner |
| Spinning wrench | |



## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Texas_May04

# EXHIBIT "1D-1"

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.



Revised April, 2003

**INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS**
**DRILLING BID PROPOSAL**
**AND**
**DAYWORK DRILLING CONTRACT - U.S.**

TO: NABORS DRILLING USA, LP

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M on _____ , 20 ____
to the following address: _____

**THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY,**
**RELEASE OF LIABILITY, AND ALLOCATION OF RISK –**
**SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14**

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

**OPERATOR:** Penn Virginia MC Energy, LLC
**Address:** 110 West 7th, Suite 1800
Tulsa, Oklahoma 74119
**CONTRACTOR:** NABORS DRILLING USA, LP
**Address:** 515 W. Greens Road, Suite 1000
Houston, Texas 77067

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). *When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.*

1. **LOCATION OF WELL:**
Well Name and Number: To be advised by Operator *HUERTA #1-30H AW CA*
Parish/County. ~~Washita~~ *LOGAN AW* State: Oklahoma Field Name: *AW CA*
Well location and land description: To be advised by Operator *Sec 30-16N-3W AW CA*
1.1 Additional Well Locations or Areas: None.

Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**
Contractor agrees to use reasonable efforts to commence operations for the drilling of the well ~~by the~~ _____ ~~day of~~ _____ ~~,20~~ or **immediately following rig release from Contractor's current customer. If Operator does not provide a sound location to accept Contractor's rig immediately following rig release from Contractor's current customer, Operator shall pay Contractor the Standby Time Rate from such release date until the location is ready.** *OPERATOR ACCEPTS Rig UPON EXECUTION of CONTRACT AW CA*

3. **DEPTH:**
3.1 Well Depth: The well(s) shall be drilled to a depth of approximately _____ **TBA** Feet, ~~or to the formation, whichever is deeper,~~ but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of _____ ** feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached herein.

4. **DAYWORK RATES:**
Contractor shall be paid at the following rates for the work performed hereunder.

4.1 Mobilization: Operator shall pay Contractor ~~a mobilization fee of $~~ _____ ~~or~~ a mobilization day rate of $ **17,000*** per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: **Move-in and rig up on the new well site.**
***Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string up services.**

4.2 Demobilization: Operator shall pay Contractor ~~a demobilization fee of $~~ _____ ~~or~~ a demobilization day rate ~~during tear-down of~~ $ **17,000*** per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: **Rig down and remove rig from the final well location and, if applicable, move the rig to the nearest suitable stack out location.** *IF THE RIG HAS NO LOCATIONS TO MOVE ON. AW CA*
***Plus actual costs of trucks, cranes and permits and $4,500 for man-lifts, light towers and string down services.**

~~4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on _____ Operator shall pay Contractor a sum of $ _____ per twenty-four (24) hour day.~~

4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with **Five (5)** man crew the operating day rate shall be:

| Depth Intervals | | | | | |
|---|---|---|---|---|---|
| From | To | Without Drill Pipe | | With Drill Pipe | |
| 0 | Rig Release | $ 20,000** per day | | $ 20,000** per day | |
| | | $ per day | | $ per day | |
| | | $ per day | | $ per day | |

Using Operator's drill pipe $ **20,000*** per day. **The Operating Day Rate includes a Canrig top drive.

The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.



**EXHIBIT "E"**

If under the above column "With Drill Pipe" no rates are specified, the rate per twenty-four hour day when drill pipe is in use shall be the applicable rate specified in the column "Without Drill Pipe" plus compensation for any drill pipe actually used at the rates specified below, computed on the basis of the maximum drill pipe in use at any time during each twenty-four hour day.

### DRILL PIPE RATE PER 24-HOUR DAY

| Straight Hole | | Size | Grade | Directional or Uncontrollable Deviated Hole | | Size | Grade |
|---|---|---|---|---|---|---|---|
| $ N/A per ft. | | | | $ N/A per ft. | | | |
| $ N/A per ft. | | | | $ N/A per ft. | | | |
| $ N/A per ft. | | | | $ N/A per ft. | | | |

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____ degrees or when the change of angle exceeds _____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided for in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.5 Repair Time: In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, Contractor shall be allowed compensation at the applicable rate for such shut down time up to a maximum of ~~eight (8)~~ *four (4)* hours for any one rig repair job, but not to exceed ~~thirty-six (36)~~ *Twenty Four (24)* hours of such compensation for any calendar month. Thereafter, Contractor shall be compensated at a rate of $_____zero (0)_____ per twenty-four (24) hour day. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, testing BOP equipment, lubricating rig, and normal rig and top drive maintenance. When two (2) mud pumps are required to be used simultaneously, the time spent changing expendable pump parts shall not be considered downtime.

4.6 Standby Time Rate: $ 100% of the Operating Day Rate per twenty-four(24) day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.7 Drilling Fluid Rates: When drilling fluids of a type and characteristic that increases Contractor's cost of performance hereunder, including, but not limited to, oil-based mud or potassium chloride, are in use, Operator shall pay Contractor in addition to the operating rate specified above:

(a) $ 20 per man per day for Contractor's rig-site personnel.
(b) $ 110 per day additional operating rate; and
(c) Cost of all labor, material and services plus twenty-four (24) hours operating rate to clean rig and related equipment

4.8 Force Majeure Rate: $ 100% of the Operating Day Rate per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Subparagraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

4.9 Reimbursable Costs: Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____fifteen (15)_____ percent for such cost of handling. *When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of the indemnity and release provisions of this Contract, said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be the Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. Notwithstanding the foregoing, Contractor shall not be obliged to purchase any items on behalf of Operator.*

4.10 Revision in Rates: The rates and/or payments herein set forth due to Contractor from Operator shall be revised to reflect the change in costs if the costs of any of the items hereinafter listed shall vary by more than _____zero (0)_____ percent from the costs thereof on the date of this Contract or by the same percent after the date of any revision pursuant to this Subparagraph:

(a) Labor costs, including all benefits, of Contractor's personnel;
(b) Contractor's cost of insurance premiums;
(c) Contractor's cost of fuel, including all taxes and fees; the cost per gallon/MCF being $_N/A_____; Operator shall provide all fuel.
(d) Contractor's cost of catering, when applicable;
(e) If Operator requires Contractor to increase or decrease the number of Contractor's personnel;
~~(f)Contractor's cost of spare parts and supplies with the understanding that such spare parts and supplies constitute_____percent of the operating rate and that the parties shall use the U.S. Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU110102) to determine to what extent a price variance has occurred in said spare parts and supplies;~~
~~(g)~~(f) If there is any change in legislation or regulations in the area in which Contractor is working or other unforeseen, unusual event that alters Contractor's financial burden.

5. **TIME OF PAYMENT**

Payment is due by Operator to Contractor as follows:

5.1 Payment for mobilization, drilling and other work performed at applicable rates, and all other applicable charges shall be due, upon presentation of invoice therefor, upon completion of mobilization, demobilization, rig release or at the end of the month in which such work was performed or other charges are incurred, whichever shall first occur. All invoices may be mailed to Operator at the address hereinabove shown, unless Operator does hereby designate that such invoices shall be mailed as follows: _____

5.2 Disputed Invoices and Late Payment: Operator shall pay all invoices within _____thirty (30)_____ days after receipt except that if Operator disputes an invoice or any part thereof, Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within the above specified days shall bear interest at the rate of _____1 1/2_____ percent or the maximum legal rate, whichever is less, per month from the due date until paid. If Operator does not pay undisputed items within the above stated time, Contractor may suspend operations or terminate this Contract as specified under Subparagraph 6.3.

6. **TERM:**

6.1 Duration of Contract: This Contract shall remain in full force and effect until drilling operations are completed on the well ~~or wells~~ specified in Paragraph 1 above, ~~or for a term of_____~~ commencing on the date specified in Paragraph 2 above.

6.2 ~~Extension of Term: Operator may extend the term of this Contract for_____well(s) or for a period of_____ by giving notice to Contractor at least_____days prior to completion of the well then being drilled or by~~ Not used.

*OPERATOR NOTIFICATION WITHIN 15 DAYS AFTER S/OD HAS THE RIGHT TO EXTEND*

6.3 Early Termination: *for additional well or for apериод of time subject to mutually agreed rates, terms AND conditions.*

(a) By Either Party: Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate stopping operations hereunder.

(b) By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c) By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.*

6.4 Early Termination Compensation:

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty ~~a sum equal to the standby time rate (Subparagraph 4.6) for a period of~~ _____ days or a lump sum of $ __140,000__ .

(b) Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above,~~ the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or __plus, as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate__

(c) Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for ____seven (7)____ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus, a lump sum of $ _____ ~~provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or~~ __as liquidated damages and not as penalty, a lump sum equal to seven (7) days at the Standby Time Rate__

### 7. CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

### 8. DRILLING METHODS AND PRACTICES:

8.1 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2 Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3 Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4 Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5 If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

### 9. INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

### 10. SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must



advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while en route to the location or during operations hereunder. *In the event subsurface conditions cause a cratering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.1 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.*

11. **EQUIPMENT CAPACITY**

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder or where canal or water depths are in excess of _____ feet. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

12. **TERMINATION OF LOCATION LIABILITY;**

*When Contractor has concluded operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.*

13. **INSURANCE**

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverages of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other additionally insured but only to the extent of the indemnification obligations assumed herein.

14. **RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:**

*14.1  Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.3.*

*14.2  Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or ____100____ percent of current new replacement cost of such equipment delivered to the well site.*

*14.3  Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.*

*14.4  Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its co-venturers', co-lessees' or joint owners' equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.*

*14.5  The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.*

*14.6  Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.*

*14.7  Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from , and shall protect, defend and indemnify Contractor from and against, any such liability.*

*14.8  Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.*

*14.9  Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or*



Revised April, 2003

damage to property. Operator's Indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



of    THE STATE OF TEXAS, EXCLUDING THE CONFLICT OF LAWS PROVISION THEREOF THAT WOULD OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.
NO HANDWRITTEN WORDS OR PROVISIONS, NOR ANY TYPEWRITTEN ADDITIONS OR CHANGES, SHALL BE GIVEN ANY GREATER EFFECT THAN THE PRE-PRINTED PROVISIONS IN THIS CONTRACT, AND ANY APPLICABLE CONTRACT INTERPRETATION RULES THAT WOULD OTHERWISE SO REQUIRE SHALL BE DISREGARDED IN THE INTERPRETATION OF THIS CONTRACT          .

19.  INFORMATION CONFIDENTIAL:

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be considered confidential and shall not be divulged by Contractor or its employees, to any person, firm, or corporation other than Operator's designated representatives.

20.  SUBCONTRACTS:

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it according to Exhibit "A".

21.  ATTORNEY'S FEES

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

22.  CLAIMS AND LIENS:

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

23.  ASSIGNMENT:

Neither party may assign this Contract without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

24.  NOTICES AND PLACE OF PAYMENT:

Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

25.  CONTINUING OBLIGATIONS:

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

26.  ENTIRE AGREEMENT:

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

27.  SPECIAL PROVISIONS:

27.1 Exhibit "C" – Contractors Special Provisions is attached hereto and made a part hereof.

27.2 In the event of any dispute arising out of or related to this Contract, the parties agree that jurisdiction will lie exclusively with the state and federal courts in Houston, Harris County, Texas.  Operator agrees and consents to the jurisdiction of the state and federal courts in Houston, Harris County, Texas, and waives any objection that such courts are an improper or inconvenient venue or forum for such disputes.

27.3 For periods of delay during rig moves, caused by circumstances beyond Contractor's control, including, but not limited to, inclement weather, lack of availability of roads, location, transportation equipment or permits, Operator shall pay Contractor a delay rate of $17,000 per day.

27.4 Canrig Drilling Technology Ltd. ("Canrig"), an affiliate of Contractor, shall invoice Operator, and Operator shall pay Canrig $260 per day (spud to release) for rental of the Canrig Rig Watch system.

The Canrig Rig Watch System Equipment includes the following: Driller's workstation, Companyman computer workstation, Toolpusher computer workstation, depth/bit tracking system, hook load/bit weight, rotary torque, rotary RPM, pump pressure, pump stroke counters (2 pumps included), pit volume probes (6 probes included), trip tank volume probes (1 probe included), and return flow paddle.

28.  ACCEPTANCE OF CONTRACT:

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this _8th_ day of _Sept_, 20 _10_.

OPERATOR:  Penn Virgina MC Energy, LLC
By:
Title:  Regional Mgr

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this _3rd_ day of _September_, 20 _10_, which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within _Seven (7)_ days of the above date Contractor shall be in no manner bound by its signature thereto.

CONTRACTOR:  Nabors Drilling USA, LP By: NDUSA Holdings Corp., Its General Partner
By:  E. Nelson
Title:  Vice President Contracts

# EXHIBIT "A"

To Daywork Contract dated  **September 3**  , 20 **10**

Operator  **Penn Virginia MC Energy, LLC**                    Contractor  **Nabors Drilling USA, LP**

Well Name and Number  **To be advised by Operator**

### SPECIFICATIONS AND SPECIAL PROVISIONS

## 1. CASING PROGRAM (See Paragraph 7)

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | In. | in. | lbs/ft | | ft | hrs |
| Surface | In. | in. | lbs/ft | | ft. | hrs |
| Protection | In. | in. | lbs/ft. | | ft. | hrs |
| | in | in. | lbs/ft. | | ft. | hrs |
| Production | In. | in. | lbs/ft. | | ft. | hrs |
| Liner | in | in. | lbs/ft. | | ft. | hrs |
| | in. | in. | lbs/ft. | | ft. | hrs |

## 2. MUD CONTROL PROGRAM (See Subparagraph 6.2)

| Depth Interval (ft) From | To | Type Mud | Weight (lbs./gal.) | Viscosity (Secs) | Water Loss (cc) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Other mud specifications: _____

## 3. INSURANCE (See Paragraph 13)

3.1  Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $ **one (1) million** covering all of Contractor's employees working under this Contract.

3.2  Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $ **one (1) million** combined single limit per occurrence for Bodily Injury and Property Damage

3.3  Automobile Public Liability Insurance with limits of $ **one (1) million** for the death or injury of each person and $ **one (1) million** for each accident; and Automobile Public Liability Property Damage Insurance with limits of $ **one (1) million** for each accident.

3.4  In the event operations are over water, Contractor shall carry in addition to the Statutory Workers' Compensation Insurance, endorsements covering liability under the Longshoreman's & Harbor Workers' Compensation Act and Maritime liability including maintenance and cure with limits of $_____ for each death or injury to one person and $_____ for any one accident.

3.5  Other insurance: **Excess liability insurance in the amount of $4 million dollars (in excess of 3.1, 3.2 and 3.3). Operator will purchase OEE insurance in an amount not less than $10 million dollars insuring the liabilities assumed by the Operator under this Contract.**

## 4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract.

4.1  Drilling Rig *Subject to availability

Complete drilling rig, designated by Contractor as its Rig No. **F28*** , the major items of equipment being:

Drawworks: Make and Model  **Per rig inventory attached hereto and made a part hereof.**

Engines: Make, Model, and H.P. _____

No. on Rig _____

Pumps: No. 1 Make, Size, and Power _____

No. 2 Make, Size, and Power _____

Mud Mixing Pump: Make, Size, and Power _____

Boilers: Number, Make, H.P. and W.P. _____

Derrick or Mast: Make, Size, and Capacity _____

Substructure: Size and Capacity _____

Rotary Drive: Type _____

Drill Pipe: Size **5"** in. **weights and grades as necessary to maintain 100,000 lbs overpull** ft ; Size: _____ in. _____ ft.

Drill Collars: Number and Size **43-6 3/8" (nominal); 10-9" (nominal)**

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



Blowout Preventers: _____

| Size | Series or Test Pr. | Make & Model | Number |
|------|--------------------|--------------|--------|
|      |                    |              |        |
|      |                    |              |        |
|      |                    |              |        |
|      |                    |              |        |

B.O P. Closing Unit: _____

B.O P Accumulator: _____

4.2   Derrick timbers.

4.3   Normal strings of drill pipe and drill collars specified above.

4.4   Conventional drift indicator

4.5   Circulating mud pits.

4.6   Necessary pipe racks and rigging up material.

4.7   ~~Normal storage for mud and chemicals.~~

4.8   Shale Shaker.

4.9   _____

4.10   _____

4.11   _____

4.12   _____

4.13   _____

4.14   _____

4.15   _____

4.16   _____

4.17   _____

## 5. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by this Contract.

5.1   Furnish and maintain adequate roadway and/or canal to location, right-of-way, including rights-of-way for fuel and water lines, river crossings, highway crossings, gates and cattle guards.

5.2   Stake location, clear and grade location, and provide turnaround, including surfacing when necessary.

5.3   Test tanks with pipe and fittings.

5.4   Mud storage tanks with pipe and fittings

5.5   Separator with pipe and fittings.

5.6   Labor and materials to connect and disconnect mud tank, test tank, and mud gas separator.

5.7   Labor to disconnect and clean test tanks and mud gas separator.

5.8   Drilling mud, chemicals, lost circulation materials and other additives.

5.9   Pipe and connections for oil circulating lines.

5.10   Labor to lay, bury and recover oil circulating lines.

5.11   Drilling bits, reamers, reamer cutters, stabilizers and special tools.

5.12   Contract fishing tool services and tool rental.

5.13   Wire line core bits or heads, core barrels and wire line core catchers if required.

5.14   Conventional core bits, core catchers and core barrels.

5.15   Diamond core barrel with head

5.16   Cement and cementing service.

5.17   Electrical wireline logging services

5.18   Directional, caliper, or other special services

5.19   Gun or jet perforating services.

5.20   Explosives and shooting devices.

5.21   Formation testing, hydraulic fracturing, acidizing and other related services.

5.22   Equipment for drill stem testing.

5.23   Mud logging services

5.24   Sidewall coring service.

5.25   Welding service for welding bottom joints of casing, guide shoe, float shoe, float collar and in connection with installing of well head equipment if required.

5.26   Casing, tubing, liners, screen, float collars, guide and float shoes and associated equipment

5.27   Casing scratchers and centralizers

5.28   Well head connections and all equipment to be installed in or on well or on the premises for use in connection with testing, completion and operation of well

5.29   Special or added storage for mud and chemicals

5.30   Casinghead, API series, to conform to that shown for the blowout preventers specified in Subparagraph 4.1 above.

5.31   Blowout preventer testing packoff and testing services.

5.32   Replacement of BOP rubbers, elements and seals, if required, after initial test

5.33   Casing Thread Protectors and Casing Lubricants.

5.34   $H_2S$ training and equipment as necessary or as required by law.

5.35   Site septic systems.

5.36   Ditching around rig and location.

5.37   Third party BOP testing service.

5.38   _____

5.39   _____

5.40   _____

5.41   _____

5.42   _____

5.43   _____

5.44   _____

5.45   _____

5.46   _____

5.47   _____

5.48   _____

5.49   _____

5.50   _____

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com



6. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY DESIGNATED PARTY:

The machinery, equipment, tools, materials, supplies, instruments, services, and labor listed as the following numbered items, including any transportation required for such items unless otherwise specified, shall be provided at the well location and at the expense of the party hereto as designated by an X mark in the appropriate column.

| | Item | To Be Provided By and At The Expense Of Operator | To Be Provided By and At The Expense Of Contractor |
|---|---|---|---|
| 6.1 | Cellar and Runways | X | |
| 6.2 | Ditches and sumps | X | |
| 6.3 | Fuel (located at _____ ) | X | |
| 6.4 | Fuel Lines (length ___ of rig only ____ ) | | X |
| 6.5 | Water at source, including required permits | X | |
| 6.6 | Water well, including required permits | X | |
| 6.7 | Water lines, including required permits | X | |
| 6.8 | Water storage tanks _____ capacity (Per rig inventory) | | X |
| 6.9 | Potable water and bottled water | X | |
| 6.10 | Labor to operate water well or water pump (Rig crew only) | | X |
| 6.11 | Maintenance of water well, if required | X | |
| 6.12 | Water Pump | X | |
| 6.13 | Fuel for water pump | X | |
| 6.14 | Mats for engines and boilers, or motors and mud pumps | X | |
| 6.15 | Transportation of Contractor's property. | | |
| | Move in | See Paragraph 4.1 | |
| | Move out | See Paragraph 4.2 | |
| 6.16 | Materials for "boxing in" rig and derrick | N/A | N/A |
| 6.17 | Special strings of drill pipe and drill collars as follows: | | |
| | Any required | X | |
| 6.18 | Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special drill pipe | X | |
| 6.19 | Drill pipe protectors for Kelly joint and each joint of drill pipe running inside of Surface Casing as required, for use with normal strings of drill pipe | X | |
| 6.20 | Drill pipe protectors for Kelly joint and drill pipe running inside of Protection Casing | X | |
| 6.21 | Rate of penetration recording device (Canrig electronic) | | X |
| 6.22 | Extra labor for running and cementing casing (Casing crews) | X | |
| 6.23 | Casing tools | X | |
| 6.24 | Power casing tongs | X | |
| 6.25 | Laydown and pickup machine | X | |
| 6.26 | Tubing tools | X | |
| 6.27 | Power tubing tong | X | |
| 6.28 | Crew Boats, Number | N/A | N/A |
| 6.29 | Service Barge | N/A | N/A |
| 6.30 | Service Tug Boat | N/A | N/A |
| 6.31 | Rat Hole | X | |
| 6.32 | Mouse Hole | X | |
| 6.33 | Reserve Pits | X | |
| 6.34 | Upper Kelly Cock | | X |
| 6.35 | Lower Kelly Valve | | X |
| 6.36 | Drill Pipe Safety Valve | | X |
| 6.37 | Inside Blowout Preventer | | X |
| 6.38 | Drilling hole for or driving for conductor pipe | X | |
| 6.39 | Charges, cost of bonds for public roads | X | |
| 6.40 | Portable Toilet | X | |
| 6.41 | Trash Receptacle | X | |
| 6.42 | Linear Motion Shale Shaker (Per rig inventory) | | X |
| 6.43 | Shale Shaker Screens | X | |
| 6.44 | Mud Cleaner | X | |
| 6.45 | Mud/Gas Separator | X | |
| 6.46 | Desander | | X |
| 6.47 | Desilter | | X |
| 6.48 | Degasser (Per rig inventory) | | X |
| 6.49 | Centrifuge | X | |
| 6.50 | Rotating Head | X | |
| 6.51 | Rotating Head Rubbers | X | |
| 6.52 | Hydraulic Adjustable Choke | X | |
| 6.53 | Pit Volume Totalizer | X | |
| 6.54 | Communication, type ___ (Cellular phone for rig use only) | | X |
| 6.55 | Forklift, capacity ___ Model JLG G9-43A (NDUSA, LP preferred model) or a JLG G10-55A (10,000 lb lift with outriggers) with a Star Industries Quick-Tach Truss boom Model 1302-JLG | X | |
| 6.56 | Corrosion Inhibitor for protecting drill string | X | |
| 6.57 | | | |
| 6.58 | | | |
| 6.59 | | | |
| 6.60 | | | |

7.    OTHER PROVISIONS:

Form provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

## EXHIBIT "B"

(See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)    The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)    The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)    The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4

(4)    The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

## EXHIBIT "C"

## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 *et seq.*, Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

Exhibit_C_01_Oklahoma_May04




# NABORS DRILLING USA, LP

## PACE 1500 – RIG F26

### Programmable AC Electric 1500 HP Rig

**DRAWWORKS:** 1,500 horsepower AC drawworks featuring regenerative AC braking. Drawworks is driven by two (2) 800 horsepower AC motors. Autodrill functionality utilizing AC motor.

**POWER GENERATION:** Three (3) – Caterpillar 3512B engines rated at 1,476 horsepower each, driving one (1) Kato 1365 KW generator, for a total of 4,428 horsepower. AC power generation, Variable Frequency Drive (VFD) and MCC unitized in a single house.

**MAST:** Pyramid Fast Moving Land Rig 152' three section mast manufactured to API-4F specification. Static hook load of 1,000,000 lbs. on 12 lines. Mast is raised and lowered utilizing hydraulic cylinders. Mast has integrated top drive rails (enables top drive to travel in mast during rig move).

**SUBSTRUCTURE:** Pyramid hydraulically elevated substructure with 30' floor height and 26' clear height under rotary beams. Substructure is rated for 1,000,000 lbs rotary load simultaneous with a 600,000 lbs setback load.

**DRILLER'S CONTROL:** Climate controlled driller's cabin provides integrated joystick control utilizing PLC technology. Touch screen controls provide state-of-the-art monitoring, control of rig equipment and drilling parameters.

**MUD PUMPS:** Two (2) 1,600 horsepower mud pumps. Each powered by one (1) 1600 horsepower AC motor, pumps are equipped with hydraulic liner retention and pump rod systems.

**MUD TANKS:** Three (3) tank system total capacity approximately 1,500 BBL; four (4) 6" x 8" centrifugal pumps powered by 100 horsepower electric motors. 100 BBL trip tank.

**SOLIDS CONTROL:** Three (3) Swaco Mongoose shale shakers
One (1) Swaco mud cleaner with desander / desilter.

**WATER STORAGE:** One (1) 500 BBL water tank.

**FUEL STORAGE:** One (1) 20,000 gallon diesel fuel tank.

**TRAVELING BLOCK** 500 ton traveling block, grooved for 1 3/8" drill line.

**TOP DRIVE** Canrig 1250 AC, 500 ton integrally mounted top drive system.

**ROTARY:** 37-1/2" rotary table, independently driven by AC motor.

**ACCUMULATOR:** Six (6) station accumulator unit with one (1) electric triplex and two (2) air operated pumps. Unit will be designed in accordance with API 16D. Remote panel will be mounted at drill floor.

**BLOWOUT PREVENTERS:**
Annular: 13-5/8" x 5000 psi.
Double Ram: 13-5/8" x 10,000 psi.
Single Ram: 13-5/8" x 10,000 psi.
Manifold: 4-1/16" x 3-1/16" 10,000 psi.

**DRILL PIPE:** As per contract.

**DRILL COLLARS:** As per contract.

**ADD. EQUIPMENT:**
Dedicated man-rider winch
Varco ST-80 Iron Roughneck
BOP Handling system
Rotating mousehole
Intercom system

Automated catwalk / pipe handling system
Two (2) air operated hoists
Air operated slips
Camera system
Vacuum degasser

## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all Contractor's drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

6. Subsequent inspections (including the inspection at the end of the job) of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent).

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

10. Operator will be responsible for the provision and maintenance of any site septic systems.

11. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

12. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

13. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

14. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

15. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

16. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors, such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

17. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR ☐ ☐ ☐ ☐, minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, LP, PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § | 281ST JUDICIAL DISTRICT |

## AFFIDAVIT OF ERNEST W. NELSON

| | |
|---|---|
| **STATE OF TEXAS** | § § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared Ernest W. Nelson, the affiant, a person whose identity is known to me. After I administered an oath to affiant, the affiant testified:

1. "My name is Ernest W. Nelson. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am the Vice President-Contracts for Nabors Corporate Services, Inc.

3. In my capacity as Vice President-Contracts, I am required to be familiar with Nabors Industries, Inc.'s corporate structure and its various subsidiaries and affiliated companies.

4. Nabors Industries, Inc. is a holding company that does not produce any goods or provide any services. Nabors Industries, Inc. also does not have any employees, nor did it have any employees in 2008 or 2010.

5. During the entirety of its existence, Nabors Completion and Production Services Co. was a subsidiary of Nabors Industries, Inc.

6. It was the intent of Nabors Drilling USA, LP (as a subsidiary of Nabors Industries, Inc., which is the Sponsor of the Employee Dispute Resolution Program) that the Electing Entity

**EXHIBIT "F"**

Agreements attached hereto as Exhibits A and B extend to all current and future Disputes between Electing Entities and present and former employees of Nabors Drilling USA, LP. It was also the intent of Nabors Industries, Inc. that the Electing Entity Agreements attached hereto as Exhibits A and B extend to all current and future Disputes between Electing Entities and present and former employees of Nabors Industries, Inc.'s subsidiaries. The term "present and former employees" references the employment status of the Employee at the time of the Dispute and not at the time the Electing Entity Agreement was entered. It was never the intent that the Electing Entity Agreements only cover employees currently employed on the date of the execution of the Electing Entity Agreement."

FURTHER AFFIANT SAYETH NOT.

Ernest W. Nelson

Sworn to and subscribed before me by Ernest W. Nelson on the 1st day of October, 2015.



Notary Public in and for the State of Texas
My Commission expires: 12-14-2015

GAIL K. SCOTT
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
12-14-2015

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR _____, minors | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, LP, PENN VIRGINIA OIL & GAS GP, LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC. and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § | 215th JUDICIAL DISTRICT |

**ORDER GRANTING DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP LLC'S MOTION FOR RECONSIDERATION OF DENIAL OF MOTION TO COMPEL ARBITRATION AND TO ABATE**

The Court has considered Defendants, PENN VIRGINIA OIL & GAS, L.P. and PENN VIRGINIA OIL & GAS GP LLC's (collectively, "Penn Virginia") Motion for Reconsideration of the Order denying Penn Virginia's Motion to Compel Arbitration and Abate, the response, and the arguments of counsel, if any, and finds that the Motion should be GRANTED.

Signed this _____ day of _____, 2015.

_____
PRESIDING JUDGE

**EXHIBIT "G"**

10/5/2015 12:22:25 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 7226643
By: SPENCER, JEANETTA
Filed: 10/5/2015 12:22:25 PM
Pgs-1
RECSY

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA,<br>INDIVIDUALLY and AS NEXT FRIEND<br>FOR [ ] [ ] [ ]<br>[ ] [ ] [ ], minors | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P.,<br>PENN VIRGINIA OIL & GAS GP LLC,<br>and MIKE FERGUSON | §<br>§<br>§ | 215ᵗʰ JUDICIAL DISTRICT |

## ORDER DENYING DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP LLC'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO COMPEL ARBITRATION

On this the ___ day of October, 2015, came to be heard and considered Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's Motion for Reconsideration of Order Denying Motion to Compel Arbitration in the above-styled and numbered cause, and the Court having considered said motion and response is of the opinion that the motion should be in all things DENIED.

It is therefore ORDERED, ADJUDGED and DECREED that Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's Motion for Reconsideration of Order Denying Motion to Compel Arbitration is DENIED.

It is further ordered that the statements in the Affidavit of Ernest W. Nelson regarding intent be stricken in their entirety.

SIGNED AND ORDERED this the ___ day of October, 2015.

Signed:
10/12/2015
_____
JUDGE PRESIDING

Order Denying Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's    Page 1 of 1
Motion for Reconsideration of Order Denying Motion to Compel Arbitration

Certified Document Number: 67408422 - Page 1 of 1

**EXHIBIT "D"**



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 13, 2015

Certified Document Number:        67408422 Total Pages:  1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR ☐ ☐ ☐ ☐ | § | |
| ☐ ☐ ☐ , minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, LP, | § | |
| PENN VIRGINIA OIL & GAS GP, LLC, | § | |
| MIKE FERGUSON, TRIFECTA | § | |
| OILFIELD SERVICES, LLC, CUDD | § | |
| PRESSURE CONTROL, INC., | § | |
| ROYWELL SERVICES, INC. and OAKS | § | |
| PERSONNEL SERVICES, INC. d/b/a | § | |
| THE OAKS GROUP | § | 215th JUDICIAL DISTRICT |

## PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP LLC'S
## NOTICE OF APPEAL

Pursuant to Texas Rule of Appellate Procedure 25, Defendants, Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas, L.P. (collectively "Penn Virginia"), file their Notice of Appeal of this Court's appealable Order on Penn Virginia's Motion to Compel Arbitration and to Abate, which was signed by the Honorable Elaine H. Palmer on September 11, 2015 (Exhibit "1"), and the appealable Order on Penn Virginia's Motion for Reconsideration of the Order Denying the Motion to Compel Arbitration, which was signed by the Honorable Elaine H. Palmer on October 12, 2015 (Exhibit "2"). In support of this Notice of Appeal, Penn Virginia respectfully would show the following:

1. This case is pending in the 215th Judicial District Court of Harris County, Texas under Cause Number 2014-42519;

2. The Order denying Penn Virginia's Motion to Compel Arbitration was signed on September 11, 2015. The Order denying Penn Virginia's Motion for Reconsideration of the Order Denying the Motion to Compel Arbitration was signed on October 12, 2015;

3. Penn Virginia desires to appeal from the referenced Orders;

**EXHIBIT "E"**

4. Penn Virginia appeals to the First or Fourteenth Court of Appeals, Houston, Texas;

5. Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas, L.P. are filing this notice;

6. This is an accelerated appeal pursuant to Texas Rule of Appellate Procedure 28.

Penn Virginia respectfully requests that this Court take notice of Penn Virginia's desire and intention to appeal. Penn Virginia further requests that this notice be forwarded to the First or Fourteenth Court of Appeals as required by the rules and/or local procedure so that Penn Virginia may tender the appropriate fee to the appellate clerk and proceed with its appeal.

Respectfully submitted,

*/s/ Kelly C. Hartmann*

Thomas J. Smith
  State Bar No. 00788934
  tsmith@gallowayjohnson.com
Kelly C. Hartmann
  State Bar No. 24055631
  khartmann@gallowayjohnson.com
Alexis B. Hester
  State Bar No. 24072807
  ahester@gallowayjohnson.com
GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777 – facsimile

**ATTORNEYS FOR DEFENDANTS, PENN VIRGINIA OIL & GAS GP, LLC AND PENN VIRGINIA OIL & GAS, L.P**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served electronically, by and through the Court approved electronic filing manager, to participating parties on this 13th day of October 2015, as follows:

John David Hart
**LAW OFFICES OF JOHN DAVID HART**
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
Phone  817-870-2102
Fax    817-332-5858
*Counsel for Plaintiffs*

Benjamin A. Escobar, Jr.
Brit T. Brown
**BEIRNE, MAYNARD & PARSON, L.L.P.**
1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Phone  713-623-0887
Fax    713-960-1527
*Counsel for Defendant, Cudd Pressure Control, Inc.*

J. Javier Gutierrez
Ana Laura Gutierrez
**THE GUTIERREZ LAW FIRM, INC.**
700 East Third Street
Alice, Texas 78332
Phone  361-664-7377
Fax    361-664-7245
*Counsel for Intervenor,*
*John Paul Adame*

J. J. Knauff
The Miller Law Firm
Turtle Creek Centre
3811 Turtle Creek Blvd., Suite 1950
Dallas, Texas 75219
Phone  469-916-2552
Fax    469-916-2555
*Counsel for Defendant,*
*Penn Virginia MC Energy, LLC*

*/s/ Kelly C. Hartmann*
Kelly C. Hartmann

CAUSE NO. 2014-42519

| | |
|---|---|
| ALFREDO DE LA GARZA, INDIVIDUALLY and AS NEXT FRIEND FOR ☐☐☐☐ ☐☐☐☐ , minors | § § § § § § |
| | IN THE DISTRICT COURT OF |
| v. | § § |
| | HARRIS COUNTY, TEXAS |
| PENN VIRGINIA OIL & GAS, L.P., PENN VIRGINIA OIL & GAS GP LLC, MIKE FERGUSON, TRIFECTA OILFIELD SERVICES, LLC, CUDD PRESSURE CONTROL, INC., ROYWELL SERVICES, INC., and OAKS PERSONNEL SERVICES, INC. d/b/a THE OAKS GROUP | § § § § § § § § § |
| | 215th JUDICIAL DISTRICT |

### ORDER DENYING DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP LLC'S MOTION TO COMPEL ARBITRATION AND TO ABATE

On __11TH__ day of __September__ , 2015, came to be considered Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's Motion to Compel Arbitration and to Abate. After considering the motion and hearing the arguments of counsel, this Court is of the opinion that the Motion should be DENIED, ~~and that Plaintiffs' claims against Defendant Mike Ferguson and Defendant Oaks Personnel Services, Inc. d/b/a The Oaks Group be severed from and proceed to trial on October 19, 2015~~.

**FILED**
Chris Daniel
District Clerk

SEP 11 2015

Time: _____
Harris County, Texas
By: _____
Deputy

SIGNED this __11TH__ day of __September__ , 2015

_____
Elaine H. Palmer
JUDGE, 215TH DISTRICT COURT

Order Denying Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's         Page 1 of 1
Motion to Compel Arbitration and to Abate

**EXHIBIT "1"**

Certified RECORDER'S MEMORANDUM 66994917 - Page 1 of 1
this instrument is of poor quality at the time of imaging



I, Chris Daniel, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   October 13, 2015

Certified Document Number:        66994917 Total Pages: 1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

10/5/2015 12:22:25 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 7226643
By: SPENCER, JEANETTA
Filed: 10/5/2015 12:22:25 PM

Pgs-1

RECSY

CAUSE NO. 2014-42519

| | | |
|---|---|---|
| ALFREDO DE LA GARZA, | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT FRIEND | § | |
| FOR [_____] | § | |
| [_____] minors | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PENN VIRGINIA OIL & GAS, L.P., | § | |
| PENN VIRGINIA OIL & GAS GP LLC, | § | |
| and MIKE FERGUSON | § | 215th JUDICIAL DISTRICT |

## ORDER DENYING DEFENDANTS, PENN VIRGINIA OIL & GAS, L.P. AND PENN VIRGINIA OIL & GAS GP LLC'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO COMPEL ARBITRATION

On this the ___ day of October, 2015, came to be heard and considered Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's Motion for Reconsideration of Order Denying Motion to Compel Arbitration in the above-styled and numbered cause, and the Court having considered said motion and response is of the opinion that the motion should be in all things DENIED.

It is therefore ORDERED, ADJUDGED and DECREED that Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's Motion for Reconsideration of Order Denying Motion to Compel Arbitration is DENIED.

It is further ordered that the statements in the Affidavit of Ernest W. Nelson regarding intent be stricken in their entirety.

SIGNED AND ORDERED this the ___ day of October, 2015.

Signed:
10/12/2015 _____
JUDGE PRESIDING

Order Denying Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP LLC's       Page 1 of 1
Motion for Reconsideration of Order Denying Motion to Compel Arbitration

Certified Document Number: 67408422 - Page 1 of 1

**EXHIBIT "2"**



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 13, 2015

Certified Document Number:        67408422 Total Pages:  1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

ACCEPTED
01-15-00867-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/29/2015 11:29:28 AM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00867-CV

---

## FIRST COURT OF APPEALS

## HOUSTON, TEXAS

---

## PENN VIRGINIA OIL & GAS GP, L.L.C. & PENN VIRGINIA OIL AND GAS L.P., Appellants.

## V.

## ALFREDO DE LA GARZA, INDIVIDUALLY AND AS NEXT OF FRIEND FOR XXXXXX XX XX XXXXX AND XXXXXXXX XX XX XXXXX, MINORS
## &
## JOHN PAUL ADAME, INDIVIDUALLY AND AS NEXT OF FRIEND OF XXXXXXXXX XXXXXX XXXXX, XXXX XXXX XXXXX, XXX, AND XXXX XXXXXXXX XXXXX, MINORS,

## Appellees.

---

### On Appeal from the 215TH Judicial District Court, Harris County, Texas
### Cause No. 2014-42519

---

APPELLANTS' REPLY TO APPELLEES' RESPONSES TO MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL

---

To the Honorable Justices of the First Court of Appeals:

Appellants, Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas, L.P. (collectively "Penn Virginia") file this Reply to Appellees' Responses to Penn Virginia's Motion for Extension of Time to File Notice of Appeal pursuant to

**EXHIBIT "B"**

Rules 26.3 and 10.5(b)(2). In support thereof, Penn Virginia would respectfully show this Honorable Court as follows:

**I.      The facts set forth in Penn Virginia's Motion for Extension reasonably explain its need for an extension.**

1.      In Appellees' Responses to Penn Virginia's Motion for Extension, Appellees refer to two Notices of Appeal, one of which was filed in 2010 by Mr. Thomas J. Smith, the other of which was filed in 2011 by the same three attorneys listed on the present matter. The 2010 filing was dismissed for want of jurisdiction because it was untimely filed while the 2011 Notice of Appeal was filed timely.

2.      Counsel would show that these examples provide further evidence that the failure to timely file in this instance was exactly as counsel described in the Motion for Extension: a mistake. Mr. Kelly Hartmann and Ms. Alexis Hester have not appeared as counsel on a Notice of Appeal since the 2011 filing and have not had occasion to familiarize themselves with the Texas Rules of Appellate Procedure or work with the Texas Rules of Appellate Procedure since that time. Four years later, counsel cannot attest with any certainty that the 2011 Notice of Appeal was filed with objective awareness of the twenty day deadline, or that the Notice of Appeal was timely filed simply by chance.

3.      While the 2011 filing noted that the appeal was an Accelerated Appeal, counsel failed to refresh their memories and review Texas Rule of Appellate Procedure 28.1(a) when the Order denying Penn Virginia's Motion to

Compel Arbitration was issued on September 11, 2015. In error and due to a lack of familiarity with the Texas Rules of Appellate Procedure, counsel believed Texas Rule of Appellate Procedure 26.1 applied.

4. The "credible facts" explaining the need for the extension are, painfully, quite simple: counsel committed an oversight and believed that the deadline was thirty days and not twenty days. Counsel committed an unfortunate human error while practicing in an area of law and dealing with a set of procedures that are otherwise foreign to it. Counsel was focused on preparing its Motion for Reconsideration during that period and was making all efforts to address the latent ambiguities identified by the Court with regard to the contracts between Penn Virginia and Nabors, as they related to the Nabors Dispute Resolution Agreement. As a result and unknowingly, Counsel filed the Motion for Reconsideration on the very deadline to file the Notice of Appeal.

5. With regard to Appellees' argument at paragraph 11 that "[Penn Virginia's] counsel failed to file the notice of appeal even within the thirty days they aver they believed was the deadline," counsel would show that it did not realize the error until after the actual, twenty day deadline had passed. As soon as counsel discovered that the Texas Rules of Appellate Procedure allowed for a fifteen day extension, counsel filed Penn Virginia's Notice of Appeal and the Motion for Extension followed soon thereafter. The Notice of Appeal, which was

filed only one day after what counsel had originally believed was a thirty day deadline, was filed as soon as practicable upon realizing that an extension was possible. Penn Virginia would show that, fortunately, the fifteen days had not expired by the time the Notice of Appeal was filed.[1]

6.      Moreover, Texas Courts have held that such error and mistake is sufficient basis for granting an extension of time. In particular, the Texas Supreme Court has stated that "'any plausible statement of circumstances indicating that failure to file ... was not deliberate or intentional, **but was the result of inadvertence, mistake, or mischance**" is a reasonable explanation, "even though counsel or his secretary may appear to have been lacking in that degree of diligence which careful practitioners normally exercise.'" *Dimotsis v. Lloyds*, 966 S.W.2d 657, 657 (Tex. App.—San Antonio, 1998) (quoting *Garcia v. Kastner Farms, Inc.*, 774 S.W.2d 668, 670 (Tex. 1989) (emphasis added)). "In other words, this standard "encompasses the negligence of counsel as a reasonable explanation." *Dimotsis*, 966 S.W.2d at 657.

7.      In *Dimotsis v. Lloyds*, a 1998 case out of the San Antonio Court of Appeals, the attorney seeking the deadline filed a verified statement in which he explained that he "erroneously calculated the perfection deadline by adding thirty

---

[1] The deadline for Penn Virginia to file its Notice of Appeal fell on October 1, 2015, which was twenty days after the September 11, 2015 Order denying the Motion to Compel Arbitration was issued. Fifteen days from October 1, 2015 was October 16, 2015. Penn Virginia filed its Notice of Appeal on October 13, 2015 and filed its Motion to Extend on October 14, 2015.

days to the date the trial court overruled [Appellant's] motion for new trial." *Id*. at 657-58. The Court held that Appellant's late filing "was not intentional or deliberate, but was due to her attorney's misunderstanding of the law" and held that "the explanation offered is a reasonable one." *Id*. at 658.

8.      The Houston First Court of Appeals has accepted similar explanations as reasonable and has granted an extension when a party's attorney miscalculated the deadline to perfect an appeal, but that such error was the result of human error and a mistake. *Hernandez v. Lopez*, 288 S.W.3d 180, 184 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("Because George has also filed a factual explanation indicating that he, in good faith, believed that he filed on time and had inadvertently miscalculated the dates, we imply an extension of time, and we conclude that George's notice of appeal was timely filed.").

9.      Texas Rule of Appellate Procedure 10.5(b) permits an extension of time so the Texas Appellate Courts are not immediately divested of jurisdiction when unintentional errors are made, and so that the substance of appellate issues may be evaluated and reviewed by the intermediary courts. The Texas Supreme Court has articulated the proper standard for a "reasonable explanation" and counsel has sworn that its own mistake was the basis for its failure to timely file. Counsel who prepared the Notice of Appeal and Motion for Reconsideration had

not reviewed the Texas Rules of Appellate Procedure since 2011 and was unfamiliar with the applicable timeline for filing.

## II.   Granting an Extension does not cause Prejudice to Appellees

10.   Finally, Penn Virginia would show that permitting this extension and allowing the fifteen day extension to file does not prejudice Appellees in any manner whatsoever.  The original deadline for Penn Virginia to file its Notice of Appeal fell on October 1, 2015. If a fifteen day extension is granted, the deadline extends to October 16, 2015. Penn Virginia filed its Notice of Appeal on October 13, 2015 and filed its Motion to Extend on October 14, 2015. Penn Virginia's two week delay in filing from October 1, 2015 to October 13, 2015 does not cause any prejudice or hardship to Appellees.

## III.   Penn Virginia should not be punished for the error of counsel

11.   Penn Virginia would urge this Court to exercise its discretionary authority and extend jurisdiction over this matter.  Penn Virginia filed its Notice of Appeal within fifteen days after the October 1, 2015 deadline. Penn Virginia did not deliberately, strategically, or intentionally delay in filing its Notice of Appeal in an effort to subvert the Texas Rules of Appellate Procedure or engage in any gamesmanship with the trial court or Appellees. Prior to learning of its error, counsel for Penn Virginia believed that, with the thirty-day deadline, it would have the opportunity to address the trial court's specific concerns as to a particular and

nuanced ambiguity in the contracts between Penn Virginia and Nabors. Penn Virginia should not be penalized for the errors made by its counsel and would request the opportunity to litigate the issues set forth in its Motion to Compel Arbitration, particularly the application of the arbitration provisions set forth in the Nabors Dispute Resolution Program.

## **PRAYER**

Accordingly, Appellants, Penn Virginia Oil & Gas GP, LLC and Penn Virginia Oil & Gas, L.P. pray that this Court grant this Motion to Extend the Deadline to File a Notice of Appeal and permit Penn Virginia to present to this Court its arguments and authorities in support of arbitration. Penn Virginia further prays for such other and further relief, both special and general, at law and in equity, to which it may be justly entitled.

Respectfully submitted,

*/s/ Thomas J. Smith*
Thomas J. Smith
  State Bar No. 00788934
  tsmith@gallowayjohnson.com
Kelly C. Hartmann
  State Bar No. 24055631
  khartmann@gallowayjohnson.com
Alexis B. Hester
  State Bar No. 24072807
  ahester@gallowayjohnson.com
GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777 – facsimile

**ATTORNEYS FOR APPELLANTS, PENN VIRGINIA OIL & GAS GP, LLC AND PENN VIRGINIA OIL & GAS, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with Rule 9.5 of the Texas Rules of Appellate Procedure, I have served the foregoing document upon the following attorneys by electronic service, personal mail, by commercial delivery service or by fax on October 29th, 2015:

John David Hart
**LAW OFFICES OF JOHN DAVID HART**
Wells Fargo Tower
201 Main Street, Suite 1720
Fort Worth, Texas 76102
Phone        817-870-2102
Fax   817-332-5858
*Counsel for Appellee, Alfredo De La Garza and his minor children*

J. Javier Gutierrez
Ana Laura Gutierrez
**THE GUTIERREZ LAW FIRM, INC.**
700 East Third Street
Alice, Texas  78332
Phone 361-664-7377
Fax   361-664-7245
*Counsel for Appellee, John Paul Adame and his minor children, and Intervenor, Ernesto Gonzalez, Jr.*

*/s/ Kelly C. Hartmann*
Kelly C. Hartmann

NO. 01-15-00867-CV

---

# FIRST COURT OF APPEALS

# HOUSTON, TEXAS

---

**PENN VIRGINIA OIL & GAS GP, L.L.C. & PENN VIRGINIA OIL AND GAS L.P., Appellants.**

## V.

**ALFREDO DE LA GARZA, INDIVIDUALLY AND AS NEXT OF FRIEND FOR XXXXXX XX XX XXXXX AND XXXXXXXX XX XX XXXXX, MINORS**

**&**

**JOHN PAUL ADAME, INDIVIDUALLY AND AS NEXT OF FRIEND OF XXXXXXXXX XXXXXX XXXXX, XXXX XXXX XXXXX, XXX, AND XXXX XXXXXXXX XXXXX, MINORS,**

Appellees.

---

On Appeal from the 215TH Judicial District Court,
Harris County, Texas
Cause No. 2014-42519

---

## VERIFICATION OF KELLY C. HARTMANN

---

| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority on this day personally appeared Kelly C. Hartmann, who after being duly sworn upon his oath stated as follows:

1.    "My name is Kelly C. Hartmann. I am over twenty-one (21) years of age. I am of sound mind and in all ways competent to make this affidavit and verification.

2.    I am one of the attorneys of record for Defendants, Penn Virginia Oil & Gas, L.P. and Penn Virginia Oil & Gas GP, LLC. I have personal knowledge of the facts stated in this affidavit and those facts are true and correct.

3.    I have reviewed Appellant's Motion for Extension of Time to File Notice of Appeal and Appellant's Reply to Appellees' Response to the Motion for Extension of Time to File Notice of Appeal. In my personal knowledge, the Motion truly and correctly recites the factual allegations set forth in the pleading."

_____
Kelly C. Hartmann


SUBSCRIBED AND SWORN TO before me a notary public, which witness my hand and seal of this office this ___ day of October, 2015.

_____
Notary Public in and for the State of Texas

ROBYN S. MORGAN
Notary Public, State of Texas
My Commission Expires
July 30, 2018